David H. Bundy (AK Bar 7210043)
DAVID H. BUNDY, P.C.
3201 C Street, Suite 301
Anchorage, AK  99503
Telephone:     (907) 248-8431
Facsimile:     (907) 248-8434
Email:  dhb@Alaska.net

James I. Stang (CA Bar 94435)
Hamid R. Rafatjoo (CA Bar 181564)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Boulevard, 11th Floor
Los Angeles, CA  90067-4100
Telephone:     (310) 277-6910
Facsimile:     (310) 201-0760
Email:  jstang@pszjlaw.com
         hrafatjoo@pszjlaw.com

(Proposed) Attorneys for Official Committee of Unsecured Creditors

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| In re: | ) CHAPTER 11 |
| | ) |
| CATHOLIC BISHOP OF NORTHERN ALASKA, | ) Case No. 08-00110-DMD |
| an Alaska religious corporation sole, | ) |
| | ) Date:  April 9, 2008 |
| | ) Time:  2:00 p.m. |
| Debtor. | ) Place:  Historic Courtroom |
| | ) Anchorage, Alaska |
| | ) |
| | ) |
| | ) |
| | ) |

**OFFICIAL COMMITTEE OF UNSECURED CREDITOR'S RESPONSE
TO DEBTOR'S EMERGENCY MOTION FOR AUTHORITY TO USE RESTRICTED
AND UNRESTRICTED FUNDS FOR CERTAIN CONSTRUCTION PROJECTS**

The Official Committee of Unsecured Creditors (the "Committee") hereby responds to the *Debtor's Emergency Motion For Authority to Use Restricted and Unrestricted Funds for Certain Construction Projects* [Docket No. 93] (the "Construction Motion") as follows:

## Introduction

The Construction Motion seeks to authorize the Catholic Bishop of Northern Alaska ("CBNA" or the "Diocese") to expend approximately $792,000 on several construction projects of various types, costs and stages of construction. CBNA seeks to gain such authority without litigating certain issues that have proved problematic in previous diocesan bankruptcy cases, such as whether the Court has jurisdiction over diocesan assets (*i.e.*, whether the Constitution requires the Court to defer to the Diocese's decisions), whether the real property and funds in its name are property of the estate, whether its parishes have a separate legal existence, whether canon law or civil law governs such determinations, and whether its building activities are protected by the Religious Freedom Restoration Act ("RFRA"). Other courts have rejected the standard diocesan position on all such issues. CBNA seeks to assume away these issues solely for purposes of the Construction Motion, seeking what is in effect an advisory ruling (on shortened time) that even if the funds were property of the estate, their expenditure on parish projects is justified because the funds are "restricted funds" that may only be used for this purpose and their expenditure is within the ordinary course of business. Alternately, it asks the Court to rule that there is a legitimate business purpose that justifies the expenditures, because the projects are part of the Diocese's "core" mission, the costs are "modest", delays would be costly, and failing to expend funds for their intended purpose could discourage future donations.

The broader issues presented by the Diocese's decision to enter chapter 11 are not so easily avoided. The Diocese hopes to short-circuit a thorough analysis by positing that the funds

it proposes to spend are "trust funds" that may only be expended for these purposes in any event. But the "trust" argument is untenable and inadequately supported. The Diocese is not a statutory trust, its recent self-declared trust is ineffective, and it has not and likely cannot show that the funds to be expended are trust funds. Such issues cannot be decided outside an adversary proceeding.

Absent that prop, the Construction Motion stumbles. The Diocese is not a construction company and replacing serviceable facilities is not its business or mission. In chapter 11, its mission is, or must at least include, maximizing the assets of the estate for the benefit of all creditors, including the survivors of childhood sexual abuse by clergy. Missing from its analysis is any recognition of this duty or of the economic reality that continued expenditures of estate funds for non-remunerative purposes jeopardizes creditor recoveries. "Business as usual" for the Diocese has meant excluding survivor compensation from its self-defined mission in the hope that it will be resolved without sacrifice. Chapter 11 does not permit that, particularly in this diocesan bankruptcy, where the Diocese presents itself as impoverished and holds out the prospect that insurance may be wholly unavailable or substantially inadequate to satisfy its liabilities. What provisions is the Diocese making for creditors while it spends money on improving facilities?

