UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF ALASKA

| In re:<br><br>CATHOLIC BISHOP OF NORTHERN ALASKA, an Alaska religious corporation sole,<br><br>Debtor. | Case No. F08-00110-DMD<br>Chapter 11<br><br>**Filed On 4/18/08** |
|---|---|

### MEMORANDUM ON DEBTOR'S EMERGENCY MOTION FOR AUTHORITY TO USE RESTRICTED AND UNRESTRICTED FUNDS FOR CERTAIN CONSTRUCTION PROJECTS

The debtor, Catholic Bishop of Northern Alaska ("CBNA"), has filed an emergency motion for authority to use restricted and unrestricted funds for certain construction projects. The Committee of Unsecured Creditors ("UCC") opposes the motion, contending that the use of funds is not within CBNA's ordinary course of business and cannot be otherwise justified. For the reasons stated below, I find that the UCC's objections should be overruled and the motion should be granted.

Case Background

CBNA is an Alaska religious corporation sole. Such entities may be formed in Alaska "for acquiring, holding, or disposing of church or religious society property, for the benefit of religion, for works of charity and education, and for public worship."[1] CBNA

---

[1] AS 10.40.010 (Thomson/West 2008).

conducts the business of the Diocese of Fairbanks.[2]  The Diocese, which serves practically the entire northern half of the state of Alaska, is the largest in the United States in geographical terms.  There are 46 parishes and missions located within the area served by the Diocese.  Only eight of the parishes are self supporting.  The remaining 36 parishes are subsidized by donations raised by CBNA.  The subsidized parishes are located in remote, rural communities in Alaska, with limited access.  Because the substantial majority of the parishes are subsidized, the Diocese is one of the poorest in the nation.  It is the only fully missionary Catholic diocese in the United States.

CBNA manages the business and administrative functions of the Diocese and the parishes that operate within its territory.  CBNA runs the payroll system for the Diocese and parishes, paying the employees of these entities, withholding payroll taxes and filing the necessary tax returns.  CBNA also administers a health insurance program for these employees, as well as liability and property insurance for the Diocese and parishes.

One of CBNA's major functions is to raise funds needed to operate the Diocese and subsidize the 36 parishes which are not self-supporting.  CBNA accomplishes this task through its Alaskan Shepherd office.  The Alaskan Shepherd publishes an informational newsletter about the Diocese's activities and actively solicits donations to fund the Diocese's

---

[2] This factual background is summarized from the Declarations of Bishop Kettler, filed Mar. 2, 2008 [Docket No. 31] and Mar. 28, 2008 [Docket No. 96], the Declaration of Rev. Bowder, filed Mar. 28. 2008 [Docket No. 94], the Declaration of Sister Radich, filed Mar. 28. 2008 [Docket No. 95], and the testimony these individuals provided April 9, 2008, at the hearing on the instant motion.

2

operations and goals. The newsletter and written solicitations reach a mailing list of over 45,000 donors worldwide.

The Alaskan Shepherd often sends out "special" or "extra" solicitations with its newsletter. This type of solicitation asks potential donors to provide an additional donation, above what that donor may provide for general operational expenses of the Diocese, so that a specific project undertaken by the Diocese can be completed. Such projects range from the building of a new church to the purchase of audio-visual equipment and materials for religious education. The cost of such projects vary depending on their scale. The expense of soliciting the "special" or "extra" donations comes out of CBNA's general operating account.

CBNA also maintains a "Parish Needs" page on its website which solicits donations for specific projects. Like the "special" or "extra" donations solicited through the Alaskan Shepherd, the Parish Needs page requests contributions to fund specific projects. The Parish Needs page allows a donor to make a donation by credit card for a specific item. Alternatively, the donor can mail a check to CBNA to fund a specific parish need; the Parish Needs page asks the donor to note the item for which the contribution is intended either by writing the name of the item in the memo field of the check or by including a letter indicating the purpose for the donation.

