# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF ALASKA

In re:

CATHOLIC BISHOP OF NORTHERN
ALASKA, a/k/a Catholic Diocese of
Fairbanks, a/k/a The Diocese of
Fairbanks, a/k/a CBNA,

Debtor.

Case No. F08-00110-DMD
Chapter 11

**Filed On
4/16/09**

## MEMORANDUM ON DEBTOR'S MOTION FOR SANCTIONS
## FOR VIOLATION OF AUTOMATIC STAY

The debtor, Catholic Bishop of Northern Alaska ("CBNA") has moved for an order to show cause why sanctions should not be imposed upon the firm of Manley & Stewart and attorneys John Manley and Amy Pope for violation of the automatic stay.[1] The purported stay violation occurred in connection with the June, 2008, continued deposition of Father Richard Case. Father Case, who has served CBNA in several capacities over the years, was deposed as a witness in *M.N. v. Society of Jesus, Oregon Province*, a civil action which was pending in the Oregon State Circuit Court for Multnoma County. CBNA objects to the scope of the deposition and to the use of the deposition in this bankruptcy proceeding. I find that there was a stay violation. The motion for sanctions will be granted, in part.

---

[1] The first page of CBNA's motion requests sanctions against the firm and the individuals, but the sanctions delineated in CBNA's prayer for relief (as well as the subsequent Order to Show Cause issued by this court at Docket No. 376), are directed against the firm of Manley & Stewart, only, and not Manley and Pope, individually.

Background

CBNA manages the business and administrative functions of the Diocese of Fairbanks and the parishes which operate within its territory. Since the fall of 2002, several suits alleging sexual abuse by priests and others affiliated with the Diocese had been filed against CBNA. CBNA filed a chapter 11 petition on March 1, 2008. At the time of filing, more than 140 lawsuits, naming 150 plaintiffs, had been filed against CBNA (the "Alaska abuse cases"). The Society of Jesus, Oregon Province, and the Society of Jesus, Alaska, had been codefendants in these actions, but in 2007 their liability in the suits was settled for $50 million.[2] CBNA's liability was not resolved, in large part because CBNA's insurers disputed coverage of the abuse claims. These factors precipitated CBNA's bankruptcy filing.

Shortly after the bankruptcy petition was filed, this court authorized Robert Groseclose and his firm, Cook, Schuhmann & Groseclose, to be employed as special litigation counsel to CBNA. The firm had previously represented CBNA in the Alaska abuse cases and was authorized to continue its representation of CBNA in this capacity in the chapter 11 case. Four of the Alaska abuse cases named a Jesuit priest, Father James Poole, as a co-defendant.[3] At the time CBNA's petition was filed, a civil action was also pending in Oregon state court against the Society of Jesus, Oregon Province, involving an incident

---

[2] Decl. of Bishop Kettler in Supp. of Ch. 13 Petition and First Day Mots., filed Mar. 2, 2008 (Docket No. 31), at p. 10, ¶ F.

[3] Debtor's App. for Order Authorizing Employment of Cook, Schuhmann & Groseclose, Inc., as Special Litig. Counsel for the Debtor and Debtor-In-Possession, filed Mar. 1, 2008 (Docket No. 8), Ex. 2 at p. 20.

2

of abuse that had occurred in Oregon in the 1960s.  Poole was the alleged perpetrator in the

Oregon abuse case as well.

In late April, 2008, Groseclose was contacted by Kenneth Roosa, an attorney

representing many of the plaintiffs in the Alaska abuse cases.  Roosa is also one of the

attorneys representing the Unofficial Tort Claimants' Committee in the CBNA bankruptcy.

