James I. Stang (CA Bar No. 94435)
Robert B.Orgel (CA Bar No. 101875)
Hamid R. Rafatjoo (CA Bar No. 181564)
Pamela E. Singer (CA Bar No. 224758)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, California  90067-4100
Telephone: 310/277-6910
Facsimile:  310/201-0760

E-mail:   jstang@pszjlaw.com
          rorgel@pszjlaw.com
          hrafatjoo@pszjlaw.com
          psinger@pszjlaw.com

Attorneys for Official Committee of Unsecured Creditors

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF ALASKA

| | |
|---|---|
| In re:<br><br>CATHOLIC BISHOP OF NORTHERN ALASKA,<br>an Alaskan religious corporation sole,<br><br>      Debtor | Case No.: 08-00110-DMD<br><br>Chapter 11<br><br><br>Date:  June 18, 2009<br>Time:  9:00 a.m. |

**OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO FIRST
AMENDED AND RESTATED DISCLOSURE STATEMENT IN SUPPORT OF
DEBTOR'S FIRST AMENDED AND RESTATED PLAN OF REORGANIZATION FOR
<u>CATHOLIC BISHOP OF NORTHERN ALASKA DATED MAY 15, 2009</u>**

## TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ................................................................................. 1
II. OBJECTIONS ..................................................................................................... 6
    A.    The Plan Should Not Be Approved Because the Plan is Patently
        Unconfirmable ......................................................................................... 6
        1.    The Plan Violates the Best Interests of Creditors Test ............................. 6
                a.    The Best Interests of Creditors Test Is Applicable ....................... 7
                b.    The Plan Fails the Best Interests of Creditors Test...................... 8
        2.    The Plan Fails the Fair and Equitable Test ............................................ 10
                a.    The Plan Fails to Provide Creditor Payments Equivalent to
                    the Value of the Debtor's Assets ................................................ 11
                b.    The Plan Fails to Fairly and Equitably Apply the
                    Endowments................................................................................ 14
                c.    The Plan Fails To Fairly Exercise the Diocese's Taxing
                    Power Over Juridic Persons ........................................................ 15
                d.    The Plan Fails To Contribute Parish Property ............................ 16
                 e.    The Plan Fails To Apply the Assets of the Monroe
                      Foundation, Inc. ........................................................................ 21
                 f.    The Alaskan Shepherd Sharing Agreement Is Insufficient.......... 22
                g.    Assistance From Other Dioceses and Roman Congregations
                      Is Insufficient ............................................................................ 23
                 h.    The Plan Does Not Contribute Any Portion of the
                      Approximately \$700,000 Held in So Called 'Diocesan
                      Priest Retirement Trust' Accounts .............................................. 24
                 i.    There Are Numerous Other Examples of the Plan's Failure
                      to Propose a Fair and Equitable Allocation ................................ 25
        3.    The Plan Unfairly Discriminates ......................................................... 26
        4.    The Plan Is Not Proposed in Good Faith ............................................. 28
        5.    The Plan Grants Third Party Discharges to Co-Defendants in
            Violation of Bankruptcy Code Section 524(e)....................................... 29
    B.    The Disclosure Statement Is Inadequate............................................... 30
III. CONCLUSION ................................................................................................ 31

# <u>TABLE OF AUTHORITIES</u>

## CASES

*Akoury v. Roman Catholic Archbishop of Boston*,
   2004 WL 2341333, 18 Mass. L. Rptr. 271 (Mass. Super. 2004) ........................................ 20

*Albers v. Church of the Nazarene*,
   698 F.2d 852, 857 (7th Cir. 1983) .................................................................................. 18

*American Hardwoods, Inc. v. Deutsche Credit Corp. (In re American Hardwoods, Inc.)*,
   885 F.2d 621, 626 (9th Cir. 1989) .................................................................................. 29

*Bank of America Nat. Trust and Sav. Ass'n v. 203 North LaSalle Street Partnership*,
   526 U.S. 434 (1999) ........................................................................................................ 10

*Bierbower v. McCarthy*
   334 B.R. 478 (D.C. 2005) ............................................................................................... 12

*Burns & Russell Co. of Baltimore v. Oldcastle, Inc.*,
   166 F. Supp. 2d 432, 440 (D. Md. 2001) ........................................................................ 18

*Computer Task Group, Inc. v. Brotby (In re Brotby)*,
   303 B.R. 177, 197-98 (BAP 9th Cir. 2003) ..................................................................... 28

*F.E.L. Publications, Ltd. v. Catholic Bishop of Chicago*,
   754 F.2d 216 (7th Cir. 1985) .......................................................................................... 20

*FSLIC v. D& F Const., Inc. (D& F Constr.)*,
   865 F.2d 673 (5th Cir. 1989) .......................................................................................... 11

*In re Beyond.com Corp.*,
   289 B.R. 138 (N.D. Cal. 2003) ......................................................................................... 6

In re *Capital West Investors*,
   186 B.R. 497, 499 (N.D. Cal. 1995) ............................................................................... 28

*In re Corey*,
   892 F.2d 829, 835 (9th Cir. 1989), *cert. denied*,
   498 U.S. 815 (1990) ........................................................................................................ 28

*In re Dow Corning Corp.*,
   237 B.R. 380 (Bankr. E.D. Mich. 1999) ............................................................................ 9

*In re Felicity Assocs.*,
   197 B.R. 12, 14 (Bankr. D.R.I. 1996) ............................................................................... 6

*In re General Teamsters, Warehousemen and Helpers Union Local 890*,
   225 B.R. 719, 737 (N.D. Cal. 1998) ................................................................................. 7

*In re Harman*,
   141 B.R. 878, 889 (Bankr. E.D. Pa. 1992) ..................................................................... 29

*In re Kemp*,
   134 B.R. 413, 415 (Bankr. E.D. Cal. 1991) .................................................................... 29

*In re Last Will and Testament of Tamplin*,
   48 P.3d 471, 473 (Alaska 2002) ..................................................................................... 18

*In re Lowenschuss*,

170 F.3d 923, 932 -933 (9th Circuit 1999) .................................................................. 11, 30

*In re M.J.H. Leasing,*
328 B.R. 363 (Bankr. D. Mass. 2005) ................................................................ 6

*In re MCorp Fin., Inc.,*
137 B.R. 219 (Bankr. S.D. Tex.) ......................................................................... 8

*In re Montgomery Court Apartments,*
141 BR 324 (Bankr. S.D. Ohio 1992) ................................................................. 29

*In re Roman Catholic Archbishop of Portland In Or.,*
335 B.R. 842, 849 (Bankr. D. Or. 2005)........................................ 17, 18, 19, 20

*In re Sugar Indust. Antitrust Litig.,*
579 F.2d 13, 18 (3d Cir. 1978)............................................................................ 17

*In re Walker,*
165 B.R. 994, 1002 (E.D. Va. 1994) ................................................................... 29

*Liberty National Enters. v. Ambanc La Mesa Ltd. Partnership (In re Ambanc La
Mesa Ltd. Partnership),*
115 F.3d 650, 656 ((9th Cir . 1997), *cert. denied,*
522 U.S. 1110 (1998) ........................................................................................... 27

*Navajo Nation v. U.S. Forest Service,*
535 F.3d 1058 (9th Cir. 2008) ............................................................................ 9

*Riddell v. Edwards,*
76 P.3d 847, 854 (Alaska 2003)........................................................................... 12

*Safeco Insur. Co. of America v. Franklin,*
185 F. Supp. 499, 501 (N.D. Cal. 1960) ............................................................. 18

*Scotts African Union Methodist Protestant Church v. Conference of African
Union First Colored Methodist Protestant Church,*
98 F.3d 78, 92 (3d Cir. 1996)............................................................................... 17

*Steelcase Inc. v. Johnston (In re Johnston),* 31 F.3d 323 (9th Cir. 1994) ................................. 27

*Underhill v. Royal,*
769 F.2d 1426, 1432 (9th Cir. 1985) ................................................................... 29

*United States v. ITT Blackburn Co.,*
824 F.2d 628, 631 (8th Cir. 1987) ...................................................................... 17

*Western Beef, Inc. v. Compton Inv. Co.,*
611 F.2d 587, 590 (5th Cir. 1980) ...................................................................... 17

## STATUTES

11 U.S.C. § 1129(a) (3) ................................................................................................. 28

11 U.S.C. § 1129(a)(7)(A) ............................................................................................. 7

11 U.S.C. § 1129(b)(1) ................................................................................................... 26

**COMMITTEE OBJECTION TO FIRST**              *CATHOLIC BISHOP OF NORTHERN ALASKA,*
**AMENDED DISCLOSURE STATEMENT AND PLAN**              CASE NO. 08-00110 - DMD

