# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| In re:<br><br>CATHOLIC BISHOP OF NORTHERN ALASKA, an Alaska religious corporation sole,<br><br>            Debtor. | Case No. F08-00110-DMD<br>Chapter 11<br><br>**Filed On**<br>**9/11/09** |

## MEMORANDUM REGARDING COMMITTEE'S
## MOTION TO PURSUE LITIGATION AND DEBTOR'S MOTION TO STRIKE

       The Official Committee of Unsecured Creditors ("UCC") has filed a motion for authority to pursue avoidance actions, to commence an action against the Holy See and to file a third-party complaint against the Holy See for equitable apportionment of certain pending state court abuse litigation. The debtor, Catholic Bishop of Northern Alaska ("CBNA"), and the Catholic Church Communities of Northern Alaska oppose the motion. CBNA has also filed a motion to strike certain pleadings of the UCC. The UCC's motion to pursue litigation will be granted, in part, and denied, in part. CBNA's motion to strike will be denied.

Discussion

       CBNA has been in chapter 11 since March 1, 2008. It filed for chapter 11 relief due to the assertion of numerous state court claims for sexual abuse arising against priests and other individuals working for CBNA. The parties have attempted mediation on

several occasions, without success. CBNA is seeking to confirm a plan of reorganization and has filed a plan and disclosure statement. The adequacy of its disclosure statement has been addressed in a separate memorandum entered concurrently with this one.

The issues underlying the UCC's motion are substantial. First, can the court grant the UCC derivative standing to assert the debtor's avoidance actions and possible claims against the Holy See, or is there a blanket prohibition against such standing in the Ninth Circuit, absent the consent of CBNA? Second, if this court can grant the UCC derivative standing, under what circumstances should it be permitted? An examination of the appellate decisions in this circuit indicates that there is no clearly articulated Ninth Circuit standard for either of these issues.

A) <u>Can the Bankruptcy Court Grant the UCC Derivative Standing?</u>

The Ninth Circuit Bankruptcy Appellate Panel ("BAP") has recognized that, in certain circumstances, a creditor or a creditors' committee may be authorized by the court to prosecute an action belonging to the bankruptcy estate. In 1986, the BAP examined the issue of derivative standing in *Hansen v. Finn (In re Curry and Sorensen, Inc.)*.[1] In *Curry*, three creditors filed a complaint seeking to avoid the debtor's issuance of stock to its president as a fraudulent transfer under 11 U.S.C. § 548. The complaint named the debtor and its president as defendants. The debtor moved to dismiss the complaint, contending the

---

[1] 57 B.R. 824 (B.A.P. 9th Cir. 1986).

creditors lacked standing to bring the suit. The bankruptcy court granted the motion and the creditors appealed. The BAP noted that individual creditors generally could not initiate avoidance actions independent of the trustee or debtor in possession.[2] If a chapter 11 debtor in possession fails to act, however, the BAP indicated that creditors could petition the court to gain permission to institute the action themselves.[3]

> Thus, if an aggrieved creditor believes that the debtor-in-possession has failed to fulfill its duty to prosecute actions, then the creditor must bring this to the attention of the court by an appropriate motion . . . . This judicial intervention is crucial, for resolution of the conflict between the creditor and the debtor-in-possession requires a balancing of the competing interests to determine whether or not the debtor-in-possession's failure to bring the action is unjustifiable and therefore constitutes an abuse of discretion.[4]

Because the appellants in *Curry* had failed to obtain court approval before filing suit, the BAP found they had no standing to bring an action under § 548 and the bankruptcy court's dismissal as to this count of the creditors' complaint was upheld. Although the debtor was the party moving for dismissal, the lack of debtor consent did not factor into the BAP's decision.

---

[2] *Id.* at 827.

[3] *Id.* at 828.

[4] *Id.* (citations omitted).

