## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF ALASKA

In re:

CATHOLIC BISHOP OF NORTHERN
ALASKA, a/k/a Catholic Diocese of
Fairbanks, a/k/a The Diocese of
Fairbanks, a/k/a CBNA,

          Debtor.

Case No. F08-00110-DMD
Chapter 11

> **Filed On**
>
> **9/11/09**

## MEMORANDUM ON DEBTOR'S FIRST AMENDED
## DISCLOSURE STATEMENT

The debtor, CBNA, filed a first amended and restated disclosure statement on

May 14, 2009. Objections to the disclosure statement were filed by Continental Insurance

Company ("CIC"), the Catholic Mutual Relief Society of America ("CMRS"), the Catholic

Relief Insurance Company of America ("CRIC"), and the Official Committee of Unsecured

Creditors ("UCC"). Travelers Casualty and Surety Company filed a joinder to CIC's

objection and the Future Claims Representative, Michael Murphy, joined in the UCC's

objection. After a hearing on June 18, 2009, consideration of the pleadings which have been

filed and the comments of counsel, and in light of this court's rulings on the "lost policies"

adversary proceeding and the UCC's motion to pursue avoidance actions, entered

concurrently with this decision, I have concluded the first amended disclosure statement

cannot be approved. CBNA will be given an opportunity to amend its disclosure statement

and plan, as further discussed below.

Discussion

    1)    CBNA's Disclosure Statement

    CBNA is an Alaska religious corporation sole which conducts the business of the Diocese of Fairbanks. The Diocese serves practically the entire northern half of the state of Alaska. It is the largest in the United States in geographical terms. There are 46 parishes and missions located within the area served by the Diocese. Just eight of the parishes are self supporting; the remaining 36 are subsidized by CBNA. The subsidized parishes are located in remote, rural communities in Alaska, off the road grid and with limited access. Because the substantial majority of the parishes are subsidized, the Diocese is the only fully missionary Catholic diocese in the United States.

    As explained in its disclosure statement, and reiterated on numerous other occasions before this court, CBNA filed chapter 11 "in order to pay just compensation to victims of sexual abuse perpetrated by individuals associated with the Fairbanks Diocese and to restructure its financial affairs to preserve and develop the ministries and missions that are facilitated by CBNA."[1]  The abuse claims against CBNA started to surface in the fall of 2002. Approximately 290 proofs of claim asserting sexual abuse have now been filed in this case. Ninety-seven percent of the claims occurred more than 20 years before CBNA's petition was filed, and more than half of the claims arose more than 35 years ago.[2]

    CBNA summarizes its plan as follows:

---

[1] CBNA's First Amended and Restated Disclosure Statement, filed May 14, 2009 (Docket No. 444), at 7-8.

[2] *Id.* at 15.

2

Under the plan, a Fund will be created that will be used primarily to pay the Claims of victims of sexual abuse.  CBNA will establish the Fund using proceeds of sales of real estate, proceeds from loans secured by real estate that is necessary to CBNA's mission, proceeds of a nation-wide raffle advertised in the Alaskan Shepherd newsletter using certain property that CBNA has been unable to [otherwise] sell . . . , shared unrestricted donation and bequest revenue under the Alaskan Shepherd Sharing Agreement, proceeds from the transfer of KNOM radio station to a new non-profit entity, and proceeds from the development, use, lease or sale of the Pilgrim Hot Springs property.  CBNA hopes that funding from these resources could be as high as $8.6 million.  In addition to the foregoing, CBNA will also transfer to the Fund proceeds from Insurance, or transfer its coverage actions against insurers.  CBNA estimates that some of its insurers could have as much as $27 million in coverage exposure.  CBNA will also assign its claims of indemnity and contribution against the Jesuits to the Fund.  Finally the Plan also gives third parties, such as Parish Churches or religious orders the opportunity to participate in the Plan by making a substantial contribution to the Fund.