From this perspective, spending what must be assumed to be estate funds for the proposed construction activities is not justified. The Committee does not oppose health and safety projects, such as emergency exits at Kotlik, or the use of fire/property damage insurance proceeds to rebuild St. Michael/McGrath. Otherwise, these projects are "wants" and not "needs". The Diocese can and has fulfilled its mission without them, and the Construction Motion lacks sufficient facts to establish that a delay would jeopardize its mission. Building a

new church entails spending an $180,000 of funds that cannot be assumed to be "restricted," and
will require the expenditure of another $280,000 that the Diocese does not yet have. The project
has been in the making since at least 2002 and the Diocese is utilizing alternative facilities.
What is the cost of warehousing the building materials to protect them while an exit strategy
from chapter 11 that satisfies the Diocese's duties to abuse survivors is devised? Such relevant
information is absent from the Construction Motion. Less significant economically, but
illustrative of the issue, why is it necessary at this particular time to spend what the Diocese
concedes are unrestricted funds to purchase toilets when the persons it serves use honey buckets?
Similarly, the Diocese put the Kalskag plumbing project on its website's "wish list" in 2005, and
largely completed the originally conceived project. Is its recent request to add a water-treatment
system a chapter 11 imperative?

### The Court Has "Jurisdiction" to Apply Civil Law to Determine Property Issues

The Diocese expressly reserves the right to argue that the Court lacks "jurisdiction" (*i.e.*,
the Court must defer to decisions of the Diocese concerning its property rights under Canon law)
and its narrative presages its position that its parishes are separate entities for which it holds
assets in trust. If valid, such arguments would effectively render the relief it seeks an advisory
ruling. But these positions are untenable.

A dispute between a church and secular creditors has <u>never</u> been decided by deference to
the decisions of the church. Any application of compulsory deference beyond the realm of
internal church disputes was summarily rejected in *Gen. Council on Fin. and Admin. of the
United Methodist Church v. Superior Court*, 439 U.S. 1355 (1978):

> There are constitutional limitations on the extent to which a civil
> court may inquire into and determine matters of ecclesiastical
> cognizance and polity in adjudicating intrachurch disputes. But

> *this Court never has suggested that those constraints similarly*
> *apply outside the context of such intraorganization disputes.*

*Id.* at 1372-73 (emphasis added). "[N]o First Amendment issue arises when a court resolves a church property dispute by relying on state statutes concerning the holding of religious property, the language in the relevant deeds, and the terms of corporate charters of religious organizations." *Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar*, 179 F.3d 1244, 1249 (9th Cir. 1999) (citing *Maryland and Virginia Eldership*, 396 U.S. 367, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970)).

Each bankruptcy court to address the issue has agreed that compulsory deference to the decisions of the Diocese concerning its property rights under Canon law is inappropriate. "No civil court reported decision has been cited for the proposition that those who have monetary claims against a religious organization regarding those claims are bound by the internal laws of that religious organization." *In re the Catholic Bishop of Spokane*, 329 B.R. 304, 321-22 (Bankr. E.D. Wash. 2005), *rev'd on other grounds*, 2006 WL 1867955 (E.D. Wash. 2006) ("*Spokane*"). *See also In re Roman Catholic Archbishop of Portland in Oregon*, 335 B.R. 842, 853 (Bankr. D. Ore. 2005) ("*Portland*") ("Who owns the property is, quite simply, not a theological or doctrinal matter.").[1]

### The Funds Are Not Held In Trust And Cannot be Deemed Restricted

### A.   Parishes Are Not Separate Legal Entities

The Diocese's argument that it holds assets in trust for the parishes is predicated on the separate legal existence of the parishes. They have no such existence. None are separately

---

[1] Indeed, the bankruptcy courts in Spokane and Portland both suggested that "if the First Amendment deprived the bankruptcy court of jurisdiction to adjudicate the fundamental question of whether, in a voluntary bankruptcy case filed by a religious organization, property held by the debtor is property of the bankruptcy estate, the proper remedy might well be dismissal of the case." *Portland*, 335 B.R. at 853, n.9; *Spokane*, 329 B.R. at 324 n. 5.

incorporated.  In *Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar, supra*, the Ninth

Circuit held that when religious institutions adopt certain legal structures, "it is incumbent upon

the civil court ... to apply to those structures the secular law that governs them." 179 F.3d at

1250.  The parishes have no separate identity that is recognized by civil law.  They are merely

unincorporated divisions of the Diocese, under civil law *and* Canon law.  The Catholic Church is

a hierarchical organization.  *See Scotts African Union Methodist Protestant Church v.*

*Conference of African Union First Colored Methodist Protestant Church,* 98 F.3d 78, 92 (3d Cir.