The "special" or "extra" solicitations made by Alaskan Shepherd include a coupon that the donor can fill out and return to CBNA with a check. The coupon indicates that the donor would like a contribution to be earmarked for a specific project. Funds

3

submitted by donors in response to the "special" or "extra" solicitations of the Alaskan Shepherd are considered "restricted funds" by CBNA. Funds donated to support the overall mission of the Diocese are considered "unrestricted funds." According to CBNA, donative intent is determined when checks are submitted to it with a coupon or other writing which asks that the funds be used for a special purpose. If intent is unclear, CBNA will ask for written clarification of intent from the donor. CBNA has, in fact, on occasion returned checks to donors in instances where donative intent couldn't be ascertained. CBNA says it is essential that donors know that their charitable contributions are used for the specific purposes intended. If the funds aren't used as specified, CBNA would lose credibility with its donor base.

Through the Alaskan Shepherd office, CBNA raises roughly $4 million annually. CBNA has a detailed system for tracking the donations it receives. Its system can find out how much an individual has donated in a given year. It can also track how much money has been raised for its general operational expenses or any of its special projects. As to funds raised for a specific project, CBNA can pull up all donors who have contributed to a given project, or find out how much was collected for a project in response to a specific fund solicitation. Information regarding any given donation is input into this tracking system at the time a check is received by CBNA, and includes the donor's name, the date and amount of the check and, when specifically indicated by notation on the check or some other form or writing from the donor, the project for which the donation is made.

As noted above, the special projects undertaken by CBNA vary in size and scale from the purchase of audio-video equipment to the construction of a new church. The projects are selected after CBNA employees, such as Sister Radich, meet with members of a parish to discuss the needs of the community. The needs are conveyed to the Diocese and then prioritized, with safety and sanitation needs coming first. Once a special project is selected, CBNA raises the needed funds for it by soliciting "special" or "extra" donations through the Alaskan Shepherd or through the "Parish Needs" page on CBNA's website. Once adequate funding has been received, CBNA acts in concert with the parish community to see the project through to completion.

Within the past 30 years, CBNA has assisted in the renovation of 16 churches and the replacement of 28 churches in various parishes located within the area served by the Diocese. CBNA has a small engineering office and employs one construction engineer. CBNA has served as a general contractor on several of these construction projects. Like other special projects, the construction projects undertaken by CBNA are generally funded by restricted donations solicited through the Alaskan Shepherd. CBNA has occasionally been able to obtain grants from the Catholic Extension Society to fund a portion of its construction projects as well.

The good works of CBNA have not insulted it from litigation. Since the fall of 2002, several suits alleging sexual abuse from priests and others affiliated with the Diocese have been filed. CBNA filed a chapter 11 petition on March 1, 2008. At the time of filing, more than 140 lawsuits, naming 150 plaintiffs, had been filed against CBNA. The

5

Society of Jesus, Oregon Province, and the Society of Jesus, Alaska, were named as co-defendants in these actions. These defendants have reached a settlement with the claimants, but CBNA's liability has not yet been resolved. CBNA's insurer is disputing coverage of these claims. These factors precipitated CBNA's bankruptcy filing.

The Motion to Use Funds for Certain Construction Projects

In the motion at issue, CBNA seeks permission to use approximately $237,000.00 in restricted and unrestricted funds to continue work on four projects which are in various stages of completion, all located in small, remote parishes in Northwest and Interior Alaska. The court has previously authorized CBNA's use of insurance proceeds to complete fire damage repairs to St. Michael Parish church in McGrath.[3] Only three construction projects, all located in the Yukon-Kuskokwim Delta region of Alaska, remain at issue.

1. Water Improvements in Kalskag

In the smallest of the three projects, CBNA proposes to use restricted funds to install a water treatment system in Immaculate Conception parish at a cost of $10,949.00. Immaculate Conception parish is located in the village of Upper Kalskag. Prior to filing bankruptcy, CBNA spent approximately $8,000.00 for water improvements at this parish.