Roosa informed Groseclose that he wanted to depose Father Richard Case in connection with

the Oregon abuse case.  At the time Roosa made this request, Father Case was the Vicar

General of the Diocese of Fairbanks.  Father Case is a Jesuit priest and a member of the

Oregon Province of the Society of Jesus.  He has served CBNA in several capacities over the

years.  He has been a parish priest, interim administrator for CBNA, chancellor and, most

recently, vicar general for the Diocese of Fairbanks.[4]  He has also served on CBNA's finance

counsel.  Before CBNA filed bankruptcy, Father Case was deposed at least 3 times in

connection with the Alaska abuse cases and testified regarding his knowledge of Father

Poole, the priest implicated in the Oregon abuse case.  In light of this, Groseclose questioned

why another deposition was necessary.  He also indicated his concerns that the deposition

would violate the automatic stay.[5]

Groseclose and John Manley, special insurance counsel for the Unsecured

Creditors' Committee ("UCC"), communicated further about Father Case's deposition in a

---

[4] Ex. 2 to Groseclose Decl., attached as Ex. A to CBNA's Mot. for Order to Show Cause why Sanctions for Violation of Automatic Stay Should not be Issued ("CBNA's OSC Motion"), filed Feb. 11, 2009 (Docket No. 375).

[5] Groseclose Decl. (Ex. A to CBNA's OSC Motion, Docket No. 375), at pp. 1-2.

series of e-mails.  Manley sent the first e-mail on April 22, 2008.  Regarding Groseclose's

concerns that the deposition would violate the stay, he stated:

> Simply put I know of no rule that prevents Father Case from being deposed in an Oregon case where he is a witness.  Your voicemail seemed to imply that such an action would violate the Bankruptcy stay. We disagree. The [M.N.] case is filed in Oregon state court and *your client CBNA (the debtor in Bankruptcy) is not a defendant.*  Father Case is a member of the Oregon Province of the Society of Jesus where he has held numerous leadership positions.  He also has served the Jesuits in leadership positions and was involved in gathering documents in Alaska regarding Father Poole and other Jesuit molestors and sent to the Oregon Jesuits at their request. There are other significant areas where we would like to question him in order to prepare for trial of this matter. .  .  .   While we thank you for your offer to allow us to use his prior testimony, we wish to question Father Case in the [M.N.] case whose abuse was unknown to us at the time of Father Case's prior deposition. . . . [6]

Groseclose replied to Manley the same day.  He noted that the pertinent time

frame for the Oregon abuse case was 1964 to 1965, when Poole was working at Jesuit High

in Portland.  Groseclose also noted that Father Case had already been deposed regarding his

knowledge of Poole, and that there were similar factual issues between the Oregon abuse

case and the Alaska abuse cases in which Poole was involved.  Groseclose reiterated his

concern that the automatic stay would be violated because some of the information which

---

[6] Groseclose Decl. (Ex. A to CBNA's OSC Motion, Docket No. 375), Ex. 1 (emphasis added).

might be discovered in the deposition could be used against CBNA in the Alaska abuse

cases, specifically those cases which also involved Poole.  As a solution, Groseclose again

offered to allow Manley to use Case's prior deposition testimony in the Oregon abuse case.

He anticipated, however, that this might not be acceptable to Manley.  In that event,

Groseclose said:

> I would like to better understand if the nature of
> your further inquiry of Fr. Case is beyond his
> earlier deposition testimony and, if so and to allay
> my concerns as to a conflict with the chp 11 stay,
> beyond what is transportable to and related to the
> Alaska based Poole litigation.  For discussion
> purposes, I believe any questioning of Fr. Case as
> to his knowledge and responsibilities while
> serving as CBNA's agent would be transportable
> to the Alaska-based litigation and is in effect
> discovery against CBNA that is subject to the
> stay.[7]

Manley found Groseclose's proposal to use Father Case's prior deposition testimony

unacceptable.  In his April 22, 2008, response to Groseclose, he pointed out that

the attorney for the victim in the Oregon abuse case shouldn't be precluded from obtaining

discovery simply because Father Case had been deposed in other cases with different facts

and victims, and from a different jurisdiction.  As for Groseclose's concerns regarding a

possible stay violation, Manley said:

> [T]he fact that Fr. Case's testimony might
> somehow impact CBNA is a red herring.  *CBNA
> is not party to the [Oregon abuse] action.  There*

---

[7] Groseclose Decl. (Ex. A to CBNA's OSC Motion, Docket No. 375), Ex. 2.