## OTHER AUTHORITIES

7 Collier on Bankruptcy
§ 1129.03[7][b] (15th ed.)........................................................................................ 7

7 Collier on Bankruptcy,
§ 1129.04[b][i] at 1129-80 ..................................................................................... 27

*Church Property, Church Finances, and Church-Related Corporations: A Canon
Law Handbook* 131 (1984) ...................................................................................... 19

Robert W. Murphy, *Corporate Divisions v. Subsidiaries*,
34 Harvard Business Review 83, 84 (1956) (emphasis added) ............................. 19

*The Theological Case for Progressive Taxation as Applied to Diocesan Taxes or
Assessments Under Canon Law in the United States* at p. 336............................. 23

The Official Committee of Unsecured Creditors (the "Committee") submits this objection (the "Objection") to the adequacy of the amended disclosure statement (the "Disclosure Statement") of the Catholic Bishop of Northern Alaska ("CBNA", the "Debtor", or the "Diocese") relating to the First Amended and Restated Plan of Reorganization for Catholic Bishop of Northern Alaska dated May 15, 2009 (the "Plan").[1]  In support of its Objection, the Committee respectfully represents as follows:

**I.**
**PRELIMINARY STATEMENT**

The Debtor has proposed a plan that cannot possibly be confirmed as a matter of law, accompanied by a Disclosure Statement that lacks the most basic information necessary for creditors to assess the Plan in an informed fashion.  For ease of reference, the Committee has endeavored to summarize its objections in the chart attached hereto as **Exhibit A**.

With respect to its inability to be confirmed, the Plan fails in at least five respects.

First, the Debtor's plan does not meet the best interests of creditors test.  In fact, the Debtor does not even try to meet that test.  Instead, it concludes that the test does not apply and states without any financial analysis that the creditors will do better under the Plan than they would if the case were dismissed.  Apart from the fact that the conclusion is wrong – the best interests test does indeed apply – the Debtor does not establish that creditors would be worse off if the case were dismissed.  As such, even on the Debtor's terms, the Plan fails the best interests test.

Second, the Debtor's plan fails the fair and equitable test.  The Debtor essentially states that the absolute priority rule does not apply to a non-profit religious organization and therefore,

---

[1] Unless otherwise defined herein, capitalized terms have the meanings ascribed to them in the Plan.

18481-003\DOCS_LA:203732.1

there is no fair and equitable test to apply.  Again, the Debtor is wrong.  Section 1129(b) contains

no exceptions.  There is no authority for the proposition that the Debtor's Plan does not have to

be 'fair and equitable' regardless of whether the absolute priority rule applies.  The Debtor needs

to pay more to its creditors, particularly to the survivors of child sex abuse.  The Debtor's Plan

does not reflect a fair, shared sacrifice by all creditors and the Diocese.  The Debtor could take a

variety of steps to obtain a wide array of additional assets for creditors under the Plan -- from the

use of its right to tax Parishes and "private juridic persons," to its right to require financial

assistance from other dioceses, to its ability to increase distributions and recover principal from

its various endowments, to its ability to reallocate the use of funds under its contemplated

budget.  Yet, under the Plan, the Debtor makes no substantial effort to make available those

assets.

Third, the Debtor's plan unfairly discriminates against sexual abuse survivors.  The Plan

proposes to pay 100% to nearly every creditor, *except* the sexual abuse survivors.  Although the

Debtor makes no effort to value the sexual abuse claims, which failure itself is a basis for

rejection of the Disclosure Statement, no one could seriously dispute that, under a best case

scenario, abuse survivors would receive under the Plan only a small fraction of the amount owed

on their claims.

Fourth, the Debtor filed the Plan in bad faith.  Under the Plan, the only constituency that

clearly continues to suffer is the class of survivors of child sex abuse:  all other creditors (except

Pilgrim Springs claims) are paid in full and the Debtor maintains all existing programs and

expands to offer new programs.  *See* Disclosure Statement at Exhibit 7, n. 7.  The Debtor

withholds or makes minimal efforts to make available significant assets, proposes to pay sexual

abuse survivors only a token or slightly larger recovery and yet increases annual capital

**COMMITTEE OBJECTION TO FIRST**                *CATHOLIC BISHOP OF NORTHERN ALASKA,*
**AMENDED DISCLOSURE STATEMENT AND PLAN**           CASE NO. 08-00110 - DMD

expenditures by significant margins and expands its programs.  While the comforting tones and platitudes in the Plan and Disclosure Statement are welcome, they need to be accompanied with substance.  Without more and a greater share of assets devoted to creditors, the Plan amounts to nothing more than a litigation tactic to avoid paying fair recompense to the survivors of child sex abuse.

Fifth, the Debtor's Plan grants third party discharges in violation of section 524(e) of the Bankruptcy Code.  Under clear Ninth Circuit law, non-debtors who are co-liable with the Debtor for child sex abuse claims cannot be discharged.

In addition to the Plan being patently unconfirmable, the Disclosure Statement provides inadequate or incorrect information:

(a)  The Debtor provides no estimates of potential financial recoveries to survivors of child sexual abuse.[2]  Although the amount of these claims and certain funding sources may be uncertain, creditors are entitled to sufficient information to enable them to make an informed decision with respect to the Plan.  Here, that would require, among other things, a full and complete analysis and discussion that at least describes a few of the possible outcomes and explains the factors affecting the outcome.[3]  Additionally, the key to determining whether the Debtor is proposing a fair, shared sacrifice between creditors and the Debtor would be a comparative analysis of the possible and proposed expenditures by the Debtor with or without the distributions it is proposing to make to creditors.  No such clarity

---

[2] The first question any abuse survivor would ask before voting on the Plan is "how much is the Debtor proposing to pay on my claim?"   The proposed disclosure statement does not offer even a clue to the answer to this most basic question.  Without answering that question, informed voting by abuse survivors is not possible.
[3] Pending the resolution of the Debtor's obstructionist objection to the Committee's employment of a financial adviser, the Committee temporarily has been thwarted in its efforts to fully analyze the Debtor's disclosure statement, including computing the percentage recovery to tort claimants through its financial advisor even using the

COMMITTEE OBJECTION TO FIRST               *CATHOLIC BISHOP OF NORTHERN ALASKA,*
AMENDED DISCLOSURE STATEMENT AND PLAN           CASE NO. 08-00110 - DMD

has been afforded through the proffered Disclosure Statement.  Although the Disclosure

Statement offers broad brush outlines of past and projected data, it does not contrast them so

as to allow creditors to evaluate the fairness of the plan proposal.  Limited information on the

proposed loans is afforded, but most basic information (*e.g.,* maturity dates and payment

terms) are not set forth.

     (b) The Disclosure Statement also fails to attach a copy of the critically important

proposed Settlement Trust Agreement and fails to fully explain the terms of the Alaska

Shepherd Sharing Agreement.

     (c) The Disclosure Statement also fails to explain why the Debtor is refusing to

increase and impose additional taxes, sell or refinance, or require the sale or refinance of,

other property it owns or controls or seek more help from other dioceses.  The Disclosure

Statement does not analyze how much it could generate for the benefit of creditors by these

measures.  It also fails to explain why the Debtor apparently intends to maintain all current

programs, add programs and increase its annual capital expenditures while failing to

compensate adequately the victims of childhood sex abuse.

For these and the other reasons set forth below, the Disclosure Statement fails to meet the

disclosure requirements of section 1125 of the Bankruptcy Code.

     Finally, the consideration of the Disclosure Statement is premature because the Debtor

has hindered the Committee's ability to analyze the financial assertions in the Disclosure

Statement:

---

Committee's own estimates as to unstated data.  A sexual abuse survivor reading the Disclosure Statement would
have no way to begin to estimate the recovery being proposed.

**COMMITTEE OBJECTION TO FIRST**       *CATHOLIC BISHOP OF NORTHERN ALASKA,*
**AMENDED DISCLOSURE STATEMENT AND PLAN**       CASE NO. 08-00110 - DMD

(I)     First, the Debtor's objection to the employment of a financial adviser effectively undermined the Committee's ability to fully evaluate the adequacy of the disclosure statement. The Debtor objected to the Committee's application to retain its financial advisor without first discussing its concerns with the Committee.  As a result, the Debtor has prevented the Committee's proposed financial advisor from reviewing documents key to the Committee's objection to the Disclosure Statement.  In particular, the Committee's financial advisor is unable to review the historical analyses and cash flow analyses attached to the Disclosure Statement.  If the Debtor had informed the Committee in advance of its intent to object to the proposed financial advisor's employment, the Committee could have requested an expedited schedule to resolve this issue and a financial advisor could have been employed in time to assist in analyzing the Disclosure Statement and Plan.