The issue of derivative standing was again addressed by the BAP in *Liberty Mutual Insurance Company, Inc. v. Official Unsecured Creditor's Committee (In re Spaulding Composites Co.).*[5] Spaulding, facing substantial liability for environmental remediation costs, filed a chapter 11 petition in 1993. Its insurer, Liberty Mutual, filed a post-petition declaratory judgment action in state court to determine its liability for the environmental clean up claims under various policies it had issued. Spaulding was not a named defendant in this action, but several of the policies at issue named Spaulding as an additional insured or the sole insured. The unsecured creditor's committee in Spaulding's chapter 11 case filed an adversary proceeding against Liberty Mutual for violation of the automatic stay. Spaulding thereafter entered a stipulation authorizing the committee to prosecute the adversary proceeding. Liberty Mutual moved to dismiss on the grounds that the committee lacked standing to bring the suit. The bankruptcy court denied Liberty's motion and granted partial summary judgment to the committee, finding that Liberty had violated the stay by commencing the state court action. Liberty appealed to the BAP.

The BAP noted that the facts were "somewhat unusual" in *Spaulding*, because typically "the setting for derivative litigation . . . involves a debtor-in-possession ("DIP") who is hostile to the proposed litigation."[6] While it found that a DIP could stipulate to representation by an unsecured creditors' committee, this was not the determinative factor in its standing analysis. Rather, the BAP considered whether a court could *retroactively*

---

[5] 207 B.R. 899 (B.A.P. 9th Cir. 1997).

[6] *Id.* at 904.

4

*approve* a committee's prosecution of litigation. It noted that "the better practice" would be for the plaintiff to secure approval before filing the complaint, but would not "foreclose the ability of a court to make its approval of the representation retroactive to the date of filing."[7] The BAP endorsed the concept of derivative standing, noting it was "well settled that in appropriate situations the bankruptcy court may allow a party other than the trustee or debtor-in-possession to pursue the estate's litigation."[8] It further commented:

> Liberty's . . . proposed rule – a flat prohibition against any surrogate representation – not only conflicts with accepted practice, it also fails to recognize the potential benefits of allowing an unsecured creditors' committee to conduct estate litigation. The DIP has an obligation to pursue all actions that are in the best interests of creditors and the estate. An unsecured creditors' committee has a close identity of interests with the DIP in this regard . . . . Rather than a flat prohibition, impartial judicial balancing of the benefits of a committee's representation better serves the bankruptcy estate. So long as the bankruptcy court exercises its judicial oversight and verifies that the litigation is indeed necessary and beneficial, allowing a creditor's committee to represent the estate presents no undue concerns.[9]

Although the court found in favor of the committee on the standing issue, it ruled against it on the merits of the stay litigation.

---

[7] *Id.* at 905.

[8] *Spaulding*, 207 B.R. at 903.

[9] *Id.* at 904 (citations omitted).

5

The Ninth Circuit touched on the issue of derivative standing in *Official Unsecured Creditors Committee v. U.S. National Bank of Oregon (In re Suffola, Inc.)*.[10] In that case, an unsecured creditors' committee asserted a preference claim against U.S. National Bank of Oregon. The court upheld a bankruptcy court decision that found in favor of the committee. Committee standing was not an issue in the case. The Ninth Circuit did comment, however, that, "[a]lthough the Bankruptcy Code contains no explicit authorization for the initiation of an adversary proceeding by a creditors' committee, a qualified implied authorization exists under 11 U.S.C. § 1103(c)(5)."[11] Section 1103(c)(5) authorizes a creditor's committee in a chapter 11 case to "perform such other services as are in the interest of those represented."[12]

---

[10] 2 F.3rd 977 (9th Cir. 1993).