The Plan also proposes a relatively streamlined procedure for evaluating Claims of sexual abuse victims who elect to be treated under a Settlement Trust.   Under the Plan, Tort Claimants or Adult Tort Claimants who elect to participate in the Settlement Trust would not be required to overcome statute of limitations defenses to their Claims . . . . CBNA believes the

3

Plan provides the best avenue for recovery for all
persons who hold Claims against it.[3]

CBNA anticipates that the lion's share of the Fund it proposes to create to
compensate the abuse victims will come from insurance proceeds. But the existence of
liability insurance and the scope of such coverage are two of the major issues present in this
case. Just one of those issues – whether CIC issued a liability insurance policy to CBNA –
has been resolved at this point, by an order entered concurrently with this memorandum.[4]
As CBNA's disclosure statement explains, unless it is able to reach a settlement with the
insurance companies, it will proceed under one of two alternative proposals: continue to
pursue its claims in the two adversary proceedings (Alternate Proposal A) or assign its
interest in these two actions and in the insurance policies (Alternate Proposal B).

The claims of the abuse victims have been placed into Class 10 under the plan.
Future Tort Claims, whose interests are represented by the Future Claims Representative, are
included in this class. Class 10 is impaired. The claims within this class are to be paid from
the proceeds of the Fund that CBNA proposes to establish. Potentially, two trusts will be
created to deal with these claims: a Settlement Trust and a Litigation Trust. Claimants in
Class 10 will have their claims resolved and paid under the Settlement Trust unless they
specifically opt out, in which event their claims will be resolved under the Litigation Trust.

---

[3] *Id.* at 8.

[4] The "lost policies" case, *Continental Ins. Co. v. CBNA (In re CBNA)*, Adv. No. F08-90033-DMD,
was initiated by CIC to determine whether a liability insurance policy from CIC to CBNA had ever been
issued. The court has granted summary judgment in favor of CIC, determining that CBNA has not
established the existence of such coverage. Scope of coverage issues are still unresolved, and are being
litigated in *CBNA v. Continental Ins. Co. (In re CBNA)*, Adv. No. F08-90019-DMD.

4

The Litigation Trust will only be established if there are claimants who have opted out of the Settlement Trust.

CBNA will "potentially" waive its statute of limitations defenses for tort claimants participating in the Settlement Trust (the "Settling Tort Claimants"). Initially, CBNA had intended to unconditionally waive this defense for Settling Tort Claimants but, "based on feedback from the Insurance Companies, that in their opinion such waiver violate[d] the so-called cooperation clauses of certain Insurance Policies,"[5] CBNA amended this proposal as follows:

> Under the Plan as amended, if an Insurance Company objects to inclusion of this agreement not to assert the statute of limitations as a defense to the Claims of Settling Tort Claimants in the Plan, then CBNA will seek a determination at the Confirmation Hearing whether such an agreement with the Settling Tort Claimants violates any Insurance Policy. If no objection to including this agreement regarding the statute of limitations in the Plan is filed, then it shall be automatically and conclusively deemed not to violate any Insurance Policy, and not to provide a defense to Insurance Coverage and/or defense to providing liability coverage to CBNA under that Insurance Policy for the Settling Tort Claimants. If the court determines that inclusion of this agreement with Settling Tort Claimants regarding the statute of limitations in the Plan violates any Insurance Policy so as to provide any insurer a defense from providing Insurance coverage, then the agreement will automatically be deleted from the plan. As to all other Claims, including the Claims of Non-settling Tort Claimants, CBNA reserves all rights

---

[5] CBNA's Disclosure Statement (Docket No. 444), at 73.

with respect thereto.  Nothing in the Plan will be deemed an admission or waiver by CBNA of the right to assert the statute of limitations as a defense to any Tort Claims, Adult Tort Claims or Future Tort Claims.[6]

The plan contains a similar provision:

> If an Insurance Company objects to inclusion of the agreement not to assert the statute of limitations as a defense to the Claims of Settling Tort Claimants in the Plan and/or any other provision of the Plan with regard to that Insurance Company's obligation to provide a defense to CBNA and/or to provide liability insurance coverage to CBNA under any Insurance Policy issued by that Insurance Company, then CBNA will seek a determination from the Court at the Confirmation Hearing of whether such an agreement with Settling Tort Claimants and/or any other provision of the plan objected to by the Insurance Company violates the provision of any Insurance Policy and/or any duty CBNA owes under an Insurance Policy issued by the objecting Insurance Company . . . . If the Court determines that inclusion of the agreement with Settling Tort Claimants regarding the statute of limitations in the Plan and/or any other provision in the Plan regarding the Settling Tort Claimants violates any Insurance Policy provision and/or duty CBNA owes under an Insurance Policy, so as to provide the objecting Insurance Company a defense from providing Insurance Coverage, then the subject agreement and/or any such other Plan provision will automatically be deleted from the Plan.[7]

---

[6] *Id.*

[7] CBNA's First Amended and Restated Plan, filed May 14, 2009 (Docket No. 443), at 42-43.