1996).  Bishops function as intermediary heads of the Church within a diocese.  *Portland,* 335

B.R. at 849 ("The Archbishop of the Archdiocese . . . has legislative, executive and judicial

power within his Archdiocese").

> Parishes are simply subdivisions of a diocese populated by communities of Catholics.

According to Canon 515, §1:

> A parish is a certain community of the Christian faithful stably constituted in a
> particular church, whose pastoral care is entrusted to a pastor (parochus) and its
> proper pastor (pastor) under the authority of the diocesan bishop.[2]

Parishes are entirely subject to the authority of the diocesan bishop, who alone determines its

existence or extinguishment:

> According to Canon Law,[3] only a diocesan bishop can erect, suppress or alter a
> parish:[4]  To erect a parish is to bring it into existence.  To suppress a parish is to
> end its existence.  To alter a parish admits a number of possibilities: e.g., to join
> two or more parishes; to divide a parish into more than one; to change a parish
> from territorial to personal, or vice versa; to modify parish boundaries, etc.

---

[2]  C.I.C., c. 515, §1.

[3]  Canon law is "the *internal law* of a religious organization, namely, the Roman Catholic Church." Adam Cardinal
Maida & Nicholas Cafardi, "Church Property, Church Finances, and Church-Related Corporations: A Canon Law
Handbook," (The Catholic Health Association of the United States, 1984) p. 53, emphasis provided. It is "[t]he
universal law of the Church, the most recent revision of which was promulgated by Pope John Paul II and became
effective November 27, 1983." Maida, p. 304. Adam Cardinal Maida is Archbishop of the Archdiocese of Detroit.
He is a member of the bar of the United States Supreme Court and the Commonwealth of Pennsylvania. Cardinal
Maida received his canon law degree in 1960 from The Pontifical Lateran University of Rome.
[4]Codex Iuris Canonici, c. 515, §2 (hereinafter cited as C.I.C.).

*New Commentary On The Code of Canon Law* (J. Beal, J. Coiden & T. Green, eds. 2000),

Commentary to Canon 515, §2, "Notion of Parish." (footnote omitted, emphasis in original).

The limited autonomy afforded parishes as juridical entities under Canon law to administer

church property does not make them separate legal entities under civil law. "Even assuming that

the parishes operate independently of debtor . . . , independent operation does not make them

separately recognizable legal entities." *Portland*, 335 B.R. at 865. "The public juridic person, as

such, has no civil law equivalent and no civil law identity. Its only existence is juridical in the

canon law. It is a religious concept and not a civil one." *Portland*, 335 B.R. at 866 (quoting

Maida & Cafardi). Thus courts consistently hold routinely held that unincorporated parishes

have no legal existence separate from the diocese where they are located. *Id*. at 867 ("Debtor . . .

gives no reason why it could not, under state law, have separately incorporated the parishes or in

some other way organized itself to protect the canonical ownership rights, if any, of the schools

and parishes."). *See also F.E.L. Publications, Ltd. v. The Catholic Bishop of Chicago*, 754 F.2d

216 (7th Cir. 1985); *EEOC v. St. Francis Xavier Parochial School*, 77 F.Supp.2d 71 (D.D.C.

1999). *Central Catholic Educ. Ass'n v. Archdiocese of Portland*, 323 Or. 238, 916 P.2d 303

(1996); *Eberle v. Benedictine Sisters of Mt. Angel and Archdiocese of Portland in Oregon*, 385

P.2d 765 (Or. 1983); *Employment Div. v. Archdiocese of Portland*, 600 P.2d 926 (Or. App.

1979); *Akoury v. Roman Catholic Archbishop of Boston*, 2004 WL 2341333, 18 Mass.L.Rptr.

271 (Mass. Super. 2004) (state court refused to enjoin the archbishop from selling parish assets

even though held in parish name, on basis that parish was only unincorporated subdivision of the

Archdiocese, and held assets only as an agent for the Archdiocese).