---

[3] *See* Order Granting, in Part, Emergency Motion for Authority to Use Restricted and Unrestricted Funds for Certain Construction Projects, Pending Ruling on Remainder of Motion, entered April 10, 2008 [Docket No. 120].

6

The parish well is drawing water again, due to the improvements that have been done to date. However, the well water is not potable, nor can it be used for washing or cleaning. The water has an odor and leaves a black film on anything it contacts. The water treatment system would resolve these problems.

### 2. Structural Improvements and Additions in Kotlik

The second project CBNA proposes to fund is for improvements to St. Joseph Parish church in Kotlik. CBNA plans to add a second exit to the church to comply with safety code requirements. It also proposes the addition of a hallway and two small rooms to the church. The hallway would permit church visitors to access the bathroom without going through the small room which is currently used by visiting priests as both an office and bedroom. The two additional rooms would be used to provide visiting priests with a separate bedroom (apart from the existing office), as well as provide additional visitors to the church with a space to use as a combined office and bedroom. According to CBNA, the community of Kotlik is growing and additional visitor accommodations are needed so that counseling, preparations for marriages and other services can be provided.

The total budget for this project is $92,540.00. CBNA spent $46,896.00 to pay for materials and shipping prior to filing. The materials are currently on their way to, or have already arrived in, Kotlik. CBNA has a bid from the local Native Corporation to serve as contractor for completion of the project, and anticipates that the planned improvements could be completed this summer, within budget. It proposes spending $45,554.00 in unrestricted

7

funds to complete the work. If CBNA isn't able to continue with the work during the short Arctic summer, it will need to find a way to secure the materials for the winter. CBNA indicates that if this becomes necessary, there is no way to guarantee that the materials would be safe from theft or weather degradation until next spring.

### 3.  New Church in Scammon Bay

The third, and largest, project which CBNA would like to fund at this time is the building of a new church for Blessed Sacrament Parish in Scammon Bay. The former church in this parish, which was built in 1946, had become very unstable. Plans to build a new church started in 1999, and in 2004 a building committee was formed to bring this project to fruition. Through special solicitations made by the Alaskan Shepherd, CBNA has collected $310,000 in restricted donations for the church. The project was delayed, however, because the lot where the old church was located was too small to accommodate the footprint of the new one. The city of Scammon Bay agreed to deed a lot adjacent to the church lot for the new church. A building located on that lot had to be removed and utility lines had to be moved. The old church was torn down and that lot was prepared for building as well. This was accomplished, and permitting for the new church was obtained, last year.

The overall budget for this project is $593,961.91. As of the date the petition was filed, CBNA had spent $130,611.24 on the project. These funds paid for removal of

buildings from the lots,[4] moving the utility lines, purchase of building materials for the new structure, and shipping of those materials to Scammon Bay. CBNA says $463,000.00 is needed to complete the church. It currently has approximately $180,000.00 in restricted funds to apply towards construction of the church. CBNA hopes to have the foundation, walls and roof of the new church up by the end of this construction season, so that all that remains to be done is interior work that can be completed over the winter. If the construction cannot be started this summer, CBNA would have to secure the building materials which have already been purchased until next summer. It would probably do this by sending a Connex container to Scammon Bay to hold the materials, at an estimated costs of about $10,000.00 (for the container and shipping). Again, CBNA could not guarantee that the materials, even if secured in this fashion, would be protected from theft or weather degradation.

CBNA plans to raise the additional $284,000.00 needed to complete the Scammon Bay church by making a special appeal for $210,000.00 in restricted donations through the Alaskan Shepherd newsletter and by requesting a grant of $75,000.00 from the Catholic Extension Society. CBNA is optimistic about obtaining this grant; it has obtained such grants in the past in similar instances.

Summary of Projects

---

[4] The City of Scammon Bay also assisted with the building removal, providing an in kind donation valued at $25,000.00.