5

> *is no potential liability to CBNA from the lawsuit.*
> *So what's the problem?* I am beginning to get the
> feeling that the Jesuits are using CBNA to prevent
> Fr. Case's deposition from going forward"[8]

On April 23, 2008, Groseclose sent Manley an e-mail in which he proposed that Father Case be deposed on May 8, that the questioning be limited to the mid-1960's, when the alleged abuse by Poole in Oregon occurred, and that the focus of the questioning be what Father Case or the Jesuits knew at that time. Groseclose also proposed that the deposition not be used "against CBNA in any of the pending Alaska claims," concluding that "[t]his accommodation is not an admission or waiver as to the stay that applies generally to matters impacting CBNA."[9]

Manley promptly replied. Citing *In re Miller*,[10] he said Groseclose's interpretation of the stay was overbroad and that the proposed deposition "in no way violates the stay and in no way threatens to impose liability on CBNA."[11] In a subsequent message, Manley added that he "had no problem agreeing that this deposition cannot be used against CBNA in the pending Alaska claims. I'm not certain it could be in any event."[12] Groseclose responded by noting that "[t]he *In re Miller* case reenforces the notion that the discovery

---

[8] Groseclose Decl. (Ex. A to CBNA's OSC Motion, Docket No. 375), Ex. 3 (emphasis added).

[9] *Id.*, Ex. 4.

[10] *Groner v. Miller (In re Miller)*, 262 B.R. 499 (B.A.P. 9th Cir. 2001).

[11] Groseclose Decl. (Ex. A to CBNA's OSC Motion, Docket No. 375), Ex. 6.

[12] Groseclose Decl. (Ex. A to CBNA's OSC Motion, Docket No. 375), Ex. 5.

6

cannot go beyond the claims against 3rd parties. I accept your acknowledgment that CBNA's liability is not and cannot be impacted."[13]  The deposition was scheduled for May 8, 2008.

Amy Pope was an associate attorney in Manley's firm in 2008. She took Father Case's deposition.  She had been copied with all the e-mail correspondence between Groseclose and Manley regarding the deposition.  Father Case's deposition commenced on May 8, 2008, but was terminated after a few hours because he wasn't feeling well.  The continued deposition was held and concluded on June 20, 2008.  For reasons which the court finds immaterial, Groseclose attended the first, but not the second, deposition.

In the May 8 deposition, Pope questioned Father Case extensively about his educational background and the positions he had held with the Diocese.[14]  He was asked whether the Diocese had ever received grants.  Pope also questioned Father Case about the scope of his authority while he was administrator of the Diocese, including whether he could bind the Diocese to contracts.  Father Case was asked about his knowledge of the Diocese's personnel files, archives and other records.  He was questioned, too, about his chain of command and whether he reported to superiors in both the Catholic Church and the Jesuit Order while he served the Diocese.[15]  According to Pope, this line of questioning was relevant to the Oregon abuse case because several Oregon Province members had occupied

---

[13] *Id.*, Ex. 6.

[14] Pope's Resp. to Order to Show Cause Why Sanctions for Violation of Automatic Stay Should Not be Issued, filed Feb. 27, 2009 (Docket Nos. 395, 397), Ex. A.

[15] *Id.* at pp. 118-131.

7

positions in the Diocesan hierarchy during Poole's presence in Alaska and "there was a significant blurring of the lines of Jesuit and Diocesan authority and control over Jesuit personnel, property and fundraising in the Alaska Mission."[16]

At Father Case's continued deposition, conducted on June 28, 2008, Pope queried him further about his background with the Diocese. She asked additional questions about the parameters of his authority as Diocese administrator and whether he had required confirmation from the Jesuit Order to hold that position. She asked Father Case which of his duties as administrator were Jesuit versus Diocese based. She asked if he had received information about incidents of sexual abuse while he worked for the Diocese, and to whom he reported those incidents. She asked additional questions about Diocese archives, records and personnel files, and specifically asked whether the Diocese kept personnel files on the Jesuit priests serving in Alaska. Father Case was also asked whether he had responsibility, as administrator of the Diocese, to oversee the Jesuits assigned to Alaska.[17]

There were other lines of questioning which CBNA contends had no relevance to the Oregon abuse case and were in essence, a Rule 2004 examination of CBNA. CBNA specifically objects to Pope's questions about the following:

-      how, when, and why the Diocese came to the conclusion that it was necessary to file bankruptcy, and when the Diocese decided to bring in bankruptcy counsel;

---

[16] Pope's Resp. to OSC , filed Feb. 27, 2009 (Docket No. 394), at p. 3.