(II)    Second, the Debtor has not produced the documents requested by the Committee in the *Committee's Request for Production of Documents to Debtor re Amended Disclosure Statement* ("Document Request"), despite the fact that the Committee submitted the Document Request only three days after the Debtor gave the Committee a redline of the amended Disclosure Statement.  While the Debtor did produce some documents on less than thirty (30) days notice per an agreement with the Committee, the bulk of the documents needed for an analysis have not been produced.  Moreover, in light of the Debtor's objection to the employment of a financial adviser, the production to date essentially is analytically useless.

Thus, the Debtor's blocking of the Committee discovery compromises the Committee's ability to set forth all bases of this objection and the Committee, therefore, seeks to reserve the right to supplement this Objection and/or have the hearing hereon continued.

## II.

## OBJECTIONS

### A.   The Plan Should Not Be Approved Because the Plan is Patently Unconfirmable[4]

When a plan is not confirmable on its face, then courts will not approve the disclosure statement.  *In re Beyond.com Corp.*, 289 B.R. 138 (N.D. Cal. 2003) (disapproval of a disclosure statement is appropriate when the "underlying plan is patently unconfirmable") (citations omitted); *In re M.J.H. Leasing,* 328 B.R. 363 (Bankr. D. Mass. 2005) (observing that it is appropriate to consider an objection related to the capability of confirmation at a disclosure statement hearing) (citations omitted); *In re Felicity Assocs.*, 197 B.R. 12, 14 (Bankr. D.R.I. 1996) ("it has become standard Chapter 11 practice that 'when an objection raises substantive plan issues that are normally addressed at confirmation, it is proper to consider and rule upon such issues prior to confirmation, where the proposed plan is arguably unconfirmable on its face'") (citations omitted).

As detailed below, the Plan is patently unconfirmable and, therefore, the Disclosure Statement should not be approved.

### 1.   The Plan Violates the Best Interests of Creditors Test

Section 1129(a)(7) of the Bankruptcy Code sets forth the best interests of creditors test, which requires that "[w]ith respect to each impaired class of claims or interests" "each holder of a claim or interest of such class" has either "accepted the plan" or:

> will receive or retain under the plan on account of such claim or
> interest property of a value, as of the effective date of the plan, that
> is not less than the amount that such holder would so receive or

---

[4] The Committee reserves the right to present additional confirmation objections if the Debtor is able to obtain approval of the Disclosure Statement.

retain if the debtor were liquidated under chapter 7 of this title on such date.

11 U.S.C. § 1129(a)(7)(A). The best interests test thus requires the debtor to perform a hypothetical liquidation analysis to establish that as to dissenting members of an impaired class, the Plan's proposal gives the dissenting creditors at least what the creditor would receive under chapter 7. *See also* Local Bankruptcy Rule of the Bankruptcy Court for the District of Alaska 3016-1(c)(10)(O) (unless otherwise ordered by the Court, a disclosure statement must include "a liquidation analysis with a specific description of all assumptions underlying the analysis").

### a.      The Best Interests of Creditors Test Is Applicable

The Debtor ignores the statutory requirements and instead concludes that (a) because this case could not be converted to chapter 7, thus (b) its Plan does not have to comply with the best interests tests or the local rules. Disclosure Statement at 89. The Debtor's ineligibility to be an involuntary debtor or reluctance to file a chapter 7 case is beside the point. The best interests test is based on a hypothetical liquidation. 7 Collier on Bankruptcy § 1129.03[7][b] (15th ed.) ("This means that, absent consent, a creditor or interest holder must receive property that has a present value equal to that participant's hypothetical chapter 7 distribution…."). Chapter 11 makes no exceptions for corporations sole. *See e.g. In re General Teamsters, Warehousemen and Helpers Union Local 890*, 225 B.R. 719, 737 (N.D. Cal. 1998) ("The Chapter 7 test must be applied to Chapter 11 plan confirmation, even though it appears that a labor union would be very unlikely to file Chapter 7. . . . Despite this practical reality, Chapter 11 makes no exceptions for labor unions in the plan confirmation standards that apply to other forms of bankruptcy debtors."). The Debtor does conclude, without analysis, that if the case were dismissed, then creditors would be worse off than under the Plan. Not only is this bare conclusion untrue, the Debtor's failure to

offer any supporting analysis or evidence makes it bare conclusion meaningless.  *See In re*

*MCorp Fin., Inc.*, 137 B.R. 219 (Bankr. S.D. Tex.) (The hypothetical liquidation analysis must

be based on evidence and not assumptions in order to meet the best interests of creditors test).

### b.      The Plan Fails the Best Interests of Creditors Test

Although the Debtor fatally fails to even address "best interests," the Plan appears to fail

the best interests test.  Under the Plan, the tort claims are extinguished for cents on the dollar.

However, if the Debtor were liquidated under chapter 7, the tort claimants (a) would receive the

full liquidation value of all assets of the estate and (b) would retain the value of their claims

against the Debtor.

### (1)      The Plan Affords Creditors Less Than the Liquidation Value of the Debtor's Assets

Under the Plan, the Debtor proposes only to pay creditors a portion of the liquidation

value of its assets and thus the Plan simply cannot pass the best interests test.  The Debtor

appears to justify this failure by identifying certain assets as "mission critical" and excludes their

value from the Plan presumably under the guise of the Religious Freedom Restoration Act, 42

U.S.C. §§ 2000bb *et seq.* ("RFRA").[5]  RFRA, however, provides only that the federal

government cannot impose a <u>substantial</u> burden on the exercise of religion, absent a compelling

governmental interest.  The Debtor, without any analysis of the measure of impact on or

alternative means of fulfilling its mission, concludes that such exclusions are appropriate.  The

Debtor has the burden to establish the substantial burden and it should provide creditors with

alternative scenarios in the Disclosure Statement or, at minimum, with a description of the most

---

[5]  The Committee does not concede that RFRA is constitutional as applied to this bankruptcy case and reserves the right to argue that RFRA is unconstitutional in its entirety.

**COMMITTEE OBJECTION TO FIRST**                      *CATHOLIC BISHOP OF NORTHERN ALASKA,*
**AMENDED DISCLOSURE STATEMENT AND PLAN**              CASE NO. 08-00110 - DMD

logical alternative scenarios it considered and why it rejected them.  As the Ninth Circuit stated

in *Navajo Nation v. U.S. Forest Service*, 535 F.3d 1058 (9th Cir. 2008):

> To establish a prima facie RFRA claim, a plaintiff must present
> evidence sufficient to allow a trier of fact rationally to find the
> existence of two elements.  First, the activities the plaintiff claims
> are burdened by the government action must be an "exercise of
> religion."  *See id*. § 2000bb-1(a).  Second, the government action
> must "substantially burden" the plaintiff's exercise of religion.  *See
> id.* If the plaintiff cannot prove either element, his RFRA claim
> fails.

*Id.,* at 1068.

The Committee believes that alternative means for the Debtor to exercise its religion

would provide assets that would significantly exceed the assets that the Debtor is proposing to

contribute under the Plan.

### (2)   The Plan Provides Nothing to Creditors for Values That Creditors Would "Retain" In the Event of Liquidation

Section 1129(a)(7) of the Bankruptcy Code also requires that plan distributions equal or

exceed amounts creditors would "retain" in a liquidation.  In a chapter 7 liquidation, claims

against a corporate debtor would not be discharged.  11 U.S.C. § 727(a)(1).  Thus, the value of

such claims also must be distributed to creditors.  *See In re Dow Corning Corp.*, 237 B.R. 380

(Bankr. E.D. Mich. 1999)[6].  Because the Debtor would continue to exist and receive donations

after the liquidation of its prepetition assets, the creditors' claims would have value.  However,

under the Plan, the creditors are receiving only a portion of their allowed claims based on their

---

[6] The Court stated:  [A] corporate debtor whose assets are liquidated in chapter 7 does *indeed remain liable for claims not paid in full since such claims are not discharged.* 11 U.S.C. § 727(a)(1).) . . . .  Thus, a non-frivolous, but decidedly novel, argument could be made that § 1129(a)(7)'s best-interests-of-creditors test should account for the value of any cause of action that a creditor would *retain* against a chapter 7 corporate debtor." 237 B.R. at 411-412 (emphasis added).

18481-003\DOCS_LA:203732.1

9

prepetition assets with no accounting whatsoever for their ability to collect their non-discharged debts from the Debtor.