[11] Id. at 979 n.1. In this footnote, the Ninth Circuit cited *In re First Capital Holdings Corp.*, 146 B.R. 7, 11 (Bankr. C.D. Cal. 1992). In that case, the bankruptcy court framed the issue before it as "whether and under what circumstances a creditors' committee may prosecute claims on behalf of a chapter 11 debtor *without first making a formal demand upon the debtor to prosecute the claims.*" *First Capital*, 146 B.R. at 9 (emphasis added). The *First Capital* court recognized without discussion that a court could authorize a creditors' committee, "in appropriate circumstances," to bring an action which would typically be filed by a chapter 11 debtor. *Id.* at 10.

[12] 11 U.S.C. § 1103(c)(5). Subsection (5) follows a list of four explicit powers given to a creditors' committee, which include the ability to "(1) consult with the trustee or debtor in possession concerning the administration of the case; (2) investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan; (3) participate in the formulation of a plan, advise those represented by such committee of such committee's determinations as to any plan formulated, and collect and file with the court acceptances or rejections of a plan; (4) request the appointment of a trustee or examiner under section 1104 of this title." 11 U.S.C. § 1103(c)(1)-(4).

The Ninth Circuit discussed derivative standing in more detail in *Avalanche Martime, Ltd. v. Parekh (In re Parmetex, Inc.)*.[13] In *Parmetex*, two unsecured creditors in a chapter 7 case filed an adversary complaint to avoid preferential and fraudulent transfers. After the complaint was filed, the chapter 7 trustee entered a stipulation authorizing the creditors to pursue the litigation on his behalf. The bankruptcy court approved the stipulation. The defendants argued that the creditors lacked standing to bring the suit and that the suit was barred by the statute of limitations. The Ninth Circuit found that, under the circumstances – "where the trustee stipulated that the Creditors could sue on his behalf and the bankruptcy court approved that stipulation" – the creditors had standing to prosecute the action.[14] The court cited a number of cases in support of this finding, including the BAP's prior decision in *Curry*.[15] While the creditors prevailed on the issue of standing, they ultimately lost the appeal on statute of limitation grounds.

The *Spaulding* and *Parmetex* cases involved situations where the trustee or debtor in possession consented to the prosecution of an estate cause of action by a creditor or creditors' committee. CBNA argues that without such consent, derivative standing cannot be granted by the bankruptcy court. It relies on two additional Ninth Circuit cases. The first is *Estate of Spirtos v. One San Bernardino County Superior Court Case*.[16] In that case,

---

[13] 199 F.3d 1029 (9th Cir. 1999).

[14] *Id.* at 1031.

[15] *Id.*

[16] 443 F.3d 1172 (9th Cir. 2006).

7

Thelma Spirtos brought a RICO action in federal district court against virtually everyone involved in the administration of her former, deceased spouse's bankruptcy and probate estates. She alleged they had conspired to conceal assets and obstruct payment to creditors of the two estates. The defendants moved to dismiss. The district court granted the motion. It found that the RICO causes of action arising out of the administration of the bankruptcy estate belonged to the bankruptcy estate and only the bankruptcy trustee had the right to bring them.[17] Thelma appealed. The Ninth Circuit affirmed the district court's holding as to the RICO claims derived from the bankruptcy estate. It recognized that "under some circumstances, the trustee may authorize others to bring suit," but the right to bring suit "belongs to the trustee in the first instance."[18] The Ninth Circuit held that "the bankruptcy code endows the bankruptcy trustee with the exclusive right to sue on behalf of the estate,"[19] but also noted that this holding did not undermine its ruling in *Parmetex.*[20]

CBNA also cites an unpublished Ninth Circuit decision, *Carramerica Realty Corporation v. Nvidia Corporation*,[21] to support its position. In that case, 3dfx Interactive, Inc., filed chapter 11 and a chapter 11 trustee was appointed. The trustee sued Nividia seeking avoidance of a fraudulent transfer and recovery under a successor liability theory.

---

[17] *Id.* at 1174.

[18] *Id.* at 1175, *citing Parmetex*, 199 F.3d at 1031.

[19] *Spirtos*, 443 F.3d at 1176.

[20] *Id.*, n.3.

[21] 302 Fed. Appx. 514, 2008 WL 5110821 (9th Cir. 2009).