The Settling Tort Claimants will waive their right to a jury trial and consent to the claim evaluation procedures and the compensation structure in the Settlement Trust.[8] A Special Arbitrator, to be appointed by the court, will determine the allowance of claims in the Settlement Trust and allocate compensation among these claims. Settling Tort Claimants must establish, by a preponderance of evidence, the fact of abuse and CBNA's liability under Alaska law for such abuse.[9] Claims which are allowed will be placed by the Special Arbitrator into one of five compensation Tiers.[10] Prior to the hearing on the disclosure statement, CBNA was to disclose likely compensation for tort claims within each Tier, and possibly also propose ranges of recovery within a Tier.[11] This information was not provided, and CBNA has agreed to include estimates of compensation for tort claimants in an amended disclosure statement.

Tort claimants electing to participate in the Litigation Trust, called "Non-settling Tort Claimants," would preserve their right to a jury trial, and would receive a pro-rata share of funds allocated to that trust, based upon all judgments obtained by claimants electing this treatment. Non-settling Tort Claimants would not receive payment on their claims until all such claims had been reduced to judgment.[12] The allocation of funds between

---

[8] CBNA's Disclosure Statement (Docket No. 444), at 73.

[9] *Id.* at 73-74.

[10] *Id.*

[11] *Id.* at 75.

[12] CBNA's Disclosure Statement (Docket No. 444), at 75.

7

the Settlement and Litigation Trusts is to be determined at the confirmation hearing by the bankruptcy court.[13]

2)    The Viability of the Pending Disclosure Statement is Impacted by two Recent Decisions of this Court

Two orders entered concurrently with this memorandum will have an impact on the posture of this case.  First, the UCC filed a motion for authority to commence, prosecute and settle litigation on behalf of the bankruptcy estate against the Holy See and Diocese-related entities.[14]  In this motion, the UCC sought authority to prosecute avoidance actions on behalf of the estate, contending the Diocese committed fraudulent transfers by recording Notices of Beneficial Interest with regard to parish property, transferring $3 million to a newly formed trust, the Catholic Trust of Northern Alaska, and making certain amendments to CBNA's articles of incorporation.[15]  Additionally, the UCC requested permission to seek a declaratory judgment with regard to one of the most fundamental issues present in this case: whether the parishes are entities separate from the Diocese.[16]  The UCC argues that parish property should be considered estate property; CBNA disagrees.

In its motion, the UCC also sought authority to file an action against the Holy See for breach of duties owed to the Diocese and to file a third party complaint against the

---

[13] *Id.*

[14] UCC's Redacted Motion for Authority to Commence, Prosecute and Settle Litigation On Behalf of Bankruptcy Estate Against the Holy See and Diocese-Related Entities, filed May 11, 2009 (Docket No. 440).

[15] *Id.* at 4-5.

[16] *Id.*, Ex. L (UCC's proposed complaint), at 20-21.

8

Holy See in pending prepetition state court litigation dealing with the abuse claims. These two claims assume that the clergy of the Diocese are employees of the Holy See. The UCC argues that a document issued by the Holy See in 1962, entitled *Crimen Sollicitationis*, was a contributing cause of the abuse occurring in the Diocese because the document mandated that bishops and clergy maintain absolute secrecy regarding allegations of sexual abuse of minors.[17] With regard to the UCC's two proposed claims against the Holy See, The UCC would seek damages and equitable apportionment of liability.

A hearing on the UCC's motion was held on the same day as the hearing on approval of CBNA's disclosure statement. The UCC's motion has been granted, in part, to permit it to pursue recovery of the $3 million of funds transferred to the Catholic Trust of Northern Alaska, on fraudulent transfer theories. The UCC's motion has been denied as to all other relief because it did not perform a cost/benefit analysis with regard to the actions it sought to pursue on behalf of the estate.

Additionally, the court has now entered a decision in the "lost policies" case, *Continental Insurance Co. v. CBNA (In re CBNA)*, Adv. No. F08-90033-DMD. This action was initiated in the United States District Court prepetition by CIC. The District Court referred it to this court after CBNA's petition was filed. CIC contended CBNA could not establish that CIC had ever issued it a liability insurance policy. After extensive discovery by both parties, cross motions for summary judgment were filed in the lost policies case. Concurrently with this memorandum, the court is entering a decision in the lost policies case

---

[17] UCC's Redacted Motion (Docket No. 440), at 19.