**B.      There is No Express Trust**

The Alaska corporation sole statute under which CBNA was formed does not support a

trust theory.  The corporation sole is a statutory solution to the problem created by the religious

doctrine that ecclesiastical property in a diocese is entitled in the mortal bishop but that such

property is not his private property.  *See Gerstenblith, Associational Structures of Religious*

*Organizations*, 1995 B.Y.U. L. Rev. 439, 455 (1995) ("In the religious context, a corporation

sole is the incorporation of the bishop or other presiding officers of the church for the purposes

of administering and managing the affairs, property and temporalities of the church.  The

principal purpose of a corporation sole is to insure the continuation of ownership of a religious

organization's property.").  Thus, when a bishop dies, the ecclesiastical property does not pass to

his heirs.  *Id.*; *San Luis Obispo v. Ashurst*, 146 Cal.App.3d 380, 383, 194 Cal.Rptr. 5 (1983) (title

retained "for the benefit of the religious group").  The only bankruptcy court to address the issue

squarely agrees: "The statute allows the natural person, the Bishop, to hold property in trust for

the religious organization, the corporation sole.  This is the plain meaning of the statute."

*Spokane*, 329 B.R. at 326 (interpreting Washington corporation sole statute).  Otherwise, a

diocese could injure people and walk away claiming that it is judgment proof because all of its

property is held in trust.  No logic or reported authority supports such an interpretation.

In his Declaration in Support of Chapter 11 Petition and First Day Motions, Bishop

Kettler attested that he has been following the disputes in the Portland and Spokane bankruptcy

cases regarding property ownership and that, "[i]n order to avoid any confusion about the

ownership of parish property in the geographic territory of the Diocese, on April 2, 2007, I

executed amended and restated articles of incorporation for CBNA to make clear the long-

standing pre-existing trust relationship between CBNA and the parishes with respect to property

ownership." *Id.*, ¶ J. Bishop Kettler also attests to another critical piece of pre-bankruptcy

planning, the transfer of the bulk of the cash and investments held by CBNA to the "Catholic

Trust of Northern Alaska," a transfer that was completed in October 2007. *Id.*, ¶ K-L. Bishop

Kettler attests that discussions regarding the establishment and operation of the trust had been

ongoing since "sometime in 2005," *i.e.*, during and after the Portland and Spokane diocesan

bankruptcies that he was monitoring. This pre-bankruptcy planning may explain why the

Diocese's 2006 Religious Biennial Report reflects an **$8 million decrease** in real property assets

from its 2002 Religious Biennial Report.

To the extent the charter amendment and/or the establishment of the Catholic Trust of

Northern Alaska were deemed to place assets in trust, it would be void as to creditors as a self-

settled, revocable trust.[5]  Both would also be, patently, avoidable as a fraudulent transfer of

property both under Code § 548 and, independently, Code § 544 and Alaska Statutes §

34.40.010.

Finally, as Judge Perris ruled, as subdivisions of the Diocese, the parishes cannot be trust

beneficiaries. "There is no authority to which the parties direct me or of which I am aware,

however, that would allow a division of a corporation or a unit or part of a legal entity to be a

beneficiary of a trust. It is one thing to hold that an independent unincorporated association has

the capacity to be the beneficiary of a trust. It is quite another to hold that a corporation can hold

property in trust for a unit or part of itself." *Portland*, 335 B.R. at 867.

**C.      The Funds Cannot be Deemed Restricted on This Record**

The Diocese contends that the funds to be spent on the Scammon Bay and Kalskag

---

[5] *See In re Bogetti*, 2003 WL 21961524, at *1 (9th Cir. 2003) (finding under California law that corpus of self-settled trust is subject to creditors' claims); Restatement (Third) of Trusts § 58(2) (2003) ("A restraint on the voluntary and involuntary alienation of a beneficial interest retained by the settlor of a trust is invalid.").

projects are restricted gifts held by the Diocese in trust because they were raised by solicitations

for such purposes, and so could not in any event be used for such things as survivor

compensation. The law and facts do not establish such a finding, and it cannot be made on

shortened time. The funds must therefore be assumed for purposes of the Construction Motion

to be unrestricted.

The Alaska Supreme Court states that "the Restatement (Second) of Trusts has helped

guide our definition of trusts in the past." *Rausch v. Devine*, 80 P.3d 733, 742 (2003). The

Restatement provides:

> § 351. Intention to Create a Trust
>
> A charitable trust is created only if the settlor properly manifests
> an intention to create a charitable trust.

The Comment states in part:

> c. Precatory words. A charitable trust is not created unless the
> settlor manifests an intention to impose enforceable duties.
> Compare to private trusts § 25. Thus, if the settlor merely
> expresses a suggestion or wish that the transferee should apply the
> property to charitable purposes, leaving it to the transferee to
> follow the suggestion or comply with the wish only if he desires to
> do so, a charitable trust is not created and the transferee holds the
> property for his own benefit. A charitable trust is not created if the
> settlor manifests an intention to impose merely a moral obligation.
> On the other hand, the mere fact that the settlor uses language
> which is precatory rather than mandatory does not necessarily
> indicate an intention not to create a charitable trust.