The three projects which CBNA seeks authority to fund can be summarized as follows:

| Project | Location | Amount[5] and Type of Funds | |
|---|---|---|---|
| Water Improvements | Kalskag (Immaculate Conception Parish) | $11,000.00 | Restricted Funds |
| Facilities Improvements | Kotlik (St. Joseph Parish) | $46,000.00 | Unrestricted Funds |
| New Church | Scammon Bay (Blessed Sacrament Parish) | $463,000.00 | Unrestricted Funds: $180,000.00 in hand  $210,000.00 prospective  Grant: $75,000.00 |

At this point in time, CBNA requests authority to use $191,000.00 in restricted funds and $46,000.00 in unrestricted funds, or a total of $237,000.00, to work on these three projects over the 2008 construction season.

<u>The Dispute</u>

CBNA brings its motion under 11 U.S.C. § 363(b), (c) and (d). It says it is entitled to use these funds because the expenditures for the three projects fall within the ordinary course of its charitable religious operations. Alternatively, CBNA contends these transactions, if found to be outside of the normal course of its business, should be permitted because there are significant business justifications for them.

The UCC objects to the use of these funds, except to the extent that they are needed for essential health and safety projects. With regard to these three projects, the UCC

---

[5] Amount is rounded up to nearest thousand.

10

says CBNA hasn't established what portion of the work falls into this category.  The UCC argues that the three projects are "wants," rather than "needs," and are not ordinary course of business transactions.  The UCC also takes issue with CBNA's designation of "restricted funds," contending that such funds are not the subject of a true trust and therefore reachable by claims of creditors in this estate.

Ordinary Course of Business

> 11 U.S.C. § 363(c)(1) provides:
>
>> If the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204, or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.[6]

A debtor in possession may operate the business of the debtor, and holds the same powers as a trustee with respect to the use, sale or lease of property under § 363 in a chapter 11 case.[7] Notice and hearing, and court approval, is required only when a debtor in possession contemplates a transaction which is outside its ordinary course of business.[8]  Accordingly,

---

[6] 11 U.S.C. § 363(c)(1) (Thomson/West 2008).

[7] 11 U.S.C. §§ 1107(a), 1108; *Burlington N. R.R. Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.)*, 853 F.2d 700, 703-04 (9th Cir. 1988), *citing Johnston v. First St. Companies, Inc. (In re Waterfront Companies, Inc.)*, 56 B.R. 31, 34-35 (Bankr. D. Minn. 1985).

[8] 11 U.S.C. § 363(b).

11

CBNA may conduct ordinary business transactions without notice to creditors or court approval. It contends the use of funds to complete the three projects falls within the ordinary course of its business and does not need court approval. I agree.

Two tests have been adopted to determine whether a transaction falls within the ordinary course of business: "(1) vertical dimension or creditor's expectation test and (2) horizontal dimension test."[9] Under the horizontal dimension test, the court looks to "whether the postpetition transaction is of a type that other similar businesses would engage in as ordinary business."[10] The test is satisfied if the transaction is of the type that would occur in the usual operation of the debtor's business.[11] In this regard, the transaction does not need to be one that occurs on a daily or regular basis; it simply needs to be ordinary when considered in the usual conduct of the debtor's business.[12]

I find the horizontal dimension test is satisfied here. The projects CBNA seeks to fund fall within the scope of its regular business activities. Within the past 30 years, CBNA has renovated 16 churches and built 28 new ones. It has also undertaken other projects throughout the parishes it subsidizes to improve health and safety and to provide better places of worship. These works are all part of CBNA's larger mission, which is "not only to minister to the people in the urban and rural areas of [the] Diocese, but also to

---

[9] *Dant & Russell*, 853 F2d. at 704.