[17] CBNA's OSC Motion (Docket No. 375), Ex. B.

- how CBNA determined what amount of money it would pay abuse claimants in the bankruptcy proceeding;

- the dollar value of assets in the CBNA bankruptcy estate;

- why certain assets are or are not considered property of the CBNA bankruptcy estate, in whose name various assets or properties are held, whether any assets are held in trust and, if so, for how long and for whom;

- the separation and relationship between CBNA, the Alaskan Shepherd, the Monroe Catholic High School and Immaculate Conception Grade School, and the parishes;

- CBNA's sources of funding, including grants, gifts, bequests, and other fundraising activities;

- CBNA's endowment fund, including its dollar value, permissible uses for the fund, restrictions on the fund, and CBNA's ability to modify the endowment.[18]

The transcript of Father Case's continued deposition is 150 pages long.  Pope asked Father Case one question about Father Poole, the priest involved in the Oregon abuse case, on page 146 of the deposition.[19]  She asked if Father Case knew Father Poole personally in any way.  Father Case responded that he had only met him at a couple of meetings and never really talked to him.

CBNA learned about the scope of the continued deposition in late January, 2009, when the UCC filed its Motion for Authority to Commence, Prosecute and Settle Litigation on Behalf of Bankruptcy Estate Against the Holy See and Diocese-Related Entities

---

[18] CBNA's OSC Motion (Docket No. 375), at pp. 7-8.

[19] *Id.*, Ex. B. at p. 146.

("the UCC's motion").[20]  The UCC's motion cites Father Case's continued deposition to support its statement that "the Diocese account was a Diocesan Bank where parishes could deposit their money to gain a fixed higher interest rate."[21]  Three pages from the continued deposition were appended to the UCC's motion as Exhibit J.  Groseclose requested a full copy of Father Case's deposition after seeing the reference to it in the UCC's motion.  He says he was shocked to learn that Father Case had been asked questions which related directly to Diocese and parish property issues.[22]

CBNA filed its Motion for Order to Show Cause Why Sanctions for Violation of the Automatic Stay Should not be Issued on February 11, 2009.[23]  CBNA says it is baffled as to how Pope's questions to Father Case regarding CBNA's bankruptcy, funding and assets are even tangentially related to "a claim of sex abuse by Father Poole, brought against the Jesuits, and related solely to an Oregon plaintiff and events that occurred in Oregon."[24]  CBNA contends the continued deposition violated both the agreement between counsel as to Father Case's deposition and the automatic stay.  It asks for the imposition of the following sanctions:  1) striking Exhibit J from the UCC's motion and barring the UCC from using or relying on any information contained in the continued deposition, 2) barring any

---

[20] This motion was filed on January 23, 2009 (Docket No. 345).

[21] The UCC's Motion (Docket No. 345), at p. 9.

[22] Groseclose Decl. (Ex. A to CBNA's OSC Motion, Docket No. 375), at p. 4.

[23] Docket No. 375.

[24] CBNA's OSC Motion (Docket No. 375), at p. 9.

10

person, entity or party from using any information from the continued deposition in the

chapter 11 case or any proceedings against CBNA for any reason, and 3) revoking the

appointment of Manley & Stewart as special insurance counsel to the UCC and disallowing

any fees and costs incurred by that firm to date as counsel for the UCC.[25]

The UCC filed a response to CBNA's motion.  Manley, individually, and the

firm of Manley & Stewart filed joinders to the UCC's response.  Amy Pope, who is no longer

with the Manley firm, filed her own response.  After a hearing on the show cause motion,

held March 6, 2009, the matter was taken under advisement by this court.


Discussion

CBNA contends the firm of Manley & Stewart, and John Manley and Amy

Pope, individually (hereinafter collectively referred to as "M&S"), have violated the

automatic stay and committed egregious ethical violations for which severe sanctions should

be imposed.  M&S vehemently denies these charges.  All parties rely on the BAP's *Miller*

decision[26] to support their positions.

In *Miller*, the debtor and her husband were co-defendants in a civil action that

was pending when she filed her bankruptcy petition.  The husband did not file bankruptcy.