> **(3)      The Plan Fails to Provide Creditors As Much as They Would Receive After Dismissal**

The Plan still fails the best interests test even if a chapter 7 liquidation were inapplicable, as the Debtor argues, and the relevant inquiry were instead to assess what creditors would receive if this case were dismissed.  Even upon dismissal, the survivors of child sexual abuse would be entitled to the present value of their allowed claims plus interest – rather than the small percentage offered under the Plan – and the Debtor would still be obligated to liquidate substantially more assets than it is proposing to liquidate under the Plan.[7]  Therefore, even on the Debtor's terms, the Plan fails the best interests test and is patently unconfirmable. Accordingly, the Disclosure Statement cannot be approved.

> **2.      The Plan Fails the Fair and Equitable Test**

The U.S. Supreme Court stated in *Bank of America Nat. Trust and Sav. Ass'n v. 203 North LaSalle Street Partnership*, 526 U.S. 434 (1999):

> Section 1129(b) requires that, to be confirmed over the objections of an impaired class of creditors, a reorganization plan [must] be fair and equitable.  With respect to an impaired class of unsecured creditors, a plan can be fair and equitable only if, *at a minimum*, it provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim, or if the holder of any claim or interest that is junior to the claims of

---

[7] RFRA is not applicable upon dismissal of the case because it cannot be constitutionally applied to the states. *City of Borne v. Flores,* 521 U.S. 507 (1997).  Therefore, on dismissal all of the Debtor's present and future assets would be available to satisfy survivors' state court judgments.  Moreover, no assumption could be made that the <u>allocation</u> among survivors of whatever values were available upon dismissal would not be fair and equitable. As has oft occurred in connection with group settlements inside and outside of bankruptcy, counsel representing the survivors of child sexual abuse claims have shown a propensity for coming to consensual arrangements for allocation of available funds among the survivors.

> such class will not receive or retain under the plan on account of
> such junior claim or interest any property.

*Id.* at 460 (quotations and citations omitted) (emphasis added).  *See also FSLIC v. D& F*

*Const., Inc. (In re D& F Constr.),* 865 F.2d 673 (5th Cir. 1989):

> Section 1129(b)(2) sets *minimal* standards [that] plans must meet.
> However, it is not to be interpreted as requiring that every plan not
> prohibited be approved.  A court must consider the entire plan in
> the context of the rights of the creditors under state law and the
> particular facts and circumstances when determining whether a
> plan is fair and equitable.

*Id.* at 675 (emphasis added).  *See also In re Lowenschuss,* 170 F.3d 923, 932 -933 (9th

Circuit 1999) (excluding over sixty percent of an $8 million asset "made plan confirmation

impossible" under section 1129(b)).

### a.   The Plan Fails to Provide Creditor Payments Equivalent to the Value of the Debtor's Assets

The Committee believes that the 'restricted' funds are assets that would be available to

creditors on liquidation and, thus, the failure to include them in amounts being distributed

violates the best interests test. As well, however, <u>even if</u> such amounts would not be available

upon liquidation, they must be made available in order for the Debtor to satisfy the fair and

equitable test and avail itself of the bankruptcy laws and obtain a discharge.  The Debtor's

exclusion of virtually all 'restricted' assets is unfair and ignores creditors' rights under Alaska

law.  Creditors are entitled to be paid from the Debtor's assets that are subject to donor-imposed

use restrictions.  *Cf.* AS 10.20.395 (this statute is specifically applicable to certain non-profit

religious or civil corporations under Alaska law).   AS 10.20.395 provides that upon dissolution

of such non-profit civil or religious corporations, creditors are to be paid in full before any

property is returned to such donors[8]:

> The assets of the corporation or the proceeds resulting from a sale,
> conveyance, or other disposition of the assets shall be applied and
> distributed as follows:
>
> (1) all costs and expenses of the court proceedings and all
> liabilities and obligations of the corporation shall be paid, satisfied
> and discharged, or adequate provision shall be made for payment;
>
> (2) assets held by the corporation upon condition requiring return,
> transfer or conveyance, which condition occurs by reason of the
> dissolution or liquidation, shall be returned, transferred or
> conveyed in accordance with these requirements;
>
> (3) assets received and held by the corporation subject to
> limitations permitting their use only for charitable, religious,
> eleemosynary, benevolent, educational or similar purposes, but not
> held upon a condition requiring return, transfer or conveyance by
> reason of the dissolution or liquidation, shall be transferred or
> conveyed to one or more domestic or foreign corporations,
> societies or organizations engaged in activities substantially similar
> to those of the dissolving or liquidating corporation as the court
> may direct….

This statutory scheme is immune from the Debtor's pleas for equitable relief under its

various trust theories. *Riddell v. Edwards*, 76 P.3d 847, 854 (Alaska 2003) (Court acting in

equity ordinarily cannot intrude in matters that are plain and fully covered by a statute or do

indirectly what the law or policy forbid doing directly).

In *Bierbower v. McCarthy,* 334 B.R. 478 (D.C. 2005), the U.S. District Court for the

District of Columbia, applying a corporate dissolution statute identical to Alaska's statute,

affirmed a Bankruptcy Court ruling that assets subject to donor-imposed use restrictions were

---

[8]  Although the Religious Corporations Act (Chapter 40 of the Alaska Corporations and Associations Code) does not
have a subsection on the liquidation of the assets of a religious corporation in dissolution, the dissolution provision
of the Alaska Nonprofit Corporation Act (Chapter 20 of the same Code) should be applied in the absence thereof.

property of the Chapter 7 bankruptcy estate and available to pay general creditors.  Prior to the

filing of a chapter 7 bankruptcy for Crossroad Health Ministry ("Crossroad"), the debtor received

a $60,000 grant for health care services for infants and toddlers.  Approximately 60 days after

receipt of the funds, Crossroad filed a chapter 7 bankruptcy.  McCarthy, the chapter 7 trustee,

responded to the donor's demand for a return of the grant by filing a complaint for declaratory

relief seeking a determination that the grant funds were property of the estate.  McCarthy

contended that the dissolution statute established the debtor's interest in all funds regardless of

donor restriction because it provided that any asset of the dissolved corporation was first

available to pay creditors and, only after creditor claims were paid, was the property to be

distributed in accordance with donor restrictions.  The donor contended that the grant funds

should be excluded from the bankruptcy estate due to a "resulting trust" arising from the

charitable use restriction it placed on the funds or due to a constructive trust by virtue of the

temporal proximity between the receipt of the funds and the bankruptcy filing.  The donor also

contended that the dissolution statute provided for three separate disposition schemes, one for

unrestricted funds, another for restricted with a donor reversionary interest and yet another for

restricted without a donor reversionary interest.

The Bankruptcy Court granted summary judgment for the trustee holding that the funds

were property of the estate.  The Bankruptcy Court rejected the trust theories as inapplicable to

the facts of the case.  The Court adopted the trustee's argument that the dissolution statute

provided for a sequential distribution scheme, rather than three separate schemes.  It concluded

that the sequential scheme reflected "a legislative determination that funds subject to such

restrictions are a legitimate source of payment of to creditors and of liquidation expenses, thus

constituting to at least that extent property of the estate. . . ."  *Id*. at 781.

The District Court affirmed the Bankruptcy Court's decision.  The Court held that the "plain meaning" of the dissolution statute was that assets are distributed sequentially and that donor restricted funds should be used to pay claims notwithstanding the donor restrictions.  The District Court also rejected the donor's trust theories.  The Court held that a "resulting trust" did not arise because the payment of creditors was consistent with the charitable purpose of the grant and that the facts of the case did not support a constructive trust for "unjust enrichment."

Even if AS 10.20.395 were not strictly applicable, which it is, a fair and equitable plan would require that the Debtor pay its creditors the full value of all of its assets, including the so-called 'restricted' funds.

### b.   The Plan Fails to Fairly and Equitably Apply the Endowments

CBNA is currently controlling approximately $12 million in various endowments (the "Endowments").  *See* Disclosure Statement, Exhibit 6, pp. 3 and 4.  According to the documents related to the Endowments (the "Endowment Documents") produced by the Debtor, the Bishop may "amend or alter" the Endowments "at any time" "[a]fter consultation with the Diocesan Finance Committee," has the power to "redirect" the "spendable income" of the Endowment, and can access the original gifts or principal contributed to the Endowments based on unforeseen circumstances.  Certainly the need to compensate the hundreds of child sex abuse victims was an unforeseen circumstance.  *See* Endowment Documents, attached hereto as **Exhibit B**.  The Endowment Documents "may [also] be altered or amended by the mutual consent of the signatories."  *Id.*  In the cases of the six (6) endowments the Debtor created for itself using its own funds, those signatories would be the Debtor.

Despite the broad power to redirect income and recover principal, the Plan only proposes to increase distributions from the Endowments from 5.5% of the "principal value" to 6.25% of

the fund's "fair market value."  Disclosure Statement at pp. 22 and 26.[9]  To meet the fair and

equitable test, the Bishop should exercise his power to contribute Endowment principal to the

Plan.