8

Carramerica and other creditors of the bankruptcy estate also filed suit against Nvidia on similar grounds. The lower court found that the creditors lacked standing to bring the suit and the Ninth Circuit affirmed. Citing *Spirtos*, it stated that "[t]he trustee's standing to sue on behalf of the estate is exclusive; a debtor's creditors cannot prosecute such claims belonging to the estate unless the trustee first abandons such claims."[22]

Notwithstanding the *Spirtos* and *Carramerica* cases, I conclude that the appellate case law in the Ninth Circuit authorizes a bankruptcy court to grant derivative standing to a creditor's committee to pursue estate causes of action under certain circumstances, even absent the consent of the debtor. The BAP reached this conclusion in the *Curry* case. The creditors in *Curry* were denied derivative standing because they had not sought court approval before initiating suit. The debtor's lack of consent was not a factor which the BAP considered. And the BAP commented in *Spaulding* that the facts of the case were "somewhat unusual" because the chapter 11 debtor *had* consented to the litigation filed by the creditors' committee. In both cases, the BAP held that derivative standing required judicial review to determine whether the proposed litigation was "necessary and beneficial"[23] or the failure of the debtor-in-possession to act was "unjustifiable."[24]

Derivative standing was upheld by the Ninth Circuit in *Parmetex* because the trustee had stipulated to the creditor's action *and the bankruptcy court had approved the*

---

[22] *Id.* at 516.

[23] *Spaulding*, 207 B.R. at 904.

[24] *Curry*, 57 B.R. at 828.

9

*stipulation.*[25] The Ninth Circuit cited *Curry* with approval in *Parmetex*.[26] It also cited another BAP decision, *In re Enserv Co., Inc.,* which it had affirmed, and which reiterated the *Curry* standard as well.[27] The Ninth Circuit also gave a nod to derivative standing in *Suffola*.[28]

While the Ninth Circuit's *Spirtos* and *Carramerica* decisions seem problematic, I don't feel that they are inconsistent with, or have overruled, *Parmetex*. First, *Carramerica* is an unpublished decision which is not binding precedent on this court.[29] Further, *Carramerica* cites *Spirtos* but fails to include the *Parmetex* exception specifically noted therein. It also makes no mention of the two published BAP opinions, *Curry* and *Spaulding*, which discuss derivative standing. And the facts are clearly distinguishable because the creditors in *Carramerica* were seeking to pursue the same causes of action that the chapter 11 trustee was already pursuing. Finally, the decision fails to address three code

---

[25] *Parmetex*, 199 F.3d at 1031.

[26] *Id.*

[27] *Id., citing Enserv Co., Inc. v. Manpower, Inc. (In re Enserv Co., Inc.)*, 64 B.R. 519, 522 (B.A.P. 9th Cir. 1987), *aff'd by mem.*, 813 F.2d 1230 (9th Cir. 1987).

[28] *Suffola*, 2 F.3d at 979 n.1.

[29] Ninth Circuit Rule 36-3(a). I note in passing that there are other unpublished Ninth Circuit cases which have recognized that a creditor may pursue litigation on behalf of an estate, if court approval is first obtained, even absent the trustee's consent. *Jones v. Schlosberg (In re Jones)*, 178 Fed.Appx. 662, 664 (9th Cir. 2006); *Stewart v. Rosenblum, Parish & Isaacs (In re Cho)*, 9 Fed.Appx. 633, 635-36 (9th Cir. 2001).

10

sections unique to Chapter 11, §§ 1103(c)(5), 1107(a) and 1109(b), as well as a provision common to both Chapters 7 and 11, § 503(b)(3).[30] *Carramerica* is not persuasive.