9

which holds that CBNA cannot establish the existence of a liability insurance policy issued by CIC.

Both of these rulings have a significant impact on the posture of this case and would require amendment of the disclosure statement and plan even absent objection to its approval from other parties.  In any amended disclosure statement, CBNA must discuss both of these rulings and how they impact distributions under the plan.

3)   The Insurance Companies Contend the Disclosure Statement Cannot be Approved Because the Plan is "Patently Unconfirmable"

Both the UCC and the insurance companies contend the disclosure statement should not be confirmed because CBNA's plan is "patently unconfirmable."  But each camp has a different basis for making this contention.  The insurance companies say the plan is unconfirmable because it impermissibly alters their contractual and state law rights.  They contend that the procedure by which the Special Arbitrator is to determine, settle and allow the claims of Settling Tort Claimants violates their right under the policies to control the investigation, settlement and defense of any claim.  They also argue that CBNA's proposal to waive the statute of limitations defense for Settling Tort Claimants is a breach of its express duties under the insurance policies.

The insurance companies cite *In re American Capital Equipment, Inc.,*[18] to support their position.  In *American Capital*, the bankruptcy court found that Pennsylvania law precluded the settlement of asbestos liability claims within the plan, absent the insurer's

---

[18] 405 B.R. 415 (Bankr. W.D. Pa. 2009).

10

consent.  Because the disclosure statement described a "facially unconfirmable plan" it was

not approved.[19]  The insurance companies urge the same result here.

CBNA contends the *American Capital* decision is not controlling and, citing

*Great Divide Ins. Co. v. Carpenter*,[20] argues that Alaska law permits an insured to settle

claims without an insurer's consent.  Such covenant settlement agreements are recognized

under Alaska law, but with a  precondition, as noted by the court in *Great Divide*:  the insurer

must have materially breached one of its defense obligations.[21]  CBNA maintains the

insurance companies have "outright denied" it coverage under the policies.[22]  An insurer who

wrongfully denies coverage has materially breached its contractual obligation to the

insured.[23]  Here, this issue has yet to be determined.  Additionally, CBNA's disclosure

statement and plan already recognize that its offer to waive the statute of limitations and the

special arbitration procedure it proposes for Settling Tort Claimants may conflict with the

insurance companies' rights under the insurance policies.  If the insurance companies do not

consent to the method CBNA proposes for resolution of the tort claims, their objections will

be considered at confirmation.

---

[19] *Id.* at 423.

[20] 79 P.3d 599 (Alaska 2003).

[21] *Id.* at 608.

[22] CBNA's Reply to Objs. to First Amended and Restated Discl. Statement, filed June 17, 2009 (Docket No. 474) at 10.

[23] *Grace v. Ins. Co. of N. America*, 944 P.2d 460, 464 (Alaska 1997), *citing Davis v. Criterion*, 754 P.2d 1331, 1332 (Alaska 1988).

CIC also urges the court to require CBNA to place an insurance neutrality provision in the plan. It has provided detailed draft language for this provision.[24] I decline to mandate the insertion of a neutrality provision at this time. First, the plan already contains a mechanism for deleting provisions relating to the Settling Tort Claimants which are legitimately objectionable to the insurance companies. Second, the disclosure statement and plan require amendment in any event because of this court's decision in the lost policies case. The issues the insurance companies have raised as to the "patent unconfirmability" of the plan will be considered at confirmation.

4)      The UCC Also Contends the Plan is "Patently Unconfirmable"

The UCC also argues that the disclosure statement should not be approved because the plan is "patently unconfirmable," and has included a six-page "Disclosure Statement Objections Chart," summarizing its position, with its objection to the disclosure statement.[25] The UCC says the plan violates the best interests of creditors test, fails the fair and equitable test, and unfairly discriminates. The UCC also says the plan is not proposed in good faith and improperly grants third-party discharges in violation of 11 U.S.C. § 524(e).

Some of the UCC's objections are rendered moot by CBNA's offer to make certain amendments to the disclosure statement. CBNA also argues that several of the issues raised by the UCC are confirmation issues and should be dealt with at that time, rather than

---

[24]  CIC's Obj. (Docket No. 466), Ex. B.