Restatement (Second) of Trusts § 351. "There do not seem to be any peculiar rules of

construction applicable to precatory charitable trusts. The court will examine carefully all the

clauses of the instrument and the situation of the parties in order to decide whether the phrases

used were intended to be binding upon the donee and to make him trustee for charity, or whether

he was to be an absolute owner with only moral obligations by reason of the suggestions or

requests from the donor as to the use of the property given." Bogert, *The Law Of Trusts And Trustees*, Ch. 17, § 324 (2007).

The factual record is insufficient to find that the funds are held in trust, and the shortened time does not permit investigation. For Scammon Bay, the Diocese submits that funds were raised in response to a 2002 solicitation in the "Alaskan Shepherd" (which is merely another name for the Diocese) and returned with preprinted coupons payable to the Diocese indicating their purpose. The evidence it submits is hearsay, as set forth in the Committee's separate evidentiary objection, and there has been no opportunity for verification. The evidence is also tenuous with respect to the Kalskag project, which began as a plumbing project for which the Diocese solicited $12,000 on the "Parish Needs" page of its website in 2005. Rough plumbing is complete; what is now wanted is a water treatment add-on to the project, raising the completed cost to $19,000. The website indicates the project is 80% funded by contributions, suggesting that the recent request for the water treatment unit is not being paid from already donated, "restricted" funds, but from unrestricted funds. For that reason, as well as the hearsay issue, such expenditures also cannot be assumed to be from restricted gifts.

Nor has there been clear disclosure of the actual source of the funds. The Diocese of Fairbanks Quinquennial Report (1999-2003) discloses at p. 56: "The majority of funds received into the Diocese are donated through the Alaskan Shepherd program. . . . All revenues received through the Alaskan Shepherd program are deposited into a general operating fund." *Id.* at 56. As of the filing, however, that account contained only $100,699.44. Funds obviously have been commingled and moved.[6] Alaska law on tracing provides that where withdrawals are made from

---

[6] The Committee will be exploring issues regarding the characterization, commingling and ultimate location of other property and funds through the Section 341 meeting and informal/formal discovery. Such inquires will include the sale of the St. Mary's Conference Center for $2.8 million at some time after June 2001 and the utilization of the

an account in which trust funds are commingled with a trustee's personal funds (here, the

unrestricted funds), "the withdrawal must be charged first to the amount of the personal cash . . .

, if any, of the trustee in the mingled fund, and, after the exhaustion of the trustee's cash . . . ,

then to the several trusts in proportion to their several interests in the cash, credit, or other

property in the cash aggregate, account, or investment at the time of the withdrawal." AS §

13.36.165.

Were all of these issues to be fully litigated, discovery would be needed.

> Creditors can demand that the debtor produce all written wills,
> trust documents, or other proof of donative intent that clearly
> evidence the amounts to be excluded from the bankruptcy case.
> Under many states' laws, the creditors may be able to argue that the
> presumption should be that all assets of the debtor constitute
> property of the estate unless the debtor can produce documentation
> specifically providing that all or a portion of such assets are
> expressly subject to a trust or are otherwise not owned by the
> debtor.

Paul J. Ricotta and Stephanie K. Hoos, *Reorganizing a Not-For-Profit Debtor*, New York Law

Journal (Vol. 234, July 11, 2005 col. 1) (suggesting that "[t]he daunting and time-consuming task

that such proof entails frequently results in a compromise by all parties.").

Finally, the very concept that a diocese can utilize serial solicitations to earmark funds to

specific projects and insulate them from payment of its involuntary liabilities is ultimately

untenable. *McCarthy v. Bierbower (In re Crossroad Health Ministry, Inc.)*, 319 B.R. 778

(Bankr. D.D.C. 2005), *aff'd*, 334 B.R. 478 (D.D.C. 2005) ("*Crossroad*"). In *Crossroad*, the

bankruptcy court held that a donor restricted gift of property was, as between the donor and

creditors, unrestricted property of the bankruptcy estate. It found that "as a matter of law, funds