[10] *Id.*

[11] *Id.*

[12] *Id.*

12

minister to the world community."[13]  This mission is consistent with what "similar businesses," i.e., other religious institutions, perform in the scope of their operations.  It is also consistent with the provisions of AS 10.40.010, which permit the formation of a corporation sole "for acquiring, holding, or disposing of church or religious society property, for the benefit of religion, for works of charity and education, and for public worship."[14]

The UCC argues that the three projects at issue here aren't within the ordinary course of CBNA's business because CBNA is not a contractor.  CBNA admits as much.  But construction is not CBNA's business; it is in the business of charitable works.  In the scope of this work, it has built and remodeled churches and provided other improvements to the parishes it serves.  Under the horizontal dimension test, the three projects are within the ordinary course of CBNA's business.

The vertical dimension test, also called the creditor's expectation test, views the transaction at issue from a hypothetical creditor's viewpoint and "inquires whether the transaction subjects a creditor to economic risks of a nature different than those he accepted when he decided to extend credit."[15]  Under this test, the court looks at whether the transaction is consistent with "the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its business."[16]  A

---

[13] *Decl.of Bishop Kettler*, filed Mar. 2, 2008 [Docket No. 31], at p. 6.

[14] AS 10.40.010 (Thomson/West 2008).

[15] *Dant & Russell*, 953 F.2d at 705.

[16] *Id.*, citing *Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 394 (S.D.N.Y. 1983).

debtor in possession's prepetition business activities are compared to the postpetition transaction to evaluate whether the transaction falls within that business's day-to-day operations or is extradordinary.[17]

Applying this test to the three projects CBNA wishes to fund, I find they are consistent with how CBNA has operated for at least three decades. CBNA has evaluated the needs of its parishes and has solicited funds to provide for those needs. This activity is consistent with the reasonable expectations of CBNA's creditors. The size and nature of the three projects, even the building of a new church in Scammon Bay, fall within the regular business operations of CBNA, and are not extraordinary. The projects satisfy the vertical dimension test. Because these projects are consistent with a hypothetical creditor's reasonable expectations, "creditors have no right to notice and a hearing, because their objections to such transactions are likely to relate to the bankrupt's Chapter 11 status, not the particular transactions themselves."[18]

The UCC argues, "What about us?" They contend CBNA's motion indicates that it intends to proceed with business as usual, rather than deal with their claims. The underlying premise of the UCC's objection is that somehow the debtor's estate should be frozen in place so the tort claims can be dealt with. This position fails to recognize the unique, fragile nature of the assets in this case. The debtor's most valuable assets are not tangible real and personal property. The biggest asset in this case is the goodwill of the

---

[17] *Dant & Russell*, 953 F.2d at 705.

[18] *Id.*

14

thousands of donors throughout the world who contribute $4 million annually to sustain the debtor. This goodwill must be preserved through both the completion of the projects already initiated and solicited *and* the confirmation of a chapter 11 plan that recognizes and addresses the legitimate claims of sexual abuse victims. Throughout the chapter 11 process, there will be an ebb and flow of donations to CBNA, and ordinary course business expenditures will continue to accrue. The goodwill of CBNA's donors must be preserved. If the donor base is lost, CBNA's business cannot function.

> Since the goal in a Chapter 7 case is to "cash out" the bankrupt entity, rather than continue its operations, Chapter 7 is more concerned with maximizing the size of the estate to be distributed than with the Chapter 11 goal of inducing third parties to contribute towards the continued operations of the business.[19]

CBNA is proposing to continue with projects it commenced, prepetition, consistent with its ordinary course of business. It wishes to apply $237,000.00 in restricted and unrestricted funds to do this. A water treatment system will provide one parish with potable water. Improvements to a church in another parish will bring the structure up to code and provide a very modest living space for visiting priests and other visitors. The parish in Scammon Bay will receive a small church. None of the projects can be considered lavish or unusual for CBNA. Under both the horizontal and vertical dimension tests, this conduct is

---

[19] *Dant & Russell*, 853 F.2d at 706-07.