Creditor Gronor continued to prosecute her case against the husband post-petition.  The

---

[25] *Id.* at pp. 16-17.  CBNA also asked that it not be required to respond to the UCC's motion until after the court had ruled on the instant motion.  That request has been denied.  *See* Order Granting Mot. to Modify Order to Show Cause In Part, filed Feb. 20, 2009 (Docket No. 387).

[26] *Groner v. Miller (In re Miller)*, 262 B.R. 499 (B.A.P. 9th Cir. 2001).

11

debtor was a key witness to Gronor's claims against the husband.  To compel the debtor's testimony as a third party witness, Groner issued three deposition subpoenas to the debtor in the civil action.  After the debtor refused to comply with the subpoenas, Groner filed a motion to compel and for sanctions in the state court.  In response, the debtor filed a motion in the bankruptcy court for sanctions against Groner for violation of the automatic stay.  The bankruptcy court found that Groner had violated the stay by issuing the deposition subpoenas because the debtor was still party to the state court action.  Groner appealed.[27]

The BAP noted that the automatic stay of 11 U.S.C. § 362(a)(1) applies only to actions against a debtor, that Gronor's claims against the debtor's husband were not stayed, and that Groner was entitled to continue to prosecute her claims against the husband, including pursuit of discovery with respect to those claims.[28]  The BAP narrowed the issue to whether the automatic stay protected the debtor "from complying with discovery requests in a multi-defendant case where the debtor is a defendant, but where those discovery requests are framed as discovery pertaining only to the claims against the other non-debtor defendants."[29]  The BAP concluded that the stay did not protect the debtor under such circumstances.  "Information is information, and we believe the discovery of it as part of the development of a case against non-debtor parties is permissible, even if that information

---

[27] *Id.* at 501-02.

[28] *Id.* at 503-04.

[29] *Miller*, 262 B.R. at 504.

could later be used against the party protected by the automatic stay."[30]  However, even in

such situations, the discovery must pertain to the claims against the non-debtor parties or

*their* property; the debtor, its property and property of the estate remain protected by the

automatic stay.[31]

        That is the issue here.  Section 362(a) did not stay the deposition of Father

Case, provided the discovery was aimed at M.N.'s claim against the Oregon Province and

its assets.  CBNA asks how the questions posed to Father Poole regarding CBNA's

bankruptcy and Diocese and parish assets are even tangentially related to the Oregon abuse

case, which pertains to a claim of sexual abuse by Father Poole in Portland, Oregon, in the

mid-1960's.  In response, Manley states that "a critical liability issue in any case involving

Poole involves the relationship between CBNA and the Oregon Province."[32]  He notes that,

as counsel for the Alaska abuse victims, he had found that CBNA and the Oregon Province

"have blamed each other for the conduct of individual Jesuit priests serving in Alaska."[33]  He

further states:

> The plaintiffs contend that the more knowledge
> and involvement of individual Jesuit officers in
> the administration of the Diocese, the more
> duality of control can be proven, a critical liability

---

[30] *Id.* at 505.

[31] *Chugach Timber Corp. v. N. Stevedoring & Handling Corp. (In re Chugach Forest Prods., Inc.),* 23 F.3d 241, 246 (9th Cir. 1994), *citing Advanced Ribbons and Office Prods., Inc., v. U.S. Interstate Distrib., Inc. (In re Advanced Ribbons and Office Prods., Inc.)* 125 B.R. 259, 263 (B.A.P. 9th Cir. 1991).

[32] Manley Decl., filed Feb. 27, 2009 (Docket No. 393), at p. 3.