**c.      The Plan Fails To Fairly Exercise the Diocese's Taxing Power
Over Juridic Persons**

Pursuant to Canon Law 1263, the Debtor can tax public juridic persons, such as the

Parishes.  Currently, CBNA taxes its eight self-sustaining Parishes at the rate of between 5.15%

and 17.4% of their revenues.  Disclosure Statement at p. 27.  Under the Plan, CBNA intends to

do no more than increase these assessments at the anticipated inflation rate of 3% – which means

that it does not intend to increase taxes in order to pay the tort victims.  Disclosure Statement,

Exhibit 7, Assumptions, p. 4, ¶ 12.h.  There also is no provision for directing any of the revenue

stream from current assessments to the fund created under the Plan.

Canon Law 1263 also empowers the Debtor to impose an "an extraordinary tax" on

private juridic persons, such as the Monroe Foundation, Inc.[10]  Canon authorities have stated that

an extraordinary tax is appropriate in cases of "grave necessity" and have cited as examples of

grave necessity, the "need . . . to pay the expenses related to a papal visit, build or repair a

cathedral or seminary, or, more recently, *to pay legal fees or damages arising from sexual abuse

cases*."  The Jurist, *The Theological Case for Progressive Taxation as Applied to Diocesan Taxes

or Assessments Under Canon Law in the United States* at p. 336 (emphasis added).

---

[9] The Disclosure Statement does not state how much additional funds this increase would generate.

[10] The 2007 Official Catholic Directory lists the Monroe Foundation, Inc. as an institution located in the Diocese and
reflects email addresses and a website that connects to Catholic Schools of Fairbanks, AKA the Debtor.  See
**Exhibit C.**  The Committee is conducting discovery to confirm that the Monroe Foundation, Inc. is a juridic entity
and the nature of that entity, *i.e.*, public or private.

15

Because the Debtor does not appear to be exercising its legal right to raise additional funds for creditors through this process, the Plan is not fair and equitable.  The case of *General Teamsters,* 225 B.R. 719, cited above, is instructive on this point.  In *General Teamsters*, a local union filed a case under chapter 11 of the Bankruptcy Code.  At plan confirmation, the court found that the absolute priority rule did not apply to a labor union.  However, the court still required that the debtor's Plan meet the fair and equitable test.  In particular, the court looked to see whether the debtor had a rational basis for failing to raise membership dues (akin to requiring the Debtor in this case to raise taxes on the Parishes and other public and private juridic persons) and queried whether the Debtor should not have been required to seek assistance from other local unions or to even merge with other unions in order to create a fiscally more sound entity that could pay more to creditors.

### d.      The Plan Fails To Contribute Parish Property

In its Disclosure Statement, the Debtor states that it does not have to contribute Parish properties (either real or personal) because CBNA holds the Parish properties in trust and, therefore, those properties are not property of the estate pursuant to section 541 of the Bankruptcy Code.  The Debtor is wrong and none of its trust theories are viable.

Properties alleged to be Parish properties instead must be included in the estate for multiple reasons.  For example, such properties can be shown to be part of the estate through the litigation for which the Committee has sought standing, which assumes the Parishes are separate entities.  Through such litigation, the Committee will establish that (i) there is no express trust as to these properties in anyone other than CBNA and (ii) that there either is no resulting trust or, even if there is a resulting trust, it can be set aside utilizing the bankruptcy strong arm powers.

Additionally, these alleged Parish properties also can be shown to be property of the estate based on the fact that the parishes themselves actually are not separate entities under Alaska law. The Parishes have none of the characteristics of civil law, voluntary unincorporated associations. They are no more separate from a diocese than the operating division of a corporation would be separate from the corporation itself.

As a matter of civil law, Parishes are subdivisions of the Diocese. The Catholic Church is a hierarchical organization. See *Scotts African Union Methodist Protestant Church v. Conference of African Union First Colored Methodist Protestant Church*, 98 F.3d 78, 92 (3d Cir. 1996). Within the Catholic community in Fairbanks, the Church hierarchy is exemplified by the primacy of the Diocese over its subdivisions - the Parishes - with regard to assets and operational matters. *In re Roman Catholic Archbishop of Portland In Or.*, 335 B.R. 842, 849 (Bankr. D. Or. 2005) ("*Portland*") ("The Archbishop of the Archdiocese [] has legislative, executive and judicial power within his Archdiocese"). Unlike some parishes elsewhere, the Parishes in the Fairbanks Diocese have never been separately incorporated. In form and substance, these unincorporated Parishes are effectively divisions of the Diocese. At civil law, a corporation may have many divisions, but those divisions have no legally recognized separate identity. *See United States v. ITT Blackburn Co.*, 824 F.2d 628, 631 (8th Cir. 1987) ("[A]n unincorporated division cannot be sued or indicted, as it is not a legal entity."); *Western Beef, Inc. v. Compton Inv. Co.*, 611 F.2d 587, 590 (5th Cir. 1980) (explaining that an unincorporated division is "not a separate legal entity wholly apart from its owner"); *In re Sugar Indust. Antitrust Litig.*, 579 F.2d 13, 18 (3d Cir. 1978).

Unincorporated divisions have no separate assets; instead, all assets are owned by the corporation or organization. *Safeco Insur. Co. of America v. Franklin*, 185 F. Supp. 499, 501

17

18481-003\DOCS_LA:203732.1

COMMITTEE OBJECTION TO FIRST                    *CATHOLIC BISHOP OF NORTHERN ALASKA,*
AMENDED DISCLOSURE STATEMENT AND PLAN      CASE NO. 08-00110 - DMD

(N.D. Cal. 1960) ("Safeco is a corporation, a single entity in contemplation of law, and, although it may have many departments, or subdivisions, being a corporation, it is an indivisible unit."); *Albers v. Church of the Nazarene*, 698 F.2d 852, 857 (7th Cir. 1983); *see also Burns & Russell Co. of Baltimore v. Oldcastle, Inc.*, 166 F. Supp. 2d 432, 440 (D. Md. 2001); *EEOC v. St. Francis Xavier Parochial School*, 77 F. Supp. 2d 71, 76 (D. D.C. 1999, *aff'd*, 254 F.3d 315 (2000 WL 1584578) (D.C. Cir. 2000.

The Debtor's express trust theories (and all of the other trust theories) fail because in effect, these trusts are unenforceable self-settled trusts.  *In re Last Will and Testament of Tamplin,* 48 P.3d 471, 473 (Alaska 2002) ("We have defined a trust as "'a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of **another person**, which arises as a result of a manifestation of an intention to create it.' ") (emphasis added); Restatement (Third) of Trusts § 58(2) (2003) ("A restraint on the voluntary and involuntary alienation of a beneficial interest retained by the settlor of a trust is invalid.").  As parts of the Diocese, the Parishes are not "another person," *i.e.*, they cannot be trust beneficiaries.  As Bankruptcy Judge Perris stated: "There is no authority to which the parties direct me or of which I am aware . . . that would allow a division of a corporation or a unit or part of a legal entity to be a beneficiary of a trust.  *It is one thing to hold that an independent unincorporated association has the capacity to be the beneficiary of a trust.  It is quite another to hold that a corporation can hold property in trust for a unit or part of itself.*"  *Portland,* 335 B.R. 842, 867 (Bankr. D. Or. 2005) (emphasis added); *see also* Restatement (Second) of Trusts § 99(5) ("The sole beneficiary of a trust cannot be the sole trustee of the trust."); *id*. at § 115(5) and § 410 (same).

The limited autonomy afforded Parishes as juridic entities under Canon law to administer church property does not make them separate legal entities under civil law.  "Even assuming that the parishes operate independently of debtor . . . independent operation does not make them separately recognizable legal entities."  *Portland*, 335 B.R. at 865.  "The public juridic person, as such, has no civil law equivalent and no civil law identity.  Its only existence is juridical in the canon law.  It is a religious concept and not a civil one."  Adam Cardinal Maida & Nicholas Cafardi, *Church Property, Church Finances, and Church-Related Corporations: A Canon Law Handbook* 131 (1984); *Portland*, 335 B.R. at 866.  Thus "*it often happens that a number of juridic persons have the same secular recognition (as when all parishes are registered civilly under a corporation sole. . . ).*"  McKenna, DiNardo & Pokusa, *Church Finance Handbook* (Canon Law Society of America 1999), 15 (emphasis added).  Such rights are entirely consistent with an entity's use of a divisional structure. A division or other subpart of an entity does not gain separate civil law status by operating independently, by using different names, or even by using a separate letterhead, bank account, or check stock.