*Spirtos* is a published decision which is binding precedent on this court. However, the Ninth Circuit in *Spirtos* recognized that there are situations where creditors can act on behalf of the bankruptcy estate, and expressly noted that its decision did not undermine *Parmetex*. And, in a more recent Ninth Circuit decision, the court noted:

> A creditor can demand that the debtor in possession bring an action on its behalf. If the debtor in possession refuses, the creditor may "appear and be heard" on the issue in the bankruptcy proceeding. After such a hearing, the court must allow the creditors' committee to sue independent of the debtor in possession if the failure to bring suit does not adequately protect the creditor's interests or the chose in action is of inconsequential value to the estate.[31]

I conclude that a bankruptcy court may grant a creditors' committee derivative standing to pursue estate litigation, even absent consent of the debtor in possession. The next issue to consider is under what circumstances such standing should be granted.

### B) Standard for Granting Derivative Standing

---

[30] As discussed above, the Ninth Circuit mentioned § 1103(c)(5) as a basis for "qualified implied authorization" for derivative standing of a creditors' committee. *Suffola*, 2 F.3d at 979 n.1. Section 1107(a) lists the general rights, powers and duties of a debtor in possession subject to "such limitations or conditions as the court prescribes." 11 U.S.C. § 1107(a). Section 1109(b) permits any party in interest, including a creditors' committee, to raise and be heard on any issue in a chapter 11 case, while § 503(b)(3) authorizes the reimbursement of expenses to a creditor who recovers, after court approval and for the benefit of the estate, any property transferred or concealed by the debtor.

[31] *Biltmore Assoc., LLC v. Twin City Fire Ins. Co.*, 572 F.3d 663, 674 n.41 (9th Cir. 2009).

11

The Ninth Circuit hasn't adopted a definitive standard for evaluating when a creditors' committee should be granted derivative standing. As noted above, the two BAP decisions in this area have indicated that the court should consider whether the proposed litigation is "necessary and beneficial"[32] or the failure of the debtor in possession to act is "unjustifiable"[33] when making this determination. The Ninth Circuit has indicated that derivative standing is appropriate where the debtor in possession's failure to bring a suit "does not adequately protect the creditor's interests or the chose in action is of inconsequential value to the estate."[34] Other circuits have been more specific in this regard. The Fifth Circuit has stated that bankruptcy courts generally require "that the claim be colorable, that the debtor-in-possession [has] refused unjustifiably to pursue the claim, and that the committee first receive leave to sue from the bankruptcy court."[35] These criteria have been endorsed by other courts and by *Collier*.[36]

The Sixth Circuit has adopted a somewhat different test to determine whether derivative standing should be granted:

> [A] creditor or creditors' committee may have derivative standing to initiate an avoidance action

---

[32] *Spaulding*, 207 B.R. at 904.

[33] *Curry*, 57 B.R. at 828.

[34] *Biltmore,* 572 F.3d at 674 n.41.

[35] *Louisiana World Expo. v. Fed. Ins. Co.,* 858 F.2d 233, 247 (5th Cir. 1988); *Louisiana World Expo., Inc., v. Fed. Ins. Co. (In re Louisiana World Expo., Inc.)* 832 F.2d 1391, 1397 (5th Cir. 1987).

[36] *See* 7 *Collier on Bankruptcy* ¶ 1103.05[6][a] at 1103-36 - 1103-37 (15th ed. revised 2009), and cases cited therein.

12

> where: 1) a demand has been made upon the statutorily authorized party to take action; 2) the demand is declined; 3) a colorable claim that would benefit the estate if successful exists, based upon a cost-benefit analysis performed by the court, and 4) the inaction is an abuse of discretion ("unjustified") in light of the debtor-in-possession's duties in a Chapter 11 case.[37]

The Second Circuit has also indicated that the court should conduct a cost-benefit analysis when determining whether derivative standing should be allowed.[38]