[25] UCC's Obj. to First Amended and Restated Disclosure Statement, filed Jun. 16, 2009 (Docket No. 467), Ex. A.

12

now.  To a large extent, I agree.  However, some of the points which the UCC has raised can be resolved now.

The UCC's first contention is that the plan fails the best interests of creditors test because CBNA did not include a liquidation analysis in the plan, as required by § 1129(a)(7)(A) and AK LBR 3016-1(c)(10)(O).  CBNA concedes that it did not include this and proposes to provide one, consistent with the *Teamsters* case.[26]

The UCC also complained that CBNA was not doing enough to fund the plan.  At the hearing, CBNA's counsel stated that she could include, in an amended disclosure statement, the time that Bishop Kettler and Reverend Bowder have spent pursuing other Dioceses for loans or gifts to fund the plan.  I feel that these disclosures are pertinent and should be made.  CBNA must include a description of its efforts to raise funds for the plan, and the results of those efforts.

The UCC also argues that "the Plan *appears* to fail the best interests test" because "tort claims are extinguished for cents on the dollar,"[27] and that the tort claimants would receive more under a chapter 7 liquidation.  These issues will be reserved for confirmation.  They cannot be determined on the merits until a liquidation analysis is performed and CBNA provides an estimate of the amounts the tort claimants will be paid under the plan.

One observation will be made here, however.  The UCC maintains that the value of claims against a corporate debtor which are not discharged in chapter 7 should be

---

[26] *In re General Teamsters, Local 890*, 225 B.R. 719, 733-35 (Bankr. N.D. Ca. 1998), *aff'd*, 265 F.3d 869 (9th Cir. 2001).

[27] UCC's Obj. (Docket No. 467) at 13 (emphasis added).

considered when determining whether a plan satisfies the best interests of creditors test.[28]

The UCC cites *In re Dow Corning Corp.*[29] in support of this contention.  In that case, the

court suggested "a non-frivolous, but decidedly novel, argument could be made that §

1129(a)(7)'s best-interests-of-creditors test should account for the value of any cause of

action that a creditor would *retain* against a chapter 7 corporate debtor."[30]  But the court also

noted that no case had ever discussed or decided this novel argument.[31]  Nor can this court

locate one. The *Dow Corning* court also observed that, when employing the best interests of

creditors test, courts generally look at "the dividend the creditor would receive from the

chapter 7 trustee – and only that amount – for comparison with the dividend available under

the plan."[32]  Finally, the central focus of the *Dow Corning* decision was to determine the

applicable interest rate, under § 726(a)(5), to be paid on allowed general unsecured claims

in a case involving a solvent corporate chapter 11 debtor.  That will not be an issue in this

case.  For these reasons, the "novel argument" mentioned in *Dow Corning* has no

applicability here.

The UCC also contends the plan fails the fair and equitable test under

§ 1129(b).  The UCC lists 5 grounds for making this contention:  1) the plan discriminates

against the tort claimants, 2) the debtor is arbitrarily withholding assets that should be

---

[28] *Id.* at 9.

[29] 237 B.R. 380 (Bankr. E.D.Mich. 1999).

[30] *Id.* at 411 (emphasis in original).

[31] *Id.*, at 411 n.20.

[32] *Id.* at 411, *citing* 7 *Collier on Bankruptcy* ¶ 1129.03[7][b].

14

contributed to the plan, 3) there is no shared sacrifice because the debtor is not proposing to eliminate any current programs, 4) the debtor appears to be proposing an increase in capital asset expenditures, and 5) there is insufficient financial information.  In this context, the UCC has raised several issues which cannot be summarily resolved in the context of a disclosure statement hearing, e.g., whether Parish property is property of the estate and whether the Endowment and other assets should be committed to the plan.  These are some of the most contentious issues in this case.  Further, CBNA's liquidation analysis will  be helpful in evaluating these issues.  They are more appropriately addressed at confirmation or within an adversary proceeding.

I do find, however, that the statutory provision for dissolution of nonprofit corporations under AS 10.20.395 does not apply to CBNA.  The UCC contends this dissolution provision, which is specific to nonprofit corporations organized under Chapter 20 of the Alaska Corporations and Associations Code, "should be" applied to a religious corporation organized under Chapter 40 of the same title because there are no comparable provisions in that chapter.[33]  But the Alaska Statutes specify that the provisions in Chapter 20 only apply to corporations organized under that chapter.[34]  The Alaska Supreme Court has also recognized this distinction.[35]  CBNA was incorporated under the religious corporation provisions found in Chapter 40 of the Alaska Corporations Code, AS 10.40.010 *et seq.*  AS 10.20.395 will not be applied here to determine whether CBNA's plan is fair and equitable.