---

sales proceeds. *See* YUKON DELTA FISHERIES DEVELOPMENT ASSOCIATION, COMMUNITY
DEVELOPMENT QUOTA, FIRST QUARTER REPORT FOR THE PERIOD APRIL 1 – JUNE 30, 2001,
available at http://www.commerce.state.ak.us/bsc/CDQ/pub/CDQ_YDFDA_Qtr2_Report_01.pdf

subject to a charitable use limitation are considered assets of the estate, and not funds held in trust, to the extent necessary to satisfy claims against the estate." *Id.*, 319 B.R. at 782 (emphasis added). The district court affirmed, ruling that a nonprofit dissolution statute providing for the payment of creditors "reflects an apparent legislative determination that, upon dissolution of a nonprofit corporation, grant funds in the corporation's possession should be used to satisfy corporate liabilities and obligations, notwithstanding any charitable-use limitations. In other words, the ultimate charitable goals of the grantor are subordinate to the corporation's responsibilities to its creditors." *Id.*, 334 B.R. at 481 (emphasis added). Alaska's statute for dissolution of nonprofit corporations is substantially similar to Washington D.C.'s statute as to the distribution priorities. Alaska Statute §10.20.295.

## The Expenditures Are Not Ordinary Course

As CBNA notes, establishing that expenditures are "ordinary course" within the meaning of Code § 363(c) (1) requires satisfying both the "horizontal" (industry-wide) test and the "vertical" (creditor expectations) test. *In re Dant & Russell, Inc.*, 853 F.2d 700, 704 (9th Cir. 1988). "The horizontal dimension test comports with the construction of the term in other code sections, namely that a transaction occurs in the debtor-in-possession's ordinary course of business when there is a showing that the transaction is the sort occurring in the day-to-day operation of debtor's business." *Id.* (emphasis added). "The vertical dimension, or creditor's expectation test, views the disputed transaction "from the vantage point of a hypothetical creditor and inquires whether the transaction subjects a creditor to economic risks of a nature different from those he accepted when he decided to extend credit." *Id.* (citation omitted).

The Diocese is not a construction company. Even if it were, these projects are largely capital improvements. Courts have distinguished between construction of capital improvements

and repair/maintenance of such improvements in assessing whether transactions are in the

ordinary course of business. *See In re Vision Metals, Inc.*, 325 B.R. 138, 144 (Bankr. D. Del.

2005) ("Once a capital improvement is deemed to be complete, costs associated with maintaining

and repairing that improvement are generally ordinary course of business expenses."). Thus in

*Lackawanna Iron & Coal Co. v. Farmers' Loan & Trust Co.*, 176 U.S. 298, 315-16, 20 S.Ct. 36

(1900), the Supreme Court held that extensive reconstruction of a railway, tantamount to new

construction, was an extraordinary expenditure deemed to occur outside the course of the

railroad's business. With respect to the creditors' expectation test, which the Diocese must also

satisfy, application of the test is not an easy when the debtor is a nonprofit entity, reliant on

donations, that seeks to apply all such revenue to the projects it pleases. A hypothetical

*involuntary* creditor is, intrinsically, left in the cold if such a debtor decides that debts of that

nature are not part of its spending program.

### The Expenditures Are Not Justified as Extraordinary Expenditures

The Committee does not oppose expending funds, restricted or unrestricted, for health

and safety needs. Nor does it oppose the insurance-funded McGrath repairs. The remainders of

the projects are not needs, but wants. From the perspective of the Committee, it is impossible to

assess whether the Diocese's exercise of business judgment is sound for purposes of Code §

363(b) without (i) information on the costs of delaying such projects and preserving assets until a

reorganization plan that satisfies the Diocese's duties to creditors is formulated, and (ii) any

articulation of how these expenditures fit into an overall business plan, and how that overall

business plan addresses other cash requirements in chapter 11, such as paying creditors.

**A.      Scammon Bay**

As described in the Construction Motion, the endeavor to construct a new and larger

church at Scammon Bay has been long planned and beset by delays.  Funds were solicited in

2002 through the Diocese's newsletter, the "Alaskan Shepherd," and the Diocese asserts, though

it does not adequately evidence, that $310,000 was raised through gifts specifically restricted to

this purpose.  Bowder Decl., ¶ 16.  $130,611 has been spent.  Construction has not commenced.

That is to happen this month, pursuant to a contract with the local Native Corporation, *id.* at ¶ 17,

that is not listed among the executory contracts in Schedule G of CBNA's schedules.  No

storage/delay costs are estimated to inform the exercise of its business judgment.

This is the single largest expenditure proposed in the Construction Motion.  The funds

must be assumed to be unrestricted.  While the Committee understands the desire to follow

through on the Diocese's capital construction plan, it objects to such substantial, non-essential

expenditures undertaken at a time when it has made no provision to address the large economic

and moral obligations to the abuse survivors.