15

in the ordinary course of CBNA's business, authorized under § 363(c). The UCC's objections are therefore overruled, and CBNA's motion will be granted.

Trust Fund Issue is Reserved

CBNA contends that the restricted donations it receives are trust funds which can only be applied to the projects for which they were donated. The UCC objects to this characterization, arguing that no express trust has been created, nor can the funds be deemed restricted on the existing record. The parties also dispute whether the improvements in the parishes funded by CBNA donations are property of the estate or the parishes. These issues do not need to be resolved within the context of this motion. Because the three transactions contemplated by CBNA are within the ordinary course of its business, it may use the $237,000.00 as proposed, consistent with its business practices.

The UCC seems fearful that an allowance of ordinary course of business expenditures will somehow render an ultimate determination of the trust status of real property and funds held in the name of the debtor. I am not making any such determination. All issues regarding the trust status of any real or personal property held in the name of the debtor are expressly reserved. Nor am I determining, for that matter, whether the parishes have a separate legal existence, whether Canon law or civil law governs such determinations, whether the debtor's building activities are protected by the Religious Freedom Reservation Act, or whether the court has jurisdiction over diocesan assets. All of these issues are also

expressly reserved, and are more appropriately raised and determined in the context of an adversary proceeding rather than under this motion, which was heard on shortened time.[20]

Hearsay Issue is Reserved

The UCC has objected to certain portions of the declarations filed by Bishop Kettler, Reverend Bowder and Sister Radich, and to some of the exhibits appended to those declarations, on two grounds. First, the UCC contended that selected paragraphs in the declarations were inadmissible because the declarants lacked personal knowledge regarding certain matters, such as the condition of the existing construction projects or the costs projected to complete those projects. The UCC also argued that none of the declarants personally had responsibility for CBNA's general contractor functions or expertise in evaluating projected costs to complete the projects. These objections are overruled. The additional testimony provided at the hearing established that both Sister Radich and Reverend Bowder were personally familiar with the status and condition of the three projects. Reverend Bowder also has extensive familiarity with CBNA's general contractor functions. He personally performed these functions for several years and now supervises CBNA's contracting office, which consists of two employees.

The UCC also objected to Reverend Bowder's testimony regarding the restricted character of funds received by CBNA, and objected to CBNA's summary reports,

---

[20] *See* Fed. R. Bankr. P. 7001(2).

admitted at the hearing, because the purported intent of the donors who made the contributions was based on inadmissible hearsay. Although the declarations and exhibits were admitted over this objection, the evidence was not used to determine each individual donor's intent. As noted above, the characterization of the funds being used by CBNA is irrelevant in the context of this motion, which is to use funds in the ordinary course of business. The exhibits and testimony demonstrate how CBNA solicits and applies funds it receives. A conclusive finding as to each donor's intent, however, has not yet been made. To this extent, the UCC's evidentiary objections are reserved so that they can be raised in a more appropriate arena, such as in conjunction with a determination of whether such funds are, in fact, trust funds or property of the estate.

Conclusion

CBNA's motion to use funds in the ordinary course of business will be granted. All issues regarding the trust status of any real or personal property held in the name of the debtor, whether the parishes have a separate legal existence, whether Canon law or civil law governs such determinations, whether the debtor's building activities are protected by the Religious Freedom Restoration Act, or whether the court has jurisdiction over diocesan assets, are expressly reserved. The UCC's evidentiary objections regarding the intent of donors who contribute to CBNA's special and general operations are also reserved for a more appropriate forum. An order will be entered consistent with this memorandum.

DATED: April 18, 2008

                                        BY THE COURT

                                        /s/ Donald MacDonald IV
                                        DONALD MacDONALD IV
                                        United States Bankruptcy Judge

Serve:  S. Boswell, Esq.
         M. Mills, Esq.
         J. Stang, Esq.
         D. Bundy, Esq.
         F. Elsaesser, Esq.
         U. S. Trustee
                4/18/08