[33] *Id.*

13

issue. Further, because Poole has specifically denied abusing more than one victim, questions concerning why and when the Diocese planned for bankruptcy are relevant, or reasonably calculated to lead to the discovery of relevant evidence, given that some such planning may have been prompted by knowledge attributable to the Oregon Province concerning other acts of child sexual abuse perpetrated by Poole. In addition, Fr. Case's participation in the decision to file bankruptcy would impact the Oregon Province's ability to blame the Diocese, as it tends to show a unity of control.[34]

Pope makes similar observations:

It was my understanding that Case's testimony was relevant in the *M.N.* case due to his position as a fully-professed member of the Oregon Province who . . . had been assigned for much of his Jesuit life to the "Alaska Mission," and who had been in the hierarchy of CBNA from 1996 to the present, that one theory of liability was the duality of control by Oregon Province members and the Diocese over personnel and financial matters, and that the actions he took, decisions he made, and knowledge he possessed . . . including the differences between the financial practices, policies and procedures of the Oregon Province and the Diocese regarding property, title, accounting, auditing and fundraising, as well as any relationship between the pending Oregon Province lawsuits and the bankruptcy, were relevant.[35]

---

[34] *Id.* at pp. 3-4.

[35] Pope Decl., filed Feb. 27, 2009 (Docket No. 398), at pp. 5-6.

14

At oral argument on March 6, 2009, Manley reiterated the duality or unity of control defense, stating that a key to liability in the abuse cases has been notice, *e.g.*, whether the Jesuits and the diocese both had notice of the abuse.  He noted that the church cases had been very difficult, in large part because the determination of where one entity ends and the other begins is "very nebulous."  Manley argued that what the Jesuits owned in Alaska was relevant to the M.N. case because, based on his prior experience in the Alaska abuse cases, church defendants always argue that a finding of liability on their part would harm all of their parishoners because needed church services would have to be cut back.  Finally, Manley stated that the post-abuse conduct of church defendants was relevant to both liability and punitive damage issues in the abuse cases, because it tended to show ratification or concealment of the offender's conduct by these defendants.

In response, CBNA asks how duality of control would even be an issue in the Oregon abuse case.[36]  The case involved one abuse victim who was attempting to establish Jesuit liability for an incident that occurred in Portland while Father Poole was under the supervision of the Oregon Province.  CBNA was not a defendant in that case.  It had been assured that it had "no potential liability" in the Oregon abuse action, "[s]o what's the problem?"[37]  Further, as emphasized by CBNA's counsel, Susan Boswell, at oral argument, Poole had left CBNA in the late 1980's.  Father Case became the administrator of the Diocese a decade later.  Even assuming the duality of control issue was relevant to the M.N.

---

[36] CBNA's Reply to Responses and Joinders, filed Mar. 4, 2009 (Docket No. 405), at pp. 3-4.

[37] Groseclose Decl. (Ex. A to CBNA's OSC Motion, Docket No. 375), Ex. 3.

15

case, Boswell argues that discovery as to this issue should have been limited to the time frame when Poole was actually with CBNA.  According to Boswell, Pope's questions regarding CBNA's assets and finances, and its decision to file bankruptcy more than 20 years after Poole had left Alaska could have no conceivable relevance to this issue in the M.N. case.

I have thoroughly reviewed CBNA's motion, the UCC's opposition, Manley's joinder and Pope's reply, as well as Father Case's deposition testimony.  I agree with CBNA. It is difficult to see how the questions regarding CBNA and Alaska parish assets, finances and fundraising could produce information which "appears reasonably calculated to lead to the discovery of admissible evidence"[38] against the Oregon Province, with regard to an incident of abuse that occurred in Oregon more than 30 years ago.  Further, even assuming that unity or duality of control were a defense in the M.N. case, the questioning specific to CBNA's finances and assets were not relevant to establish the *Oregon Province's* liability to M.N.[39]

_____

[38] Fed. R. Civ. P. 26(b)(1), made applicable to contested matters by Fed. R. Bankr. P. 9014(c).  This scope of discovery standard also applies in state court civil actions in both Alaska and Oregon (*See* Ak. R. Civ. P. 26(b)(1); Or. R. Civ. P. 36(B)(1)).

[39] Pope did, in fact, cover several areas with Father Case which would be pertinent to the duality or unity of control defense.  She asked about Father Case's chain of command and whether he reported to superiors in both the Catholic Church and the Jesuit Order; whether he had required confirmation from the Jesuit Order to hold the position of Diocese administrator and which of his duties, as administrator, were Jesuit versus Diocese based; whether the Diocese kept personnel files on the Jesuit priests who served within its territory; and whether Father Case had the responsibility, as administrator of the Diocese, to oversee the Jesuits assigned to Alaska.  These lines of questioning were appropriate to the unity of control defense even though the information elicited could also, conceivably, be detrimental to CBNA in the Alaska abuse cases.