> There are all kinds and breeds of divisions. However, a 'true' division might be defined as an organizational unit that acts in all respects like a subsidiary whose stock is held by the parent or holding company, differing primarily in that it *has no legal existence apart from the parent company.*

Robert W. Murphy, *Corporate Divisions v. Subsidiaries*, 34 Harvard Business Review 83, 84 (1956) (emphasis added).  Thus a division or subpart of a corporation may have significant autonomy and may act as if it is a separate entity.  However, the law does not convert the division into a separate civil law entity, independent of its parent.

**COMMITTEE OBJECTION TO FIRST**     *CATHOLIC BISHOP OF NORTHERN ALASKA,*
**AMENDED DISCLOSURE STATEMENT AND PLAN**     CASE NO. 08-00110 - DMD

All reported cases hold that parishes that are not separately incorporated are a part of a diocese's corporate structure. *F.E.L. Publications, Ltd. v. Catholic Bishop of Chicago*, 754 F.2d 216 (7th Cir. 1985); *EEOC v. St. Francis Xavier Parochial School*, 77 F.Supp. 2d 71 (D. D.C. 1999), *aff'd*, 254 F.3d 315 (2000 WL 1584578) (D.C. Cir. 2000); *Akoury v. Roman Catholic Archbishop of Boston*, 2004 WL 2341333, 18 Mass. L. Rptr. 271 (Mass. Super. 2004).

During the Debtor's Section 341 Meeting, George Bowder, the Debtor's Chief Financial Officer, essentially admitted in the following testimony that the Parishes do not have a separate civil existence from the Diocese:

> John Manly:  Let me just---so the record is clear.  Are you aware of any agreement, formal written agreement of any type or sort other than a religious document, any secular document, that establishes that the parishes are separate from the diocese that existed prior to all of these lawsuits involved child molestation being filed?
>
> Deacon Bowder:  No.

Transcript 341 Creditor's Meeting Northern Alaska, p. 70:8-14, dated April 9, 2007.  *See* **Exhibit D**.

The same issues presented here were addressed in detail by Bankruptcy Judge Perris in *Portland*.  The court ruled that parishes and schools were not separate entities under civil law.  It noted that a diocese "has choices about how to organize itself under civil law in a way that recognizes and implements its internal organization with relation to the secular world." *Portland*, 335 B.R. at 853.  It concluded that "[b]ecause the parishes are not separately incorporated, as they could be under Oregon religious corporations law, they cannot hold title to real property.  They are not separate from, but are merely a part of debtor." *Id*. at 866.  The

Diocese did not create its Parishes as distinct and independent legal entities, the Diocese cannot now claim the bankruptcy advantages of separate entity status.[11]

Given the foregoing, the Plan should reflect the value of the Parish properties and all other juridic entities within the Diocese.[12]  The Plan and the Disclosure Statement, however, are devoid of this analysis.

> **e.    The Plan Fails To Apply the Assets of the Monroe Foundation, Inc.**

The Monroe Foundation, Inc. is currently holding approximately $1.4 million in pooled assets.  Disclosure Statement, Exhibit 6 at p. 4.  Section 9.07 of the Bylaws to the Monroe Foundation, Inc. allows the board of directors with an affirmative vote from the Bishop to apply "the whole or any part of the principal or income of the fund" if changed conditions or circumstances make literal compliance unnecessary, undesirable, incapable of fulfillment or inconsistent with the education or religious goals or needs of Catholic Schools of Fairbanks.[13] *See* **Exhibit F**.  Further, Section 10.02 of the Bylaws provides that principal may be invaded where the board determines by a ¾ vote that an extraordinary situation exists and the determination is approved by CBNA.  *See* **Exhibit F**.  Finally, pursuant to Section 3.05 of the Bylaws, the Bishop controls the board of the Monroe Foundation, Inc.  *See* **Exhibit F**.

The Plan makes no provision for modifying these Bylaws so that the Monroe Foundation, Inc. could contribute to the Plan, despite the fact that the abuse of children is an extraordinary

---

[11] The Committee also incorporates by reference as though fully set forth therein all the arguments made in its *[Redacted] Motion for Official Committee of Unsecured Creditors for Authority to Commence, Prosecute and Settle Litigation on Behalf of Bankruptcy Estate Against the Holy See and Diocese-Related Entities*, dated May 11, 2009 [Docket No. 440].

[12] Based on the bank statements provided by certain Parishes to the Committee, the cash balances in the Parish operating bank accounts have increased by at least $330,000 since May 2008.  See **Exhibit E.**

[13] The Catholic Schools of Fairbanks is simply another name for the Debtor.

situation that makes literal compliance with the Bylaws both undesirable and inconsistent with the education and religious goals and needs of the Catholic Schools of Fairbanks.

f.       **The Alaskan Shepherd Sharing Agreement Is Insufficient**

As the Court pointed out in its *Memorandum on Debtor's Emergency Motion for Authority to Use Restricted and Unrestricted Funds for Certain Construction Projects* ("Court Memorandum"), filed on April 18, 2008 as Docket No. 126, the Debtor, through its newsletter and solicitations utilizing the trade name "Alaskan Shepherd" reaches a mailing list of 45,000 donors worldwide.  Memorandum at p. 3.  As the Court further pointed out, "The Alaskan Shepherd often sends out 'special' or 'extra' solicitations with its newsletter.  This type of solicitation asks potential donors to provide an additional donation, above what that donor may provide for general operational expenses of the Diocese, so that a specific project undertaken by the Diocese can be completed."  *Id.* at p. 3.  Thus, the Court recognized the Alaskan Shepherd's ability to solicit contributions for the benefit of compensating tort victims.  Currently, the Debtor raises "roughly 4 million annually" through the Alaskan Shepherd.  *Id.* at p. 4.

Despite the Alaskan Shepherd's ability to generate $4 million annually, the Plan only provides that after an operating reserve is established and, on top of that, after an undefined "Agreed Minimum" has been met, the Debtor will contribute (i) 100% of the first $250,000 in unrestricted funds raised, (ii) 80% of the next $250,000 in unrestricted funds raised (which is $200,000) and (iii) 60% of the next $500,000 unrestricted funds raised (which is $300,000), for a total of $750,000.  Thereafter, all unrestricted amounts that exceed $1 million over the undefined Agreed Minimum will be split 50-50 for the next five years.

There is no explanation why the Debtor has to keep both an operating reserve and the Agreed Minimum and no indication of the amount of the Agreed Minimum.  There is no

provision in the Plan that the Debtor will solicit "unrestricted" instead of "restricted" funds so

that the contribution to the Plan can be maximized.  There is no explanation for why

contributions cannot continue beyond five years or why solicitations do not carve out a portion

of restricted contributions for compensation to survivors.  Thus, despite contributions from the

community being acknowledged as an important source of Diocese revenue, because the

unstated reserve could be high, because the formula limits the allocation of contributions to

creditors, because there is a lack of any projected amount to be raised, or any estimate of the

possible amounts, or clarity as to this funding, this significant funding resource appears to be

substantially underutilized under the Plan to the detriment of the survivors of child sexual abuse.

> **g.  Assistance From Other Dioceses and Roman Congregations Is Insufficient**

Canon Law 1274, §3 clearly sets forth the obligation of richer dioceses to help poorer

ones:  "Insofar as necessary, each diocese is to establish a common fund through which bishops

are able to satisfy obligations towards other persons who serve the Church and meet the various

needs of the diocese and *through which the richer dioceses can also assist the poorer ones*."

(Emphasis added.)

As one Canon Law scholar adds:

> Bishops should bear it in mind that in the expenditure of
> ecclesiastical resources they must take into account the needs not
> only of their own dioceses but of other individual churches, since
> they too form part of the one Church of Christ.  *Let it be their care
> also to give help according to their resources when other dioceses
> or regions are afflicted by disaster.*

The Jurist, *The Theological Case for Progressive Taxation as Applied to Diocesan Taxes*

*or Assessments Under Canon Law in the United States* at p. 336 (emphasis added), quoting

Kealy, Diocesan Financial Support, 249 and Christus Dominus ¶ 6: AAS 58 (1966) 676, trans. in

Documents of Vatican II, ed. Austin P. Flannery (Grand Rapids: Eerdmans, 1975) (emphasis

added).  The Debtor admits that the sexual abuse of the tort claimants in this case is a grave

disaster.  Given, Canon Law's clear dictate that dioceses help each other, the Plan should include

additional contributions from other dioceses. [14]

The Disclosure Statement at Exhibit 7, p. 3, states that the Debtor expects to recover

$60,000 to $65,000 annually over the next five years from other dioceses.  However, the

Disclosure Statement does not disclose whether this is more or less than the Debtor historically

receives from other dioceses.  Therefore, the Disclosure Statement does not enable the

Committee to determine whether the Debtor is seeking additional assistance from other dioceses

and, if not, why not.