CBNA contends the UCC's motion should be denied because it has not provided a cost-benefit analysis with regard to the claims it seeks to pursue. CBNA says this analysis is essential, particularly in light of the fact that millions of dollars have been spent on professional fees for prosecuting similar claims in other church reorganization cases, without resolution of the ultimate issues involved. I agree that an analysis of this type is appropriate and find that it is inferred in the criteria mentioned by other courts. A consideration of whether the proposed litigation is "necessary and beneficial" to the estate, as stated in *Spaulding*, or whether the debtor in possession's failure to act is "unjustified," as stated in *Curry* and included in the Fifth Circuit's test for derivative standing, would require such a cost-benefit analysis. Clearly, a ground for justifiably refusing to pursue a claim exists where the projected cost of pursuing the litigation would exceed the value of the claim. Nor would litigation in such a circumstance be beneficial to the estate.

---

[37] *Canadian Pac. Forest Prod. Ltd. v. J.D. Irving, Ltd. (In re The Gibson Group, Inc.)*, 66 F.3d 1436, 1446 (6th Cir. 1995).

[38] *Unsecured Creditors Comm. v. Noyes (In re STN Enterprises)*, 779 F.2d 901, 905 (2d Cir. 1985).

13

The UCC has provided neither an estimate of the costs of pursuing the various claims it seeks to assert or an analysis of the ultimate reward the estate would receive if it were successful. It points out that bankruptcy courts in Portland and San Diego have granted creditors' committees in other diocese bankruptcy cases derivative standing to pursue claims similar to the ones it wishes to assert here. But this is not a basis for granting the instant motion. Unlike those more "civilized" locations, many of the real property assets at issue here are remote Bush properties, inaccessible by road. One third of the parish properties have no running water.[39] The value of any personal property located in these remote parishes would also be diminished by the fact of its remoteness.[40] Given these considerations, the court is not convinced that "tens of millions of dollars worth" of real and personal property is at issue here, at least with regard to the Bush parish property.[41]

The UCC has provided no estimate as to the costs for recovery of the disputed real property. It is impossible for the court to make a cost-benefit analysis under such circumstances. The UCC also asserts that funds were fraudulently transferred from CBNA to the Endowments. I have no information regarding the amount of funds in question or the projected cost for recovering such funds. Again, a cost-benefit analysis cannot be made without this information.

---

[39] CBNA's Objection to UCC's Motion, filed Mar. 2, 2009 (Docket No. 403), Ex. 5-A (Testimony of Bishop Kettler).

[40] This observation is based on this court's past experience in other bankruptcy cases involving construction equipment or other such assets located in remote locations. The expense of transporting the asset to a better market for liquidation often makes a sale of the asset prohibitive.

[41] *See* UCC's Redacted Motion, filed May 11, 2009 (Docket No. 440), at p. 4.

14

The UCC seeks to recover the transfer of funds from CBNA to the parishes under fraudulent transfer theories, but has supplied no information regarding the amount of funds transferred or the cost of recovering those funds. The vast majority of the parishes are not self supporting and receive funds from CBNA simply to continue operations. Even if the UCC were to get a judgment against the Bush parishes, how could it possibly be paid?

The UCC's proposed claims against the Holy See face hurdles as well. These claims are based on a document titled *Crimen Sollicitationis* which was in effect from 1962 through at least 2001. Through this document, archbishops, bishops and clergy were instructed to maintain absolute secrecy regarding accusations of sexual abuse of minors. The UCC alleges that maintenance of this policy was a contributing cause to the sexual abuse of children in the Diocese of Fairbanks. Furthermore, the UCC contends Holy See breached its duties to the Diocese through implementation of this document. The UCC demands to pursue these claims on the debtor's behalf but, as before, it has failed to submit any evidence which would allow this court to conclude that the benefit of pursuing these claims outweigh the costs of litigation. I cannot estimate the costs of pursuing such lengthy and complex litigation. Further, given the unsettled nature of the law in this area, any projection as to the success of such litigation is speculative.[42]

The UCC also seeks to assert an avoidance action against the Catholic Trust of North America (CTNA). In the fall of 2007, while CBNA was facing multiple state court claims alleging sexual abuse by its employees and agents, it created CTNA and transferred

---

[42] In this regard, I note that petitions for certiorari have been filed in both of the circuit court cases cited by the parties. *O'Bryan v. Holy See*, 556 F.3d 361 (6th Cir. 2009), *petition for certiorari filed*, 77 USLW 3645 (May 7, 2009); *Doe v. Holy See*, 557 F.3d 1066 (9th Cir. 2009), *petition for certiorari filed*, 78 USLW 3049 (Jun. 25, 2009).