---

[33] UCC's Obj. (Docket No. 467), at 12 n.8.

[34] AS 10.20.710(a).

[35] *Herning v. Eason*, 739 P.2d 167, 169 n.7 (Alaska 1987).

The UCC argues that the plan unfairly discriminates and is not proposed in good faith.  In addition, the UCC contends that the plan grants third party discharges in violation of § 524(e).[36]  These arguments address the same contested property issues noted above: whether certain property is property of the estate, separate property, or property held in trust by CBNA.  These issues will not be summarily determined here.  They will be addressed at confirmation, or in the context of an adversary proceeding.

5)   Adequacy of Disclosure Statement

As noted above, two orders entered concurrently with this memorandum – one on the UCC's motion for authority to commence, prosecute and settle litigation on behalf of the bankruptcy estate and the other in the "lost policies" case – have a significant impact on the posture of this case and would require amendment of the disclosure statement and plan even absent objection to its approval from other parties.  CBNA must amend its disclosure statement to include a brief discussion of these rulings, and must also amend its plan and disclosure statement to be consistent with these two decisions.

The UCC and the insurance companies have objected to the adequacy of the disclosure statement as well.  CIC first points to "Alternate Proposal B,"the provision in the disclosure statement which provides for the assignment of CBNA's right, title and interest in the two pending adversary proceedings and its insurance policies.  The disclosure statement doesn't identify the assignee of these rights and interests.  CIC says the assignee should be specified.  At the disclosure statement hearing, CBNA agreed to clarify this point

---

[36] This argument would be rendered moot in large part if the court were to find, as the UCC contends, that the parishes and certain other entities are not separate from CBNA.

after consultation with the UCC.  The plan and disclosure statement should be amended accordingly.

CIC notes that the debtor failed to include copies of the proposed Settlement and Litigation Trusts, and says the debtor should disclose the proposed trustees and the Special Arbitrator under the documents.  The UCC also pointed out that the terms of the Settlement Trust Agreement were not disclosed.  At the hearing, CBNA's counsel said draft copies of the documents could be provided, but that she had hoped for the UCC's participation in this arena.  However, even absent the UCC's cooperation, I feel that any trusts proposed under the disclosure statement, and the identities and qualifications of the proposed trustees and any other professionals to be employed by the trusts, should be included in the amended disclosure statement.

CIC maintained that examples of possible distributions to claimants under the plan should be included in the disclosure statement.  The UCC raised this argument as well, noting that the first question any tort claimant would ask before voting on a plan is, "How much is the Debtor proposing to pay on my claim?"[37]  The pending disclosure statement had indicated that this disclosure would be made.[38]  I agree that this is an important detail which should be included in an amended disclosure statement.  At the hearing, CBNA agreed to produce a range of possible distributions to tort claimants based on the funds recovered from insurance carriers and the distribution of other assets.  No prejudice would accrue to the debtor by providing this information.

---

[37] UCC Obj. (Docket No. 467), at 3 n.2.

[38] CBNA's Disclosure Statement (Docket No. 444), at 75.

17

Finally, CIC argues that the disclosure statement doesn't describe how the insurer's contractual rights will be affected by the plan, or whether their rights to object to claims under § 502(a) will be altered. As noted above, these are confirmation issues, not disclosure issues. Further, the disclosure statement and plan will require amendment in any event, with regard to CIC, because of this court's decision in the policies existence case.

CIC specifically objects to how it has been characterized in the disclosure statement. CBNA must amend its references to CIC in the disclosure statement and plan to be consistent with this court's decision in the policies existence case.

The Catholic Relief Insurance Company ("CRIC") also seeks a change to the disclosure statement. It says it has never provided coverage of any type to CBNA. However, CBNA's inclusion of CRIC within the plan's definition of "insurance company" is not conclusive on this issue. Such coverage issues will be determined in the scope of coverage adversary proceeding. The disclosure statement doesn't require amendment as to this point.