**B.      Kotlik**

This is described as a Facilities Exiting and Life-Safety Improvement Project, the

remaining $45,554 of which is to be paid from unrestricted funds.  The Committee does not

object to expenditures needed to protect public health and safety.  It is not clear how much of this

project qualifies.

Mr. Bowder attests to the risk that the building materials will be damaged or stolen if

work does not commence immediately.  He does not estimate the cost of storing the materials to

protect against such risk, a figure that is relevant to the exercise of CBNA's business judgment.

Bowder Decl., ¶ 11.

**C.      Kalskag**

$11,000 remains to be spent on a plumbing project that is nearly complete, the only

remaining item being the purchase and installation of a "sophisticated treatment system" to provide potable water. Mr. Bowder attests that it is to be funded from gifts made through the Parish Needs page on the Diocese's website. Bowder Decl., ¶ 15. As noted, however, the website indicates the project is 80% funded, which correlates roughly to the budget for the project as originally conceived and described on the website. The treatment system is a new request not funded from gifts.

Though it is now cast as a health necessity, the project has been in the works since 2005, during which time the Diocese has fulfilled its mission. During the same period, the Diocese has done nothing to include survivor compensation in its mission or business plan.

**D.    St. Michael Parish**

The Committee does not oppose the use of insurance proceeds to repair the fire damage to the church building in McGrath.

**E.    Toilet Facilities**

The Committee recognizes that objection to the purchase of upgraded toilet facilities might at first glance appear puerile, but it is based on a real failure of the Diocese to sympathize and identify with the plight of the remote villagers. Many reasons might be offered to explain the widespread nature of the childhood sexual abuse in this Diocese and amongst those reasons was the Diocese's failure to closely identify with its laity. A viewpoint that allows for basic social and lifestyle distinctions between clergy and laity in matters as fundamental as sanitation facilities is a viewpoint that, at its extreme, allows the group sensing superiority to tolerate sub-human treatment of the minority group.[7] Simply put, "It's good enough for them but it's not

---

[7] Population statistics dramatically demonstrate the extent of the abuse. The San Diego Diocese has a Catholic population of approximately 980,000 and had pending on its petition date approximately 146 claims in litigation (0.014% of the Catholic population). The Fairbanks Diocese has a Catholic population of 14,500 and had pending

good enough for us." The Committee does not subscribe to this belief. If this Diocese is going
to demonstrate that the attitudes that allowed for the widespread sexual abuse of the Native
Alaskan Catholic population have changed fundamentally, it should withdraw this request and
maintain the same lifestyle as its laity until redress is made to them.

Under Section 363, the Court has discretion to place conditions on whatever relief it
authorizes. There is an equitable means to give at least partial protection to creditors from the
Diocese's desire to expend cash on projects that will not return dollar-for-dollar value to the
estate:

- The Court may condition the expenditures on the Debtor's stipulation that if it is
ultimately found that the cash and the real property is property of the estate, any resulting
diminishment to the estate would not reduce the estate's hypothetical liquidation value in
connection with its proposed plan of reorganization. In that way, creditors would be
partially protected against prejudice from the expenditure of such cash for non-
remunerative purposes.

- If the funds are later determined to belong to the Diocese and the real property belongs to
the parishes, the estate could be protected by having a note and deed of trust on the
property at reasonable commercial terms, payable on confirmation of the Diocese's plan.

These measures place the risk of the reasonableness of the construction expenditures
squarely on the Diocese, and protect creditors against the Debtor's expressly stated position that
it is entitled to spend its cash on non-revenue generating items because that is what it does.

**WHEREFORE**, the Committee requests that the Court deny the Construction Motion,
except for the relief sought in relation to S. Michael Parish, provided relief is limited to spending
related insurance proceeds.

---

on its petition date approximately 145 claims in litigation (1% of the Catholic population). From these numbers
alone, it is apparent that sexual abuse in the Fairbanks Diocese was over seven times more prevalent in Alaska than
in San Diego.

Dated:   April 8, 2008                   DAVID H. BUNDY, P.C.