I find M&S's assertion that it needed information regarding CBNA's decision to file bankruptcy to be a red herring in this situation, as well. First of all, Father Case was not asked whether he had communicated with the Jesuit Order with regard to CBNA's decision to file, or whether he had any knowledge of the Jesuits being involved in that decision. From my perspective, questions along those lines would be permissible to show unity or duality of control. But there were none. Further, at the time CBNA's petition was filed, more than 140 civil actions had already been filed against it. Just four of these involved Father Poole. The Oregon Society had already settled out of the Alaska abuse cases. In scheduling Father Case's deposition, CBNA had been repeatedly assured that it would have no liability in the M.N. case. Under such circumstances, it is quite a stretch to find that CBNA's decision to file bankruptcy had any relevance to the Oregon abuse case.

I conclude that M&S's questioning of Father Case regarding the value of CBNA and Alaska parish assets, the working of its finances and its fundraising activities violated the automatic stay. These questions did not go to the Oregon Province or its property, nor has M&S convinced me that they had any bearing whatsoever on the duality or unity of control defense which M&S contends was so critical. These questions were more in the nature of a judgment debtor examination or a Rule 2004 examination of CBNA. They had nothing to do with the liability of the Oregon Province, a non-debtor defendant, in the Oregon abuse suit. The UCC argues that the information elicited in the continued deposition of Father Case "was not even adverse to the estate, but relates at most to identifying potential

17

*assets* of the estate and thus in no way violates the stay.[40]  However, this observation fails to make any connection between CBNA assets and the Oregon abuse case.  It buttresses my finding that this portion of the deposition was, in essence, a judgment debtor examination of CBNA taken in violation of the automatic stay.

The automatic stay is one of the most important protections provided a debtor in bankruptcy.[41]  It halts all collection efforts and "affords the debtor time to propose a reorganization plan, or simply 'to be relieved of the financial pressures that drove him into bankruptcy.'"[42]  Acts taken in violation of the automatic stay are void.[43]  The deposition of Father Case, to the extent that it sought information regarding CBNA's assets, finances and bankruptcy, violated the automatic stay and is thus void.  It may not be used in the CBNA bankruptcy case or any of the Alaska abuse cases, for any purpose.

Under 11 U.S.C. § 362(k)(1), the bankruptcy court must award an individual injured by a willful stay violation "actual damages, including costs and attorneys' fees."[44]  Section 362(k)(1) does not apply to corporate debtors.[45]  However, bankruptcy courts have

---

[40] UCC's Resp. to OSC, filed Feb. 27. 2009 (Docket No. 390) at p. 2 (emphasis in original).

[41] *Chugach*, 23 F.3d at 243.

[42] *Gruntz v. County of Los Angeles (In re Gruntz)*, 202 F.3d 1074, 1081 (9th Cir. 2000) (quoting S.Rep. No. 95-989, at 54-55 (1978)).

[43] *Gruntz,* 202 F.3d at 1082.

[44] 11 U.S.C. § 362(k)(1).

[45] *Johnston Envtl. Corp. v. Knight (In re Goodman)*, 991 F.2d 613, 618-20 (9th Cir. 1993) (discussing 11 U.S.C. § 362(h), which was renumbered as § 362(k)(1) under the provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8, 119 Stat. 23 (April 20, 2005).

18

the discretion to award damages to a corporation injured by a violation of the stay under ordinary civil contempt powers.[46]

> "The standard for finding a party in civil contempt is well settled:  The moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court."  Because the "metes and bounds of the automatic stay are provided by statute and systematically apply to all cases," there can be no doubt that the automatic stay qualifies as a specific and definite court order.[47]

To award civil contempt sanctions for a stay violation, the court must find that the contemnor knew of the automatic stay and that the actions which violated the stay were intentional.[48] Here, there is no question that M&S knew of the automatic stay.  Nor is there any question that M&S intended to propound the questions asked of Father Case at the deposition.  The fact that M&S may not have subjectively intended to violate the stay is immaterial.[49]

The bankruptcy court may award compensatory sanctions under its contempt authority.[50]  However, the bankruptcy court cannot award punitive damages for civil

---

[46] *Id.* at 620.