The Diocese, as a mission diocese, is responsible to the Congregation for the

Evangelization of Peoples of the Holy See.  The Disclosure Statement should explain the nature

of the relationship between itself and the Congregation (and any other Congregations of the Holy

See) and whether any of the Congregations or the Holy See have been solicited for funds to

assist the Debtor fund the Plan.  If it has not solicited funds, it should explain why it has not done

so.

>    **h.    The Plan Does Not Contribute Any Portion of the
>           Approximately $700,000 Held in So Called 'Diocesan Priest
>           Retirement Trust' Accounts**

The Debtor is holding $700,000 in accounts that it apparently refers to as 'Diocesan Priest

Retirement Trust' accounts.  Disclosure Statement, Exhibit 6, p. 4.  Documents obtained from the

Diocese in discovery clearly establish that the Diocese expressly decided that the priest

---

[14] On June 16-19, 2009, The United States Conference of Catholic Bishops is conducting a mandatory-attendance
meeting in San Antonio, Texas.  The Committee presumes that Bishop Kettler will be in attendance.  The Disclosure
Statement should explain what Bishop Kettler did at that meeting to request the assistance of other dioceses.

retirement accounts would not be held in a trust.  The names of the accounts notwithstanding,

these Priest Retirement Accounts are simply bank accounts of the Debtor that contain cash

property of the estate.  They are thus wholly dissimilar to "401(k)" type accounts maintained by

an employer for the benefit of employees.  The Debtor has no statutory or fiduciary obligation to

maintain these accounts or preserve their value for the benefit of employees.  *See* **Exhibit G**,

attached hereto.  Inexplicably, the Debtor's Plan does not account to creditors for these

retirement accounts.  Under the fair and equitable test, these accounts should be contributed to

the funding of the Plan.

> **i.       There Are Numerous Other Examples of the Plan's Failure to Propose a Fair and Equitable Allocation**

First, the Plan provides for a "sale" of KNOM for $380,000.  KNOM is an acknowledged

vehicle for raising funds for the Debtor both as a direct recipient of contributions and as a media

outlet.  It likely owns an FCC license.  No facts are provided with respect to the market value of

KNOM.  Accordingly, the Committee is unable to determine whether this purchase price is

reasonable.  Moreover, in p. 1, ¶ 5 of Exhibit 7, Assumptions to the Disclosure Statement, the

Debtor discloses that KNOM is essentially buying itself from the Debtor and "[a]ccordingly,

KNOM's financial data is not part of [Debtor's] forecast" of income over the next five years."

Again, this is a substantial, potential funding source of the Debtor. Yet, again, the Debtor is

proposing to remove this fund raising tool as a source for creditor payments going forward

without analysis or discussion of the fairness of the purchase price or its basis.  If KNOM is

essentially raising funds to "buy itself" from the Debtor, would the Debtor not be better off to

require KNOM to raise the funds and contribute them to the Plan without "buying itself?"

Second, while the Debtor claims that it is cutting back expenses in order to make its proposed contributions to the Plan, this is simply not evident from the Disclosure Statement exhibits. For example, in the next five years, the Debtor intends to set capital asset expenditures at $505,000 in each of 2010, 2011, and 2014 and $1,005,000 in each of 2012 and 2013. *See* Disclosure Statement, Exhibit 7. Exhibit 3's two budgets ("General Fund" and "Plan Fund") reflect aggregate capital asset expenditures in 2008 of only $15,486.[15]

Third, the Debtor does not intend to eliminate any current programs (regardless of whether it could do so without substantially burdening the exercise of religion), *see* Disclosure Statement, Exhibit 7, Assumptions, p. 1, ¶ 7, and in fact intends to add additional programs, *id.* The Debtor is also proposing to increase the funding to programs that have been previously reduced. *Id.* Absent a consensual Plan, the Debtor should be required to curtail programs except where it can demonstrate clearly that to do so would substantially burden the exercise of religion.

Accordingly, the Plan patently fails the fair and equitable test and the Disclosure Statement should not be approved.

### 3. The Plan Unfairly Discriminates

To confirm a nonconsensual plan, a plan proponent must show that the "plan does not discriminate unfairly . . . with respect to each class of claims or interest that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1). In the Ninth Circuit, courts employ a four-part examination: (1) whether the discrimination is supported by a reasonable basis; (2) whether the debtor can confirm and consummate a plan without the discrimination; (3) whether the discrimination is proposed in good faith, and (4) the treatment of the classes discriminated against. *Liberty National Enters. v. Ambanc La Mesa Ltd. Partnership (In re Ambanc La Mesa*

---

[15] Exhibit 3 and Exhibit 4 appear to provide the relevant historical data. Exhibit 4's figures for the school budget are

*Ltd. Partnership),* 115 F.3d 650, 656 ((9th Cir . 1997), *cert. denied*, 522 U.S. 1110 (1998).  This test stems from the basic policy of ensuring "fair allocation of reorganizational value among claims with equal nonbankruptcy liquidation priorities."  7 *Collier on Bankruptcy*, ¶ 1129.04[3][a] at 1129-79 (15th Ed. 2004).  While this test turns to a large degree on whether the proposed discrimination has a reasonable basis and is necessary for reorganization, the lynch pin is whether "each class will realize the same percentage of its allowed claim."  7 Collier on Bankruptcy,  ¶ 1129.04[3][b] at 1129-80.

Collier cites the example of creating a separate class for large tort claims that "dwarf" all unsecured vendor claims.  In that case, Collier points out, it could make sense to pay the unsecured vendor claims more quickly than the tort claims, if, in particular, the debtor needed to continue to work with the unsecured vendor claims in conducting its business.  "The key, however, will be paying them the same, *i.e.*, each class will realize the same percentage of its allowed claim."  Colliers, § 1129.04[b][i] at 1129-80.  *See also Steelcase Inc. v. Johnston (In re Johnston),* 31 F.3d 323 (9th Cir. 1994) (creating different reserve requirements for different claims not unfairly discriminatory when all claims were to paid the same).

Under these standards, the plan unfairly discriminates against the tort victims by providing that nearly every holder of an allowed claim – except the innocent tort victims of the Diocese – will be paid in full.  Therefore, this non-consensual Plan discriminates and is patently not confirmable.

Accordingly, the Disclosure Statement should not be approved.

---

unlabeled and thus indiscernible.

18481-003\DOCS_LA:203732.1

**COMMITTEE OBJECTION TO FIRST**          *CATHOLIC BISHOP OF NORTHERN ALASKA,*
**AMENDED DISCLOSURE STATEMENT AND PLAN**          CASE NO. 08-00110 - DMD

### 4.     The Plan Is Not Proposed in Good Faith

The Bankruptcy Code requires that a plan be proposed in good faith.  11 U.S.C. § 1129(a)(3).  This has been interpreted to require that the plan "be intended to achieve a result consistent with the objectives of the Bankruptcy Code."  *In re Corey,* 892 F.2d 829, 835 (9th Cir. 1989), *cert. denied,* 498 U.S. 815 (1990).  The objectives of chapter 11 are: (1) to permit successful rehabilitation of the debtor; and (2) maximize the value of the bankruptcy estate.  *In re Capital West Investors*, 186 B.R. 497, 499 (N.D. Cal. 1995).

While the Plan clearly permits its successful rehabilitation, it effectively thumbs its nose at the second objective:  maximizing value for creditors.  It ignores its power to tax Parishes and other juridic persons.  It fails to request help from other dioceses, although the dioceses are bound to help.  It ignores its ability to tap into the principal and income of the Endowments and the Monroe Foundation, Inc. and it gives short shrift to the fact that using those funds as reparation for tort claimants is entirely consistent with the letter and spirit of the agreements governing these funds.  It also minimizes the contributions from the Alaskan Shepherd Sharing Agreement and ignores the best interests and fair and equitable tests.

The Plan also makes no effort to have all constituencies share the pain of the Debtor's insolvency.  No programs are to be cut, capital expenditures appear to increase and all creditors except the sex abuse survivors are to be paid in full.  From the minimal disclosures that have been made, this Plan appears to be nothing more than confirming that the bankruptcy was wrongfully filed as a litigation tactic.  *Computer Task Group, Inc. v. Brotby (In re Brotby),* 303 B.R. 177, 197-98 (BAP 9th Cir. 2003) (stating that a plan can fail the good-faith requirements of § 1129(a)(3) when the debtor files a chapter 11 petition solely as a litigation tactic.)