15

$3 million from a pooled investment account to this newly created entity. The funds transferred from the account to CTNA included commingled funds from the parishes and schools in the Diocese. CBNA alleges that it was simply following the advice of courts in other church sexual abuse cases by establishing the trust. Given the circumstances surrounding the creation of CTNA, however, I feel the UCC has asserted colorable fraudulent transfer claims as to the $3 million transfer. A cost-benefit analysis of pursuing these proposed claims is fairly straightforward. Assuming CTNA has not spent the funds, the UCC could obtain a judgment against a viable entity. While the UCC has not submitted evidence regarding the costs of litigation, I cannot foresee such costs exceeding one-third of the transferred amount. In my view, the estate could receive a net benefit of as much as $2 million or more if the UCC succeeds on its proposed claims against CTNA. The debtor takes the position that CTNA is a separate entity whose assets are not part of its bankruptcy estate. It will not pursue these claims against CTNA.[43] Given the amount of money at stake, and the circumstances under which CTNA was created, I feel that refusal to investigate these claims is unjustified.

        For the foregoing reasons, the UCC will be authorized to pursue its proposed avoidance actions against CTNA arising under 11 U.S.C. §§ 548 and 544, on behalf of the bankruptcy estate. Only this portion of the UCC's motion will be granted. Although the balance of the UCC's motion will be denied, the UCC has correctly observed that several of the property issues it has raised can be litigated in an appropriate adversary proceeding without the need for obtaining prior court approval or the assertion of avoidance claims.

---

[43] As far as I can tell from some terse language in CBNA's opposition, it does not claim that allowing the UCC derivative standing to pursue a CTNA fraudulent transfer suit for $3 million would violate the Religious Freedom Restoration Act.

CBNA concedes this point. My decision here does not impact the ability of the UCC to proceed with such litigation.

### C) CBNA's Motion to Strike the UCC's Replies

The debtor filed a motion to strike replies which the UCC filed in support of its motion, alleging untimely filings by the UCC. The replies were filed on May 4, 2009. They were late under the standards of AK LBR 9013-1. However, the hearing on the UCC's underlying motion did not occur until June 18, 2009, well after the replies were submitted. Longstanding judicial policy provides that matters should be resolved on their merits, rather than by default, if possible.[44] The debtor has suffered no prejudice on account of the UCC's delay in filing its replies. CBNA's motion to strike will be denied.

### Conclusion

The UCC's motion to pursue claims will be denied, except as to the fraudulent transfer claims it seeks to assert against CTNA. CBNA's motion to strike will be denied. Orders will be entered consistent with this memorandum.

/ / / /

/ / / /

---

[44] *Civic Center Square, Inc. v. Ford (In re Roxford Foods, Inc.)*, 12 F.3d 875, 879 (9th Cir. 1993).

DATED: September 11, 2009

BY THE COURT

 /s/ Donald MacDonald IV
DONALD MacDONALD IV
United States Bankruptcy Judge

Serve: S. Boswell, Esq.
M. Mills, Esq.
F. Elsaesser, Esq.
D. Paige, Esq.
D. LaGory, Esq.
D. Spector, Esq.
M. Pompeo, Esq.
W. Corbett, Esq.
P. Nash, Esq.
R. Dykstra, Esq.
C. Ekberg, Esq.
R. Orgel, Esq.
J. Stang, Esq.
CM/ECF Participants
K. Hill, Esq.
U. S. Trustee
9/11/09