The UCC has raised a number of objections with regard to the disclosure statement, saying that there are "myriad areas" where the disclosure statement is deficient.[39] Some of the UCC's objections have already been resolved above. CBNA will include the trust documents and provide potential distributions to the tort claimants in its amended disclosure statement. CBNA will also provide a liquidation analysis, consistent with its view of the law. CBNA should discuss which assets are included in the liquidation analysis, which assets it believes are excluded, and why. The valuation of assets must also be included, with CBNA's basis for arriving at such valuations. CBNA should note that the UCC disagrees

---

[39] UCC's Obj. (Docket No. 467), at 30.

18

with its analysis.  Alternatively, the UCC can prepare a liquidation analysis based on its view of the law in this case, and have it included in the disclosure statement as an exhibit.

With regard to the Endowment, the UCC says CBNA should be required to disclose that Bishop Kettler has the power to unilaterally amend the Endowment documents to access principal and income for the benefit of creditors.  I disagree, but do note that CBNA's disclosure statement expresses its position as to why the Endowment is not an asset of this estate as "black letter" law.[40]  This is one of the most contested issues present in this case.  The amended disclosure statement should include a recitation of CBNA's  reasons for not including it in the plan, and a sentence noting that the UCC disputes this position.

The UCC closes its objections as to the disclosure statement's adequacy with a barrage of bullet points.  First, the UCC says CBNA should explain why Bishop Kettler is not "exercising his unilateral power to amend the Endowments to substantially increase contribution to the Plan."[41]  This is a good cross-examination question for confirmation.  There is no point in including it in the disclosure statement.  It does not add more meaningful information to the plan which has been filed.

Second, the UCC says the disclosure statement should explain the "financial impact of increasing distributions from the endowments from 5.5% of the 'fair market value' to 6.25% of the 'principal value' and how the Bishop settled upon the 6.25% figure."[42]  CBNA should furnish this information.

---

[40] CBNA's Disclosure Statement (Docket No. 444) at 24.

[41] UCC's Obj. (Docket No. 467), at 30.

[42] *Id.*

19

The UCC's third bullet point asks "[w]hy CBNA has not raised taxes on juridic persons or allocated a portion thereof to pay creditors."[43]  The disclosure statement should note that Parish taxes are not be raised to fund the plan, and briefly explain why.  This likely would be included by CBNA in any event, in its liquidation analysis, to be consistent with *Teamsters*.[44]

The UCC's fourth bullet point requests disclosure regarding the "extent to which monetizing the value of the so-called 'mission critical' assets would substantially burden the exercise of religion."[45]  This is a confirmation issue.  It needn't be further addressed in the disclosure statement.

The UCC's fifth bullet point asks "[w]hy the Bishop has not exercised his authority to amend, directly or indirectly, the Bylaws to the Monroe Foundation, Inc. to reach its assets."[46]  This is a corollary to the first bullet point regarding tapping the Endowments.  It is an issue for confirmation.  It need not be addressed in a disclosure statement for a plan which does not propose to utilize the assets of the Monroe Foundation to pay creditors.

The UCC's sixth bullet point seeks information about "the Agreed Minimum under the Alaska Shepherd Sharing Agreement."[47]  The debtor should provide this information in its amended disclosure statement.

---

[43] *Id.*

[44] *See In re General Teamsters, Local 890,* 223 B.R. 719, 730-31; *aff'd*, 265 F.3d 869, 877.

[45] UCC's Obj. (Docket No. 467), at 30.

[46] *Id.*

[47] *Id.*

20

The UCC's seventh bullet point asks if "CBNA has asked for substantial, additional help from other dioceses and, if not, why."[48]   This point has already been addressed above.  CBNA will provide this information in its amended disclosure statement.

The UCC's eighth bullet point questions "[w]hy amounts from the so-called priest retirement accounts are not treated as any other asset of the estate such that the value thereof would be contributed to creditors under the Plan."[49]  This is a confirmation issue and, except to the extent that CBNA may explain its position further on this asset in the context of a liquidation analysis, further information in the disclosure statement is not required.

The UCC's ninth bullet point asks "[w]hy capital expenditures appear set to increase by hundreds of thousands of dollars over the life of the Plan."[50]  The debtor should address this point in its amended disclosure statement.

The UCC's tenth bullet point requests the "basis for the Debtor's assumption that CBNA will receive $1 million from a raffle as stated in the assumptions to Disclosure Statement, Exhibit 7."[51]   This information should be included as part of the debtor's liquidation analysis.