                                         By     /s/ David H. Bundy
                                                David H. Bundy (AK Bar 7210043)
                                                3201 C Street, Suite 301
                                                Anchorage, AK 99503
                                                Telephone: 907/248-8431

                                                (Proposed) Attorneys for Official
                                                Committee of Unsecured Creditors

Dated:   April 8, 2008                   PACHULSKI STANG ZIEHL & JONES LLP


                                         By     /s/ James I. Stang
                                                James I. Stang (CA Bar No. 94435)
                                                Hamid R. Rafatjoo (CA Bar No. 181564)
                                                10100 Santa Monica Boulevard, 11th Floor
                                                Los Angeles, CA  90067-4100
                                                Telephone: 310/277-6910
                                                Facsimile:  310/201-0760

                                                (Proposed) Attorneys for Official
                                                Committee of Unsecured Creditors

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on
the 8th day of April, 2008, the foregoing
document was served by ECF on:

-       U. S. Trustee
-       Michael Mills, Esq.
-       Susan Boswell, Esq.


By___/s/ James I. Stang_____
        James I. Stang

## PROOF OF SERVICE

STATE OF CALIFORNIA        )
                                      )
COUNTY OF LOS ANGELES    )

       I, Joyce A. Higgins, am employed in the city and county of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 10100 Santa Monica Boulevard, 11th Floor, Los Angeles, California 90067.

       On April 8, 2008, I caused to be served the **OFFICIAL COMMITTEE OF UNSECURED CREDITOR'S RESPONSE TO DEBTOR'S EMERGENCY MOTION FOR AUTHORITY TO USE RESTRICTED AND UNRESTRICTED FUNDS FOR CERTAIN CONSTRUCTION PROJECTS**, in this action by placing a true and correct copy of said document(s) in sealed envelopes addressed as follows:

### *Please see attached Service List*

☑     **(BY MAIL)** I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐     **(BY FAX)** I caused to be transmitted the above-described document by facsimile machine to the fax number(s) as shown. The transmission was reported as complete and without error. (Service by Facsimile Transmission to those parties on the attached List with fax numbers indicated.)

☐     **(BY PERSONAL SERVICE)** By causing to be delivered by hand to the offices of the addressee(s).

☐     **(BY NOTICE OF ELECTRONIC FILING)** I caused to be served the above-described document by means of electronic transmission of the Notice of Electronic Filing through the Court's transmission facilities, for parties and/or counsel who are registered ECF Users.

☐     **(BY EMAIL)** I caused to be served the above-described document by email to the parties indicated on the attached service list at the indicated email address .

       I declare that I am employed in the office of a member of the bar of this Court at whose direction was made.

       Executed on April 8, 2008, at Los Angeles, California.

                                       Joyce A. Higgins

18481-001\DOCS_LA:181578.1

## SERVICE LIST

| PARTIES SERVED ELECTRONICALLY | PARTIES SERVED VIA US MAIL |
|---|---|
| Susan G. Boswell - sboswell@quarles.com | **Counsel for the Debtor**<br>**Lori L. Winkelman**<br>Quarles & Brady LLP<br>One Renaissance Square<br>Two North Central Avenue<br>Phoenix, AZ 85004-2391 |
| Lori L. Winkelman -lwinkelm@quarles.com | **Counsel for the Unofficial Tort**<br>**Claimants Committee**<br>**Christopher R. Cooke**<br>Cooke Roosa LLC<br>3700 Jewel Lake Road<br>Anchorage, AK 99502 |
| David H. Bundy - dhb@alaska.net | **Counsel for Certain Plaintiffs in State**<br>**Court Actions**<br>John C. Manly<br>Manly & Stewart<br>4220 Von Karman Avenue, Suite 200<br>Newport Beach, CA 92660 |
| William L. Courshon - bill.l.courshon@usdoj.gov | |
| Kay (UST) Hill - kay.hill@usdoj.gov | |
| Michael R. Mills - bankruptcyak@dorsey.com;<br>droege.michele@dorsey.com | |
| Kasey C. Nye - knye@quarles.com | |
| U.S. Trustee's Office -<br>ustpregion18.ak.ecf@usdoj.gov | |
| Brad E. Ambarian - ambarianb@lanepowell.com<br>biggerstaffn@lanepowell.com<br>jensonj@lanepowell.com<br>gerkenl@lanepowell.com<br>wagnerf@lanepowell.com<br>usbc-ak@lanepowell.com | |
| Stephen P. Baker -<br>ancirs.bk.email@irscounsel.treas.gov | |

18481-001\DOCS_LA:180353.1

| PARTIES SERVED ELECTRONICALLY | PARTIES SERVED VIA US MAIL |
|---|---|
| • Charles R. Ekberg - ekbergc@lanepowell.com, jagows@lanepowell.com;intlekofert@lanepowell.com | |