[47] *Knupfer v. Lindblade (In re Dyer)*, 322 F.3d 1178, 1190-91 (9th Cir. 2003) (citations omitted).

[48] *Id.* at 1191.

[49] *Id.*

[50] *Id.* at 1192.

19

contempt, as it can under § 362(k)(1).[51]  CBNA has asked for imposition of the following sanctions:  1) striking Exhibit J from the UCC's motion and barring the UCC from using or relying on any information contained in the continued deposition, 2) barring any person, entity or party from using any information from the continued deposition in the chapter 11 case or any proceedings against CBNA for any reason, and 3) revoking the appointment of Manley & Stewart as special insurance counsel to the UCC and disallowing any fees and costs incurred by that firm to date as counsel for the UCC.

The UCC has already agreed to strike Exhibit J and redact any reference to Father Case's deposition from its motion.  I feel the second sanction should also be imposed.  Father Case's deposition may not be used for any purpose, by any person, entity or party, in this chapter 11 case, any related adversary proceeding which has been or may be filed, or in any of the Alaska abuse cases which have been or may be filed.  Because the deposition is void, this prohibition will survive the termination of CBNA's bankruptcy case.

The third sanction requested by CBNA is more problematic.  From my perspective, to revoke Manley & Stewart's appointment as special insurance counsel to the UCC and disallow all of its fees and costs incurred to date would be extremely harsh.  While a stay violation did occur, the imposition of such a sanction would be punitive to Manley & Stewart rather than compensatory to CBNA.  However, because of the fundamental importance of the automatic stay, I do feel that a lesser sanction, disallowing a portion of

---

[51] *Dyer*, 322 F.3d at 1192-3 (comparing civil contempt authority under 11 U.S.C. § 105(a) with the mandatory damages provision of 11 U.S.C. § 362(h), which subsection was renumbered as § 362(k)(1) pursuant to BAPCPA) .

Manley & Stewart's fees, is appropriate.  A partial disallowance of fees would serve as a compensatory, rather than punitive, sanction.  CBNA has incurred fees and costs in bringing this motion.  Further, CBNA is responsible for the payment of all administrative expenses incurred in this case, including the fees of Manley & Stewart as special litigation counsel to the UCC.  CBNA should not have to pay for the cost of enforcing the stay.  CBNA has not requested monetary sanctions, but a disallowance of a portion of Manley & Stewart's fees would essentially serve the same purpose, as it will reduce CBNA's overall administrative expenses.  Accordingly, Manley & Stewart's fees incurred to date will be disallowed in the sum of $7,500.00.  This sanction will not preclude the court from reviewing and, if appropriate, disallowing any of Manley & Stewart's fees or costs on other grounds in conjunction with any future fee applications which it submits in this case.  Further, this sanction is directed solely to the firm.  As noted earlier, CBNA included Manley and Pope in its OSC motion, but did not ask for the imposition of sanctions against them individually. Because no sanctions against the two individuals was requested, none can be awarded.[52]

An order will be entered consistent with this memorandum.

---

[52] This is not to say that the court considers the imposition of additional sanctions against these two individuals appropriate.  Rather, the court will not reach the issue of whether these two individuals should be sanctioned because CBNA's motion didn't specifically request such sanctions.  A court can't impose sanctions against a party without first giving notice of the penalties it is considering.  *See Christie v. Point Possession, Inc.*, 7 A.B.R. 213, 219-20 (D. Alaska 2002) (discussing the imposition of civil sanctions against an attorney under Fed. R. Bankr. P. 9011).

DATED: April 16, 2009

BY THE COURT

 /s/ Donald MacDonald IV
DONALD MacDONALD IV
United States Bankruptcy Judge

Serve:  S. Boswell, Esq.
        M. Mills, Esq.
        R. Groseclose, Esq.
        D. Bundy, Esq.
        J. Stang, Esq.
        J. Manley, Esq.
        J. Altieri, Esq.
        M. Pompeo, Esq.
        C. Cooke, Esq.
        A. Pope, Esq.
        K. Hill, Esq.
        U. S. Trustee

        04/16/09