Even if the Debtor's status as a nonprofit corporation precludes technical application of the absolute priority rule, a substantial effort by the Debtor to pay the sex abuse survivors as much as possible is needed for good faith.  By analogy, in individual bankruptcy cases, good faith and fundamental fairness to creditors require that debtors propose more than the minimum necessary to satisfy chapter 11 cramdown requirements where they have the means to do so.  *In re Walker,* 165 B.R. 994, 1002 (E.D. Va. 1994) (no good faith where, *inter alia,* plan "does not adequately commit the full range of the debtor's resources to repayment of [creditor's] debt"); *In re Kemp,* 134 B.R. 413, 415 (Bankr. E.D. Cal. 1991) (no good faith where "debtor is capable of making payments substantially higher than he has offered in his Plan."); *In re Harman,* 141 B.R. 878, 889 (Bankr. E.D. Pa. 1992) (denying confirmation but giving debtor chance to negotiate with creditors where plan failed "to make anything close to the best offer of payment to the creditors"); *In re Montgomery Court Apartments*, 141 BR 324 (Bankr. S.D. Ohio 1992) (questioning whether the Debtor's formula for payment demonstrate a good faith effort to repay its obligations).  Under these circumstances, the Court should find that the Plan is not submitted in good faith and the Plan is patently unconfirmable.  It, therefore, should not approve the Disclosure Statement.

### 5.    The Plan Grants Third Party Discharges to Co-Defendants in Violation of Bankruptcy Code Section 524(e)

The Ninth Circuit has been emphatic in rejecting the attempted use of a Debtor's plan to protect non-debtors:

> This Court has repeatedly held, without exception, that section 524(e) precludes bankruptcy courts from discharging the liabilities of non-debtors.  *Underhill v. Royal*, 769 F.2d 1426, 1432 (9th Cir. 1985); *American Hardwoods, Inc. v. Deutsche Credit Corp. (In re American Hardwoods, Inc.)*, 885 F.2d 621, 626 (9th Cir. 1989) . . . .

29

*In re Lowenschuss,* 67 F.3d 1394, 1401 (9th Cir. 1995), *cert denied,* 517 U.S. 1243 (1996).

The Plan violates Ninth Circuit mandates and 11 U.S.C. section 524(e) by proposing to discharge non-debtors co-liable with the Debtor for child sex abuse claims.  *See* Plan sections 2.85, 2.118, 20.3 and 20.5 on pp. 21, 28, and 70 - 72.

**B.      The Disclosure Statement Is Inadequate**

The chart attached hereto as **Exhibit A** outlines the myriad areas where the Disclosure Statement fails to provide basic information.  By example, the Disclosure Statement does not attempt to explain the following:

- Why the Bishop is not exercising his unilateral power to amend the Endowments to substantially increase the contribution to the Plan;

- The financial impact of increasing distributions from the Endowments from 5.5% of the "fair market value" to 6.25% of the "principal value" and how the Bishop settled upon the 6.25% figure;

- Why CBNA has not raised taxes on juridic persons or allocated a portion thereof to pay creditors;

- The extent to which monetizing the value of the so-called 'mission critical' assets would substantially burden the exercise of religion;

- Why the Bishop has not exercised his authority to amend, directly or indirectly, the Bylaws to the Monroe Foundation, Inc. to reach its assets;

- What is the Agreed Minimum under the Alaskan Shepherd Sharing Agreement;

- Whether CBNA has asked for substantial, additional help from other dioceses and, if not, why;

COMMITTEE OBJECTION TO FIRST                          *CATHOLIC BISHOP OF NORTHERN ALASKA,*
AMENDED DISCLOSURE STATEMENT AND PLAN          CASE NO. 08-00110 - DMD

- Why amounts from the so-called priest retirement accounts are not treated as any other asset of the estate such that the value thereof would be contributed to creditors under the Plan;

- Why capital expenditures appear set to increase by hundreds of thousands of dollars over the life of the Plan;

- The basis for the Debtor's assumption that CBNA will receive $1 million from a raffle as stated in the assumptions to Disclosure Statement, Exhibit 7;

- The basis for the assumption that $3 million will be recovered from the Pilgrim Hot Springs Allocation in light of the lack of development to date; and

- Why a copy of the Settlement Trust, apparently an integral component of the Plan, is not provided.

These are not technical omissions, but instead prevent any creditor from being able to reasonably decide whether or not to vote for the Plan.  Accordingly, the Disclosure Statement is inadequate.

## III.

## <u>CONCLUSION</u>

Based on the foregoing and the detailed objections set forth on **Exhibit A** attached hereto, the Committee respectfully requests that the Court deny approval of the Disclosure Statement, find that the proposed Plan is patently unconfirmable on its face, and grant such other and further relief as is just and proper.

18481-003\DOCS_LA:203732.1

**COMMITTEE OBJECTION TO FIRST**
**AMENDED DISCLOSURE STATEMENT AND PLAN**

*CATHOLIC BISHOP OF NORTHERN ALASKA,*
CASE NO. 08-00110 - DMD

Dated:   June 16, 2009                    PACHULSKI STANG ZIEHL & JONES LLP


                            By      */s/ James I. Stang*
                                    James I. Stang (CA Bar No. 94435)
                                    Robert B. Orgel (Ca Bar No. 101875)
                                    Hamid R. Rafatjoo (CA Bar No. 181564)
                                    Pamela E. Singer (CA Bar No. 224758)
                                    Attorneys for Official Committee of
                                    Unsecured Creditors

**COMMITTEE OBJECTION TO FIRST**                 *CATHOLIC BISHOP OF NORTHERN ALASKA,*
**AMENDED DISCLOSURE STATEMENT AND PLAN**        CASE NO. 08-00110 - DMD

The undersigned hereby certifies that on the 16th day of June, 2009, the foregoing document was served:

**By electronic means through the ECF system as indicated on the Notice of Electronic Filing**

James M. Altieri - james.altieri@dbr.com
Stephen P. Baker - ANCIRS.BK.EMAIL@IRSCOUNSEL.TREAS.GOV
Susan G. Boswell - sboswell@quarles.com
Gillian N. Brown - gbrown@pszjlaw.com
David H. Bundy - dhb@alaska.net
David C. Christian - dchristian@seyfarth.com
Christopher R. Cooke - crcooke@cookeroosa.com
William L. Courshon - Bill.L.Courshon@usdoj.gov
Kenneth L. Covell - kcovell@gci.net, covelladmin@gci.net
A. Richard Dykstra - rdykstra@staffordfrey.com, erayborn@staffordfrey.com
Charles R. Ekberg - ekbergc@lanepowell.com,
jagows@lanepowell.com;intlekofert@lanepowell.com
Ford Elsaesser on -ford@ejame.com, dlarue@ejame.com
Robert B. Groseclose - bob@alaskalaw.com, deanaw@alaskalaw.com
Kay (UST) Hill - Kay.Hill@usdoj.gov
Jean H. Hurricane - jhurricane@schiffhardin.com
Dennis G. LaGory on - dlagory@schiffhardin.com
Sara E. Lorber - slorber@seyfarth.com
James S. MacDonald - james@ejame.com
John C. Manly - jmanly@manlystewart.com, rrhoades@manlystewart.com
Frederick P. Marczyk - frederick.marczyk@dbr.com
Laura K. McNally - Michael R. Mills on behalf of Debtor Catholic Bishop of Northern Alaska
Michael R. Mills - bankruptcyak@dorsey.com, droege.michele@dorsey.com
Patrick T. Nash - docket@grippoelden.com, ourdocket@gmail.com
Kasey C. Nye - knye@quarles.com
Frederick J. Odsen - fjo@hbplaw.net
Robert B. Orgel - rorgel@pszjlaw.com
David A. Paige - dpaige@quarles.com, mwillson@quarles.com;docketaz@quarles.com
Michael P. Pompeo - - michael.pompeo@dbr.com
Hamid R. Rafatjoo - hrafatjoo@pszjlaw.com
Kenneth S. Roosa - ken@cookeroosa.com
Paul J. Sievers - psievers@manlystewart.com
David M. Spector - dspector@schiffhardin.com
Philip C. Stahl - docket@grippoelden.com, ourdocket@gmail.com
James I. Stang - jstang@pszjlaw.com
U.S. Trustee's Office - USTPRegion18.ak.ecf@usdoj.gov
Jim Valcarce - jim@bushlawyers.com
John C. Wendlandt on - wendlandt@swwak.com
Zane D. Wilson on - zane@alaskalaw.com
Lori L. Winkelman - lwinkelm@quarles.com
Clay A. Young - cay@delaneywiles.com, dml@delaneywiles.com
Gary A. Zipkin - gzipkin@guessrudd.com

18481-003\DOCS_LA:203732.1