The UCC's eleventh bullet point seeks the "basis for the assumption that $3 million will be recovered from the Pilgrim Hot Springs Allocation in light of the lack of

---

[48] *Id.*

[49] UCC's Obj. (Docket No. 467) at 31.

[50] *Id.*

[51] *Id.*

21

development to date."[52]  Again, the basis for this assumption should be included as part of the debtor's liquidation analysis.

The UCC's twelfth and final bullet point asks why "the Settlement Trust, apparently an integral component of the Plan, is not provided."  This point has already been resolved, above.  A copy of the settlement trust will be provided.

Conclusion

CBNA will be given an opportunity to amend its plan and disclosure statement, consistent with this memorandum and with the court's decisions in the lost policies case and with regard to the UCC's motion for authority to prosecute avoidance actions on behalf of the estate.  A summary of the required amendments is attached to this memorandum.

An order will be entered consistent with this memorandum.


/ / / /

/ / / /

---

[52] *Id.*

22

DATED: September 11, 2009

BY THE COURT


 /s/ Donald MacDonald IV
DONALD MacDONALD IV
United States Bankruptcy Judge

Serve:  S. Boswell, Esq.
        M. Mills, Esq.
        F. Elsaesser, Esq.
        D. Paige, Esq.
        D. LaGory, Esq.
        D. Spector, Esq.
        M. Pompeo, Esq.
        W. Corbett, Esq.
        P. Nash, Esq.
        R. Dykstra, Esq.
        C. Ekberg, Esq.
        R. Orgel, Esq.
        J. Stang, Esq.
        CM/ECF Participants
        K. Hill, Esq.
        U. S. Trustee

        09/11/09

**SUMMARY OF REQUIRED AMENDMENTS
TO CBNA'S DISCLOSURE STATEMENT**

1)   The disclosure statement must include a brief discussion of the court's decisions on the UCC's motion for authority to commence, prosecute and settle litigation on behalf of the bankruptcy estate against the Holy See and Diocese-related entities (Docket No. 440); and the order granting summary judgment to CIC in the lost policies case, *Continental Insurance Co. v. CBNA (In re CBNA)*, Adv. No. F08-90033-DMD. The disclosure statement and plan must be amended to be consistent with these two decisions.

2)   A liquidation analysis, consistent with CBNA's view of the law, must be included. CBNA should discuss which assets are included in the liquidation analysis, which assets it believes are excluded, and why. The valuation of assets must also be included, with CBNA's basis for arriving at such valuations. CBNA should note that the UCC disagrees with its analysis. Alternatively, the UCC can prepare a liquidation analysis based on its view of the law in this case, and have it included in the disclosure statement as an exhibit.

3)   The disclosure statement should include a recitation of CBNA's reasons for not including the Endowments in the Plan, and also include a sentence noting that the UCC disputes CBNA's position.

4)   The disclosure statement should be amended to explain the financial impact of increasing distributions from the Endowments from 5.5% of the fair market value to 6.25% of the principal value, and why the 6.25% figure was selected.

5)   CBNA should include a description of its efforts to raise funds for the plan, including any requests for help it has made to other Dioceses, and the results of those efforts.

6)   Copies of any trust agreements should be included and, even absent cooperation from the UCC, the identities and qualifications of the proposed trustees, special arbitrator, and any other trust professionals should be disclosed.

7)   The disclosure statement must clarify who will be the assignee under "Alternate Proposal B," if this provision is retained.

8)   CBNA should provide a range of possible distributions to tort claimants based on its estimate of funds to be recovered from insurance companies and the distribution of other assets. No prejudice will accrue to CBNA by providing this information.

9)   CBNA must amend its references to CIC in the disclosure statement and plan to be consistent with this court's decision in the lost policies case, *Continental Insurance Co. v. CBNA (In re CBNA)*, Adv. No. F08-90033-DMD.

-1-

10)     The disclosure statement should note that Parish taxes are not being raised to fund the plan, and briefly explain why.

11)     The disclosure statement should also be amended to further explain:

     a)   the "Agreed Minimum" under the Alaska Shepherd Sharing Agreement;

     b)   the basis for CBNA's proposed capital expenditures over the life of the plan, and why those expenditures will increase;

     c)   why CBNA projects that a raffle of certain assets will bring in $1 million to fund the plan; and

     d)   the basis for CBNA's projection that $3 million will be recovered from the Pilgrim Hot Springs Allocation.