Susan G. Boswell, Esq. (AZ #004791; Admitted Pro Hac Vice)
Kasey C. Nye, Esq. (AZ#020610; Admitted Pro Hac Vice)
Lori L. Winkelman, Esq. (AZ#021400; Admitted Pro Hac Vice)
QUARLES & BRADY LLP
One South Church Avenue
Suite 1700
Tucson, Arizona 85701-1621
Telephone:     (520) 770-8700
Facsimile:     (520) 770-2222
Email: susan.boswell@quarles.com
Email: kasey.nye@quarles.com
Email: lori.winkelman@quarles.com

Michael R. Mills, Esq. (AK #891174)
DORSEY & WHITNEY LLP
1031 West Fourth Avenue
Suite 600
Anchorage, AK 99501-5907
Telephone:     (907) 276-4557
Facsimile:     (907) 276-4152
Email: mills.mike@dorsey.com

Attorneys for Debtor, Catholic Bishop of Northern Alaska

## IN THE UNITED STATES BANKRUPTCY COURT

### FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| CATHOLIC BISHOP OF NORTHERN ALASKA, an Alaska religious corporation sole,<br><br>　　　Debtor. | Case No. 08-00110-DMD<br><br>(Chapter 11) |

---

**THIRD AMENDED AND RESTATED DISCLOSURE STATEMENT IN SUPPORT OF DEBTOR'S AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' THIRD AMENDED AND RESTATED JOINT PLAN OF REORGANIZATION FOR CATHOLIC BISHOP OF NORTHERN ALASKA DATED DECEMBER 16, 2009**

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-
1621

Table of Contents

Page

I.    INTRODUCTION ................................................................................. 1

II.   INFORMATION ABOUT THIS DISCLOSURE STATEMENT AND
      PLAN CONFIRMATION PROCESS .................................................. 3

      A.    Definitions And Plan Supremacy.................................................. 3

      B.    Limited Representations ............................................................... 3

      C.    Voting Procedures........................................................................ 5

III.  OVERVIEW OF THE THIRD AMENDED JOINT PLAN .................. 9

IV.   THE DEBTOR ..................................................................................... 12

      A.    The Ministries and Activities of CBNA and the Fairbanks Diocese
            and their Relationship to Roman Catholic Parishes and Parish
            Churches in Northern and Western Alaska.................................. 12

      B.    Other Ministries and Activities of CBNA ................................... 15

      C.    The Sexual Abuse Crisis and the Fairbanks Diocese's Response.............. 18

      D.    The Financial Structure and Operations of CBNA ..................... 23

      E.    Disputes Over Property Ownership and Associated Risks ......... 38

V.    SIGNIFICANT EVENTS PRIOR TO THE REORGANIZATION CASE ......... 65

      A.    Clarification of Fiduciary Relationships..................................... 65

      B.    Creation of the Catholic Trust of Northern Alaska..................... 66

      C.    CBNA's and the Fairbanks Diocese's  Response to the Sexual Abuse
            Crisis .......................................................................................... 67

      D.    The Alaska Clergy Abuse Litigation .......................................... 68

VI.   SIGNIFICANT EVENTS IN CHAPTER 11 ...................................... 69

      A.    First Day Motions ...................................................................... 69

      B.    Employment of Bankruptcy Professionals ................................. 70

      C.    Establishment of Bar Date and Procedures Related to Filing Claims
            Under Seal................................................................................... 71

      D.    Construction Motion ................................................................... 72

      E.    Insurance and Tort Litigation..................................................... 72

      F.    Post-Petition Financing .............................................................. 73

      G.    The Standing Motion and Related Proceedings.......................... 74

Table of Contents
(continued)

Page

H.    Other Property of the Estate ............................................................... 74

I.    Recession Affects CBNA Income and Budgets ........................................ 76

J.    Mediations and Settlement Negotiations ................................................... 77

K.    Stay Relief Proceedings ........................................................................ 77

L.    Plan & Disclosure Statement ................................................................. 77

M.    Events Following the Filing of the Second Amended Plan ....................... 78

VII.    DESCRIPTION OF THE THIRD AMENDED JOINT PLAN ........................... 79

A.    Unclassified and Unimpaired Claims ...................................................... 80

B.    Impaired Claims ................................................................................... 81

VIII.    MEANS FOR EXECUTION OF THE THIRD AMENDED JOINT PLAN ....... 99

A.    Pre-Effective Date Transactions ............................................................ 99

B.    Actions on the Effective Date ................................................................ 100

C.    Post-Effective Date Performance by the Reorganized Debtor ............... 100

D.    Post-Confirmation Management ............................................................. 102

E.    Treatment of Executory Contracts .......................................................... 103

IX.    EFFECT OF CONFIRMATION .......................................................................... 104

A.    Discharge ............................................................................................. 104

B.    Vesting ................................................................................................. 105

C.    Channeled Claims ................................................................................ 105

D.    Exculpation and Limitation of Liability ................................................. 106

E.    Permanent Injunction Against Prosecution of Released and Channeled Claims ................................................................................. 106

X.    FEDERAL TAX CONSEQUENCES ................................................................. 107

XI.    ACCEPTANCE AND CONFIRMATION .......................................................... 110

A.    Voting Procedures ................................................................................ 110

B.    Feasibility ............................................................................................ 112

C.    Best Interests Of Creditors And Liquidation Analysis ........................... 112

D.    Confirmation Over Dissenting Class ...................................................... 114

XII.    ALTERNATIVES TO THE THIRD AMENDED JOINT PLAN ..................... 116

Table of Contents
(continued)

Page

XIII.   RECOMMENDATIONS OF THE DEBTOR AND CONCLUSION ............... 116

# I.
# <u>INTRODUCTION</u>

Catholic Bishop of Northern Alaska, an Alaska religious corporation sole, the debtor and debtor-in-possession ("CBNA" or the "Debtor") in the above-captioned Chapter 11 reorganization case (the "Reorganization Case"), has prepared this Third Amended and Restated Disclosure Statement ("Disclosure Statement") in connection with soliciting acceptances of the "Third Amended and Restated Joint Plan of Reorganization for the Catholic Bishop of Northern Alaska" dated December 16, 2009 (the "Third Amended Joint Plan") from CBNA's Creditors. A copy of the Third Amended Joint Plan is attached as Exhibit "1" to this Disclosure Statement. The Official Committee of Unsecured Creditors (the "Committee") is a co-proponent of the Third Amended Joint Plan. The Committee supports confirmation of the Third Amended Joint Plan and will be sending a letter of recommendation to Creditors recommending that Creditors vote to accept the Third Amended Joint Plan (the "Committee Letter"). The Committee Letter will be a part of the solicitation package that will be sent to Creditors. The Third Amended Joint Plan reflects the agreements between CBNA and the Committee for the reorganization of CBNA and compensation and treatment of the Tort Claims[1] of Tort Claimants. The Third Amended Joint Plan reflects the tireless efforts of retired California State Court Judge William L. Bettinelli ("Judge Bettinelli") who acted as the mediator in the Reorganization Case and the efforts and the willingness of CBNA and the Committee to continue to engage in mediation which resulted in the resolution that is embodied in the Third Amended Joint Plan.

It is impossible to overstate the tragedy of the sexual abuse that was inflicted on literally hundreds of Native Alaskan children and teenagers by a small group of individuals, mostly Jesuit priests or, in some cases, volunteers supervised by Jesuits, who purported to be doing the missionary work of the Roman Catholic Church, but instead inflicted untold pain and suffering on these children and teenagers. CBNA, the civil entity incorporated pursuant to Alaska's

**Quarles & Brady LLP**
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-
1621

---

[1] Capitalized terms used in this Disclosure Statement that are not otherwise defined in this Disclosure Statement will have the meaning ascribed to them in the Third Amended Joint Plan.

QB\9376558.4

Religious Corporations statute for purposes of holding and administering property in trust for the benefit of the Roman Catholic religious entities and functions within the Diocese of Fairbanks (the "Fairbanks Diocese"), together with the Committee proposes the Third Amended Joint Plan in order to pay just compensation to survivors of sexual abuse perpetrated by individuals associated with the Fairbanks Diocese, and to restructure its financial affairs to preserve and develop the ministries and missions that are facilitated by CBNA and are so critical to the people of northern and western Alaska.

The Third Amended Joint Plan memorializes a compromise between CBNA and the Committee after nearly one year and nine months in Reorganization, and extensive litigation and mediations. Below, this Disclosure Statement seeks to provide adequate information for Creditors to be able to evaluate the Third Amended Joint Plan and decide whether to vote to accept the Third Amended Joint Plan. In addition to describing the Third Amended Joint Plan itself, in order to assist Creditors in voting on the Third Amended Joint Plan, this Disclosure Statement provides information about CBNA, its Assets, property that it holds for others, its liabilities, its history, the problem of sexual abuse perpetrated by individuals associated with the Fairbanks Diocese, the steps taken by CBNA to address the injuries inflicted by such sexual abuse and steps taken to prevent abuse from occurring now and in the future. This Disclosure Statement also provides information about CBNA's insurance coverage for these Tort Claims, its current operations and business plan for the future and the events that have occurred in the Reorganization Case, including disputes with the Committee regarding whether the Bankruptcy Court should require CBNA to use property held for others to pay CBNA's Creditors. This Disclosure Statement also describes the process by which Creditors will vote to accept or reject the Third Amended Joint Plan, and the circumstances under which the Third Amended Joint Plan may be approved by the Court, even if some creditors do not vote to accept the Third Amended Joint Plan.

**Quarles & Brady LLP**
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

## II.
## INFORMATION ABOUT THIS DISCLOSURE STATEMENT AND PLAN CONFIRMATION PROCESS

### A.    Definitions And Plan Supremacy

All terms defined in the Third Amended Joint Plan will have the same meanings when used in this Disclosure Statement, unless it is expressly stated that a term will have a different meaning when used in this Disclosure Statement.  In addition, unless otherwise stated, terms used in this Disclosure Statement will have the same meanings as in the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure or the Local Rules of the Bankruptcy Court.  Terms defined in this Disclosure Statement which are also defined in the Third Amended Joint Plan or the other sources described above, are solely for convenience when reading this Disclosure Statement; the Debtor does not intend to change the definitions of those terms from the Third Amended Joint Plan or from the otherwise applicable sources.  Furthermore, in the event of any inconsistency between the Third Amended Joint Plan and this Disclosure Statement, the Third Amended Joint Plan will control.  The exhibits attached to this Disclosure Statement are incorporated into and are a part of this Disclosure Statement.

### B.    Limited Representations

This Disclosure Statement is submitted in accordance with Bankruptcy Code § 1125 for the purpose of soliciting acceptances of the Third Amended Joint Plan from holders of certain Claims.  This Disclosure Statement has been approved by the Bankruptcy Court as containing information of a kind, and in sufficient detail, which is adequate to enable you to make an informed judgment whether to vote to accept or to reject the Third Amended Joint Plan.

In determining whether the Third Amended Joint Plan should be confirmed, the Bankruptcy Court will consider whether the Third Amended Joint Plan satisfies the requirements of the Bankruptcy Code, including whether it is feasible, and whether it is in the best interests of the holders of Claims.  The Bankruptcy Court also will receive and consider a ballot report prepared by the Debtor, concerning the votes for acceptance or rejection of the Third Amended Joint Plan by parties entitled to vote.  Only holders of Allowed Claims that are impaired under

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona  85701-1621

the Third Amended Joint Plan will be allowed to vote to accept or reject the Third Amended Joint Plan.

THIS DISCLOSURE STATEMENT IS NOT THE THIRD AMENDED JOINT PLAN. THIS DISCLOSURE STATEMENT, TOGETHER WITH THE THIRD AMENDED JOINT PLAN, WHICH IS ATTACHED HERETO AS EXHIBIT "1", SHOULD BE READ COMPLETELY.  FOR THE CONVENIENCE OF CREDITORS, THE THIRD AMENDED JOINT PLAN IS SUMMARIZED IN THIS DISCLOSURE STATEMENT, BUT ALL SUMMARIES AND OTHER STATEMENTS REGARDING THE THIRD AMENDED JOINT PLAN ARE QUALIFIED IN THEIR ENTIRETY BY THE THIRD AMENDED JOINT PLAN ITSELF, WHICH IS CONTROLLING IN THE EVENT OF ANY INCONSISTENCY.

The Bankruptcy Court will hold a hearing on confirmation of the Third Amended Joint Plan on January 25 and 26, 2010, commencing at 9:00 a.m. Alaska Standard Time (the "Confirmation Hearing") and continuing thereafter until conclusion of the Confirmation Hearing. The Confirmation Hearing may be adjourned from time to time without further written notice.

Information contained in this Disclosure Statement was obtained from knowledgeable personnel at CBNA or from the books and records of CBNA.  Financial information developed for purposes of this Disclosure Statement was developed by personnel at CBNA working with the Debtor's Professionals.  Certain materials contained in this Disclosure Statement are taken directly from other, readily accessible documents or are digests of other documents.  While every effort has been made to retain the meaning of such documents, you are urged to rely upon the contents of such documents and only after a thorough review of the documents themselves.

NO REPRESENTATIONS OR ASSURANCES CONCERNING THE DEBTOR, INCLUDING, WITHOUT LIMITATION, ITS OPERATIONS, THE VALUE OF ITS ASSETS, OR THE FUTURE OPERATIONS OF THE REORGANIZED DEBTOR ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. UNLESS OTHERWISE EXPRESSLY STATED, PORTIONS OF THIS DISCLOSURE STATEMENT DESCRIBING CBNA HAVE NOT BEEN SUBJECT TO A CERTIFIED

**Quarles & Brady LLP**
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

AUDIT, BUT HAVE BEEN PREPARED FROM INFORMATION COMPILED BY CBNA FROM RECORDS MAINTAINED IN THE ORDINARY COURSE OF ITS BUSINESS. EVERY EFFORT HAS BEEN MADE TO BE AS ACCURATE AS POSSIBLE IN THE PREPARATION OF THIS DISCLOSURE STATEMENT.

THIS IS A SOLICITATION BY THE DEBTOR AND IT IS NOT A SOLICITATION BY THE DEBTOR'S ATTORNEYS OR ANY OTHER PROFESSIONALS EMPLOYED BY THE DEBTOR.   THE REPRESENTATIONS MADE HEREIN ARE THOSE OF THE DEBTOR AND NOT OF THE DEBTOR'S ATTORNEYS OR ANY OTHER PROFESSIONAL. THE COMMITTEE WILL ALSO BE SOLICITING ACCEPTANCES OF THE PLAN; HOWEVER NONE OF THE REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT ARE REPRESENTATIONS OF THE COMMITTEE OR THE COMMITTEE'S PROFESSIONALS.   ALL REPRESENTATIONS AND STATEMENTS MADE BY THE COMMITTEE WILL BE CONTAINED IN THE LETTER OF THE COMMITTEE ACCOMPANYING THIS DISCLOSURE STATEMENT.

REASONABLE EFFORTS HAVE BEEN MADE TO ACCURATELY PREPARE ALL UNAUDITED FINANCIAL STATEMENTS WHICH MAY BE CONTAINED IN THIS DISCLOSURE STATEMENT FROM THE INFORMATION AVAILABLE TO THE DEBTOR. HOWEVER, AS TO ALL SUCH FINANCIAL STATEMENTS, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED THEREIN IS WITHOUT ERROR.

APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE CERTIFICATION BY THE COURT THAT THIS DISCLOSURE STATEMENT IS WITHOUT INACCURACY.

C.      **Voting Procedures**

In accordance with Bankruptcy Code § 1122(a), the Third Amended Joint Plan classifies Claims into different Classes based on similarities and differences between the legal rights associated with the Claims and provides for how each Class of Claims will be treated.

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-
1621

Specifically, the Third Amended Joint Plan classifies Claims against the Debtor into the following Classes:

Class 1 – Priority Employee Unsecured Claims

Class 2 – Prepetition Date Secured Tax Claims

Class 3 – Other Secured Claims

Class 4 – Great Falls Secured Claim

Class 5 – Annuity Secured Claims

Class 6 – General Unsecured Convenience Claims

Class 7 – Jesuit Unsecured Claims

Class 8 – General Unsecured Claims

Class 9 – Other Tort and Employee Claims

Class 10 – Tort Claims and Future Tort Claims

Class 11 – Insurance and Benefit Claims

Class 12 – Continental Claims

Class 13 – Pilgrim Springs Claims

Class 14 – Penalty Claims

The Third Amended Joint Plan's treatment of a Class will either "impair" the Claims in that Class or leave them "unimpaired." Claims are impaired if the Third Amended Joint Plan in any way alters the legal, equitable, or contractual rights associated with the Claims or if the Third Amended Joint Plan provides for paying less than the full amount of the Allowed Claims. Holders of Claims in Classes which are impaired under the Third Amended Joint Plan may vote to either accept or reject the Third Amended Joint Plan. If you are the holder of such Claim, it is important that you vote.[2]

---

[2] Holders of Claims which are unimpaired, that is their rights are not altered and they will be paid or satisfied in full, are deemed to have accepted the Third Amended Joint Plan and are not required to vote. See Bankruptcy Code § 1126(f). Similarly, holders of Claims who will receive nothing under the Third Amended Joint Plan are deemed to reject the Third Amended Joint Plan and also need not vote. See Bankruptcy Code § 1126(g).

**Quarles & Brady LLP**
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

In order to confirm the Third Amended Joint Plan, at least one Class of Claims impaired by the Third Amended Joint Plan must vote to accept the Third Amended Joint Plan.  In order for a Class of Claims to vote to accept the Third Amended Joint Plan, votes representing at least two-thirds (2/3) in amount of the Claims in that Class that vote and more than one-half (1/2) in number of the Claims in that Class that vote must be cast in favor of accepting the Third Amended Joint Plan.  As more fully described below, the Debtor is seeking acceptances from holders of Allowed Claims in the following Classes (reserving the right to supplement as to any other impaired Class(es) of Claims, if any):

| Class | Description | Status |
|-------|-------------|--------|
| Class 2 | Prepetition Date Secured Tax Claims | Impaired – Entitled To Vote |
| Class 3 | Other Secured Claims | Impaired – Entitled To Vote |
| Class 4 | Great Falls Secured Claim | Impaired – Entitled To Vote |
| Class 6 | General Unsecured Convenience Claims | Impaired – Entitled To Vote |
| Class 7 | Jesuit Unsecured Claims | Impaired – Entitled To Vote |
| Class 8 | General Unsecured Claims | Impaired – Entitled To Vote |
| Class 9 | Other Tort and Employee Claims | Impaired – Entitled To Vote |
| Class 10 | Tort Claims and Future Tort Claims | Impaired – Entitled To Vote |
| Class 12 | Continental Claims | Impaired – Entitled to Vote |

The following Classes of Claims are not impaired under the Third Amended Joint Plan, or are otherwise prohibited by the Bankruptcy Code from voting on the Third Amended Joint Plan, for the reason indicated:

**Quarles & Brady LLP**
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-
1621

| Class | Description | Status |
|-------|-------------|--------|
| Unclassified | Administrative Claims | Unimpaired – Deemed to Accept |
| Unclassified | Priority Unsecured Claims | Unimpaired – Deemed to Accept |
| Unclassified | Priority Tax Claims | Unimpaired – Deemed to Accept |
| Class 1 | Priority Employee Unsecured Claims | Unimpaired – Deemed to Accept |
| Class 5 | Annuity Secured Claims | Unimpaired – Deemed to Accept |
| Class 11 | Insurance and Benefit Claims | Unimpaired – Deemed to Accept |
| Class 13 | Pilgrim Springs Claims | Receive $0.00 - Deemed to Reject |
| Class 14 | Penalty Claims | Receive $0.00 - Deemed to Reject |

The specific treatment of each Class under the Third Amended Joint Plan is set forth in the Third Amended Joint Plan and is summarized in Article VII of this Disclosure Statement. It is possible that one or more Classes of Claims will have no Creditors in that Class. In that event, under the terms of the Third Amended Joint Plan, that Class will be deemed to be automatically deleted from the Third Amended Joint Plan.

Bankruptcy Code § 1129(b) provides that, if the Third Amended Joint Plan is rejected by one or more impaired Classes of Claims, the Third Amended Joint Plan nevertheless may be confirmed by the Bankruptcy Court, if: (i) the Bankruptcy Court determines that the Third Amended Joint Plan does not discriminate unfairly and is fair and equitable with respect to the rejecting Class(es) of Claims; and (ii) at least one Class of Impaired Claims has voted to accept the Third Amended Joint Plan.

**A VOTE FOR ACCEPTANCE OF THE THIRD AMENDED JOINT PLAN BY THOSE HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE IS MOST IMPORTANT.   THE DEBTOR RECOMMENDS THAT THE HOLDERS OF ALLOWED CLAIMS VOTE IN FAVOR OF THE THIRD AMENDED JOINT PLAN.   THE DEBTOR FURTHER UNDERSTANDS THAT THE COMMITTEE RECOMMENDS THAT THE HOLDER OF ALLOWED CLAIMS VOTE IN FAVOR OF THE THIRD AMENDED JOINT PLAN.**

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-
1621

## III.
## OVERVIEW OF THE THIRD AMENDED JOINT PLAN

As discussed above, CBNA filed this Reorganization Case in order to pay just compensation to survivors of sexual abuse perpetrated by individuals associated with the Fairbanks Diocese and to restructure its financial affairs to preserve and develop the ministries and missions that are facilitated by CBNA and are so critical to the people of northern and western Alaska. CBNA and the Committee have proposed the Third Amended Joint Plan to accomplish these goals. Under the Third Amended Joint Plan the Debtor, with additional help from its KNOM division, the Parish Churches, the Monroe Foundation, increased insurance settlements and agreements by professionals to forego certain fees, has been able to commit to a guaranteed payment of $9.8 million to the Fund for paying Tort Claims. The $9.8 million amount to be paid to Tort Claimants is net of administrative expenses (representing an increase in funding of over $1,300,000 compared with the Second Amended Plan proposed by the Debtor on October 26, 2009). The $9.8 million will be transferred to the Fund by CBNA on or before the Effective Date. The Third Amended Joint Plan also contains certain minor modifications to the treatment of Tort Claims as well as certain refinements to the *Great Divide* settlement arrangement proposed in the Second Amended Plan.

As a result, the Third Amended Joint Plan provides for the sale of CBNA's essential ministry property, including the Catholic Schools of Fairbanks, to the Endowment in exchange for approximately $7.9 million of Cash on or before the Effective Date. One of the conditions of the Endowment's purchase of CBNA's Real Property is a dismissal of any actions pending against the Endowment, a finding in the Confirmation Order that the Endowment, as a charitable trust, is properly excluded from the Estate and approval by the Bankruptcy Court of the sale of CBNA Real Property to the Endowment. In order to accomplish this sale, the Third Amended Joint Plan also provides for amendments to the Endowment Documents that must be approved by the Confirmation Order.

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

In addition, CBNA will immediately sell the Pilgrim Springs Property at an auction to be conducted on February 25, 2010. The Endowment will submit the opening bid at the Pilgrim Springs Auction for $1.85 million (the "Pilgrim Springs Guaranteed Sale Price"). If there are third party bidders at the Pilgrim Springs Auction who submit bids in excess of the Pilgrim Springs Guaranteed Sale Price and close on the sale, all excess proceeds, net of customary closing costs of the sale will be paid to the Fund to then be used in accordance with the Plan.

In addition, the Third Amended Joint Plan effects a settlement and compromise between the CBNA and the Estate on the one hand and the Parish Churches, Monroe Foundation, and the Catholic Trust of Northern Alaska ("CTNA") on the other hand, pursuant to which the Parishes agree to contribute $650,000 from their unrestricted funds on deposit with the CTNA to the Fund for paying Tort Claimants and the Monroe Foundation agrees to contribute $150,000, in order to settle any and all claims that CBNA, as the Debtor-in-Possession and the Estate may have to the property of the Parish Churches, the Monroe Foundation or the CTNA, including any and all Avoidance Actions. As a result of this settlement, the Parish Churches, the CTNA and the Monroe Foundation will become Participating Third Parties under the Third Amended Joint Plan and will receive the protections of the Channeling Injunction provided under the Third Amended Joint Plan. In addition to the foregoing, CBNA will also transfer to the Fund, proceeds from an insurance settlement with Alaska National Insurance Company ("Alaska National"), which increased from $1,100,000 to $1,400,000. The Alaska National settlement will be the subject of a motion under Bankruptcy Rule 9019 when CBNA and Alaska National complete documentation. CBNA will also assign its claims of indemnity, allocation of fault and contribution against the Sisters of Saint Ann to the Fund, as well as any claims it may have for insurance coverage under the Oregon Province of Jesuit's Safeco Insurance Policies and the Jesuit Allocation of Fault Claims net of any amounts utilized to setoff against the Jesuit Unsecured Claims.

The Third Amended Joint Plan provides for certain modifications to the treatment of Tort Creditors. First, there is the addition of a Convenience Tort Claim treatment, which will allow

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-
1621

Tort Creditors to opt out of the Litigation Protocol and the Litigation Trust (if one is established) and Settlement Trust claim allowance and evaluation procedures and receive $2,500 within thirty (30) days of the Effective Date of the Plan.   Second, there are certain modifications to the Litigation Protocol for allowing and liquidating Tort Claims that opt into Litigation Tort Claim treatment.   Third, there are certain refinements to the process governing Settling Tort Claims: (1) Settling Tort Claims are deemed Allowed and Allowed Settling Tort Claims are assigned by the Settling Tort Claimants to the Settlement Trustee; the liquidated amount of the assigned Settling Tort Claims will be determined by either Claim Allowance Agreements which have been approved as reasonable by the Bankruptcy Court under Bankruptcy R1ule 9019, or will be liquidated by the Special Arbitrator in a Binding Arbitration Proceeding; (2) Each Settling Tort Claimant will receive a reasonable share of the Settlement Trust based on a matrix of evaluation factors that was developed in connection with the settlement between the Jesuits and one hundred thirteen (113) Tort Claimants in December 2007.  The Settlement Trustee will make a preliminary distribution from the Settlement Trust shortly after the matrix evaluation is completed and as expeditiously as possible after the Effective Date.   The Third Amended Joint Plan also gives effect to a covenant settlement arrangement under *Great Divide Insurance Co. v. Carpenter*, 79 P.3d 599 (Alaska 2003), and other legal authority, pursuant to which CBNA will assign its Claims against Great Divide Candidate Insurers to the Settlement Trustee, who will pursue Debtor's insurance coverage claims against the Great Divide Candidate Insurers for the Settling Tort Claimants Allowed Claims.  In addition, each Settling Tort Claimant will assign any of his or her Claims against a Great Divide Candidate Insurer to the Settlement Trustee. Proceeds from actions against the Great Divide Candidate Insurers will be used to fund additional distributions from the Settlement Trust to Settling Tort Claimants and will also be used to fund the Future Claims Reserve.

**Quarles & Brady LLP**
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-
1621

## IV.
## THE DEBTOR

A.   **The Ministries and Activities of CBNA and the Fairbanks Diocese and their Relationship to Roman Catholic Parishes and Parish Churches in Northern and Western Alaska**

CBNA is the civil entity incorporated pursuant to Alaska's Religious Corporations statute since 1952, to hold and administer property in trust for the benefit of all of the religious entities and functions that exist within the Fairbanks Diocese (or its ecclesiastical predecessor, the Vicariate Apostolic of Alaska).  The Fairbanks Diocese is the ecclesiastical entity subject to the jurisdiction of the Bishop, presently Most Reverend Donald J. Kettler, JCL ("Bishop Kettler") who serves as the principal teacher, sanctifier, and governor of the Roman Catholic faith and the Catholic faithful within the territory of the Fairbanks Diocese.  As reflected in the map of the Fairbanks Diocese that is attached as Exhibit "2" to this Disclosure Statement, the territory of the Fairbanks Diocese is vast.  It stretches from Tok, near the Canadian border, all the way across the state to Little Diomede near the border with Russia; from Barrow on the coast of the Arctic Ocean to Chefornak south of Nelson Island, encompassing almost 410,000 square miles (an area slightly more than one and one half times the area of the state of Texas).  Within its boundaries, the Fairbanks Diocese is home to 15,500 Catholics, out of a general population of 161,000.  The Fairbanks Diocese is also the ecclesiastical entity through which the Bishop carries out his duties in accordance with the Code of Canon Law ("Canon Law"), which is the ecclesiastical law of the Roman Catholic Church.

There are many other Roman Catholic ecclesiastical entities that operate within the Fairbanks Diocese.  Under Canon Law, such entities are referred to as "juridic persons."  The most prominent of these ecclesiastical entities are Parishes, but other juridic persons include the various religious orders that minister within the Fairbanks Diocese's territory.

Under Canon law, Parishes are defined as established stable communities of the Christian faithful whose pastoral care is entrusted by the diocesan bishop to its proper pastor.  Although appointed by the diocesan bishop, a pastor does not receive his power from the diocesan bishop,

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

but rather from his office as pastor, nor is a pastor of a parish the representative or delegate of the diocesan bishop. Instead, the power of a pastor stems from his office. CIC, c. 131, 519. The pastor, not the Bishop, is the steward of all of the property of the parishes to which he is appointed. CIC, c. 532. Although in many parts of the United States parishes are separately incorporated, in Alaska parish communities function for civil law purposes as unincorporated associations typically known as "____ Catholic Church." In this Disclosure Statement, the civil law unincorporated associations are referred to as "Parish Churches" and the ecclesiastical juridic persons are referred to as "Parishes."

Including the five Parishes in the Fairbanks and North Pole metropolitan area, only nine (9) of the forty-six (46) Parishes in the Fairbanks Diocese are located on the road system. The rest of the Parishes are located in rural villages that are only accessible by airplane year round. In the summer, many of these villages are accessible by boat, and in winter by snow machine. Approximately eight (8) Parishes are located in the Interior Region in primarily Athabaskan villages situated on or near the Koyukuk, Kuskokwim, Tanana and Yukon Rivers. There are five (5) Parishes and two (2) mission churches in the Northern Region, including the urban areas of Nome and Barrow. These churches serve largely Inupiat Eskimo and Caucasian populations. There are also approximately twenty-four (24) Parishes serving Yup'ik Eskimo villages and the Yukon Kuskokwim Region. The locations of the Parishes within the Fairbanks Diocese are reflected on the Exhibit "2" map.

It is well documented that the rural Alaska villages where most of the Parishes are located suffer from staggering poverty and social problems[3] when compared to national

---

[3]    See, "A Summary of Recent Findings Regarding Substance Abuse in Alaska," http://www.hss.state.ak.us/dph/PDF/substance%20abuse/ExecSmries.pdf; See "Alaska Behavioral Health Score Card Drill Down, December 2008," http://www.hss.state.ak.us/pdh/healthplanning/scorecard/assets/indicators.pdf; See "Alaska Family Violence Prevention Project" http://www.hss.state.ak.us/dph/ipems/injury_prevention/akfvpp/bkgnd.htm

**Quarles & Brady LLP**
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

averages. In spite of these challenges, the Parishes located in so-called "Bush Alaska" are truly remarkable "communities of the Christian faithful." Due to the severe shortage of priests in the Fairbanks Diocese (there are only 18 active priests including the Bishop[4]), only five (5) of the Fairbanks Diocese's forty-six (46) Parishes have the benefit of a full-time, assigned priest as pastor. For Canon Law purposes, Bishop Kettler has appointed the Vicar General for the Parishes without a resident pastor, alternatively he has appointed the Coordinator for Office of Rural Ministries for the Yukon Kuskokwim Region as Parish administrator for the twenty-four (24) Parishes in the Yukon Kuskokwim Region.[5] Typically these Parishes only see a priest once every several weeks. The ministry of these mission Parishes is carried on by trained lay staff members, local volunteer Eucharistic and Catechistic ministers, or one of the more than twenty (20) ordained Native Yup'ik Eskimo deacons, whose ministry is supported by priests and religious brothers or sisters. More often than not, a priest is unavailable to offer the traditional Sunday Mass; instead trained lay leaders or ordained Native deacons from the villages preside over Celebrations of the Word, with Holy Communion, using hosts that were consecrated at the last Mass that was celebrated. This has become a very important part of the spiritual life of many of the Alaskan communities. It is their way of continuing to learn the meaning of the Word and remembering that Jesus continues to live on, in and through all of us.

Whether through major events such as baptisms, weddings, or funerals or through weekly Celebrations of the Liturgy of the Word along with Holy Communion, these Parishes play a distinctive role in the continued vitality of village life, offering communities both spiritual succor and common ground where all are welcome. Parish Churches' facilities are often gathering spots in the communities where they are located and important parts of the communities in which they

---

[4] That is roughly one priest for every 24,000 square miles-an area slightly smaller than West Virginia.

[5] Canon Law authorizes appointment of administrators to serve as a temporary substitute for a pastor.

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

exist.  In addition to volunteer Native Deacons and lay ministers, almost all of these Parish Churches have at least one lay paid administrator who typically works several hours per week keeping up the property, keeping the books, keeping sacramental records and coordinating religious services.  The only geographic area within the Fairbanks Diocese that has more than one Parish is Fairbanks.

Only eight (8) of the forty-six (46) Parishes and missions are self-supporting, meaning that they raise enough from plate collections and donations from parishioners to sustain their own operations.  The eight self-supporting Parishes are:

       a.    St. Patrick Church, Barrow

       b.    Immaculate Conception Church, Bethel

       c.    Our Lady of Sorrows, Delta Junction

       d.    Sacred Heart Cathedral, Fairbanks

       e.    Immaculate Conception Church, Fairbanks

       f.    St. Mark's University Parish, Fairbanks

       g.    St. Nicholas Church, North Pole

       h.    St. Raphael Church, Fairbanks.

The other Parish Churches fund their Parishes' operations through a combination of plate collections and subsidies from CBNA.  As a result of the poverty and social challenges of the communities within its territory, as well as the inability of most of the Parishes in its territory to sustain themselves financially, the Fairbanks Diocese is considered the only fully missionary Catholic diocese in the United States, falling under the "Congregation for the Evangelization of Peoples," the Church's international missionary wing formerly known as the Sacred Congregation for the Propagation of the Faith. `

**B.**    **Other Ministries and Activities of CBNA**

There are only two Catholic schools in the Fairbanks Diocese which share a campus in the City of Fairbanks just three (3) miles from CBNA's Chancery Offices.  Immaculate Conception Elementary and Monroe Junior/Senior High, also known as the Catholic Schools of

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-
1621

DISCLOSURE STATEMENT SUPPORTING THIRD AMENDED JOINT PLAN OF REORGANIZATION    Page 15 of 120
In re *Catholic Bishop of Northern Alaska*, Case No. 08-00110-DMD
QB\9376558.4

Fairbanks ("CSF"), have been a vibrant part of the social fabric of the Fairbanks community since 1946, counting many prominent Alaskans among its alumni. Although it receives a substantial subsidy from CBNA, the majority of funding for CSF comes from tuition and fundraising efforts of the Monroe Foundation, Inc., a separate non-profit corporation renowned for its annual three day HIPOW auction fundraiser. The Board of Directors for the Monroe Foundation also provides guidance to CSF administration.

The Fairbanks Diocese is also home to the oldest Catholic radio station in the country ("KNOM"). Located in Nome on the western edge of the Seward Peninsula more than six hundred (600) miles away from CBNA's main offices, KNOM went on the air in July 1971, after years of planning, fund-raising and work. The educationally oriented, public-service station has garnered dozens of awards for its news and programming. It has full-time listeners throughout Alaska's Seward Peninsula, around Norton Sound, the Yukon-Kuskokwim Delta, and deep into the Russian Far East. It can be heard easily from the Aleutian Islands to the Arctic coast. KNOM's programming sounds similar to many commercial stations with popular music, talk, and news, but in place of the commercials, KNOM inserts 30 and 60-second inspirational and educational spots. KNOM also plays a number of special programs, including the live broadcast of Sunday Mass from St. Joseph Church in Nome, the nightly "Family Rosary," and an inspirational spot which preaches the following week's Gospel, as well as a number of programs from other religious broadcasters. It is wholly financed through listener and donor support from mailing of the "*Static*" newspaper to thousands of donors in the lower forty-eight (48) states. KNOM is staffed with a combination of paid employees and full-time volunteers who receive a small stipend.

The Fairbanks Diocese also conducts several other important ministries, including:

o   The Alaska Native Ministry which includes the Kateri Tekakwitha Center located in Galena, Alaska which serves eight (8) Athabaskan Indian villages in the interior of Alaska and provides educational programs in the surrounding villages to educate

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

individuals to become more proficient in administering their local Parishes in the absence of priests, brothers and sisters;

o  The Native Ministry Training Program based in the Yup'ik Eskimo village of St. Mary's, which offers the very effective training of native Eskimo adults members and local leaders of the Church in the twenty-four (24) Yup'ik Parishes within the geographic territory of the Fairbanks Diocese;

o  The Children and Family Center provides faith-based enrichment and education activities for families and children.   This office includes the Diocesan Child Protection Officer;

o  The Office of Worship supports and guides the sacramental, liturgical and spiritual life of the Fairbanks Diocese and Parishes;

o  Stephen Ministry Outreach offers one-on-one care for people with special needs by well-trained Stephen ministers.  This ministry includes Catholic chaplaincy to the Fairbanks community hospital and nursing homes;

o  The Urban Native Ministry serves as a liaison between the Fairbanks Diocese and the native people living in the Fairbanks urban area;

o  The Diocesan Engineering Office provides services for the actual construction and/or maintenance of Parish Churches and facilities at a major savings in construction and maintenance costs;

In addition, in the Deacon Programs within the Fairbanks Diocese consist of:

o  The Rural Deacon Program, formerly known as the Native Deacon Program, which was founded in 1970 as the first program in the United States to train native men for the permanent diaconate.  Presently, the program has twenty (20) active deacons who minister as the leaders of prayer in eleven (11) of the twenty-four (24) villages that comprise the Yukon-Kuskokwim Region of the Fairbanks Diocese.

o  The Urban Deacon Program has historically functioned as a training program for deacons in urban areas of the Fairbanks Diocese and is currently being revamped.

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

Also, through the Office of Religious Education the Fairbanks Diocese promotes the ministry of catechesis in the Fairbanks Diocese.   Catechesis is the word that describes the essential ministry of the Roman Catholic Church through which the teachings of Christ have been passed on throughout the ages.

## C.    The Sexual Abuse Crisis and the Fairbanks Diocese's Response

The sexual abuse crisis that led CBNA to this point cannot be underestimated as to its impact on the Tort Claimants, the Fairbanks Diocese and the Catholic faithful.  Let there be no doubt, a handful of individuals,[6] mostly Jesuit priests or volunteers, engaged in criminal sexual acts in varying degrees including exposing themselves, genital touching and fondling over and under clothing, oral sex, child rape including vaginal penetration and sodomy, with more than two-hundred fifty (250) mostly native Athabaskan, Yup'ik Eskimo, or Inupiat Eskimo children and teenagers over a period of more than three (3) decades.  These individuals' conduct was despicable, and contrary to every teaching of the Roman Catholic Church (the "Church").  The harm that these individuals caused the survivors, the survivors' families, and the survivors' communities is tragic.  These individuals who perpetrated these horrible crimes also betrayed and injured the Church in so many ways.

Approximately two hundred ninety (290) Proofs of Claim were filed asserting injuries from sexual abuse. Ninety-seven percent (97%) of the Tort Claims occurred more than twenty (20) years before the commencement of this Reorganization Case, and more than half of the abuse occurred more than thirty-five (35) years ago.  There are no allegations of childhood sexual abuse taking place since Bishop Kettler became Bishop of the Fairbanks Diocese.

Attached hereto as Exhibit "3" is a list of individuals associated with the Fairbanks Diocese who have been accused of sexual abuse that are known to CBNA.  Others may have also

**Quarles & Brady LLP**
One South Church Ave.
Suite 1700
Tucson, Arizona  85701-
1621

_____

[6] More than four hundred (400) priests and one thousand (1000) religious women and lay volunteers have served in the Fairbanks Diocese.

engaged in the conduct that they have been accused of, but CBNA has not been able to evaluate the credibility of those Claims.

Survivors started coming forward in large numbers beginning in the fall of 2002. In response, Bishop Kettler has led the Fairbanks Diocese in:

- o Apologizing for the wrongs committed;

- o Appointing a Child Protection Review Board;

- o Implementing a comprehensive policy called Faithful Healing - Preventing and Responding To Ministry Related Child Sex Abuse;

- o Requiring all priests, deacons, religious, and lay employees and volunteers to receive education and training regarding recognizing and preventing childhood sexual abuse;

- o Requiring criminal background checks for all priests, deacons, religious, and lay employees and volunteers ministering in the Fairbanks Diocese;

- o Appointing a survivor assistance coordinator;

- o Advertising to encourage survivors to come forward;

- o Traveling throughout the Fairbanks Diocese to engage in listening sessions in affected communities;

- o Conducting Healing Masses and liturgies that incorporate Native elements;

- o Making himself available to personally meet with survivors; and

- o Requesting that special prayers be added to the intercessions portion of the Mass asking for healing of past wrongs and to strengthen the resolve to prevent future abuse.

The Bishop's forthrightness and aggressive policies to combat the problem of childhood sexual abuse has earned praise both from village communities and from the auditors who audit the extent of the Fairbanks Diocese's implementation of sexual abuse prevention measures adopted by the United States Conference of Catholic Bishops. Bishop Kettler and CBNA intend by the Third Amended Joint Plan that CBNA pay just compensation for the survivors of abuse

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-
1621

and facilitate the future hard work toward healing and reconciliation for everyone involved taking into account the financial circumstances of CBNA and the need to continue the ministry and mission of the Fairbanks Diocese which is critical to the many communities that it serves.

The Third Amended Joint Plan further reinforces CBNA's commitment to reconciliation and healing by continuing CBNA's commitment to assist the healing process and by CBNA's commitment to take additional actions including:

(a)    CBNA will file with the Bankruptcy Court the names of the individuals attached on Exhibit "3" identifying them as the priests, religious, lay employees and volunteers accused of sexual abuse in filed Proofs of Claim. The Debtor will not seek to seal such filing and will oppose any effort by any third party to seal such filing.

(b)    For a period of ten (10) years after the Effective Date, the Reorganized Debtor will post on the home page of its website and the Website of the Fairbanks Diocese, a prominent link on the home page to the names listed on Exhibit "3" and any other known perpetrators (admitted, proven or credibly accused), including deceased perpetrators and those previously listed.

(c)    Within eighteen (18) months after the Effective Date, Bishop Kettler will personally go to every Parish in which any individuals were abused and where those persons identified in Paragraph (a) above served. The Bishop will read from the pulpit a statement of apology and encourage parishioners to support victims. He will also identify all perpetrators that have served in the Fairbanks Diocese and urge all abuse survivors to report abuse to law enforcement, the diocesan Victim's Assistance Coordinator, health care professionals and/or any survivor group or organization felt appropriate by the person wishing to make a report of abuse. He will assure survivors and parishioners that no one will go to hell as a result of coming forward regarding the abuse they suffered and that survivors did not commit any sin in coming forward.

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

DISCLOSURE STATEMENT SUPPORTING THIRD AMENDED JOINT PLAN OF REORGANIZATION    Page 20 of 120
In re *Catholic Bishop of Northern Alaska*, Case No. 08-00110-DMD
QB\9376558.4

The Bishop's visits to the rural Parishes will, to the extent feasible, be publicized by the following means: (i) posted on the Parish Church bulletin board; (ii) posted by the Parish administrator or the Parish contact in the post office, the washeteria, the community center and the store of each village to the extent allowed by each of such place; (iii) announced by VHF radio by the Parish contact person as requested by the Bishop; and (iv) announced on KNOM two weeks in advance. At least thirty (30) days in advance of the Bishop's visit to a Parish, the Bishop will send a written invitation to all known abuse survivors in that Parish inviting them to attend his visit. Consistent with the Bishop's current practice, the Bishop will continue his "listening" sessions and healing ceremonies during the Parish visits.

(d)     A general letter of apology will be displayed on the Fairbanks Diocese's website for a period of ten (10) years from the Effective Date. In addition, this letter of apology will be published in Parish bulletins (where Parish bulletins are used) once a month for three (3) months after the Effective Date. The letter of apology will be read by the Bishop onto a public service announcement to be played on KNOM at least once a month for three (3) months after the Effective Date.

(e)     The statement of apology described above in paragraph (c) and the letter of apology described in paragraph (d) above will, among other things:

(i)     assure the faithful that all the sacraments conducted by perpetrators are not invalid by virtue of the fact that they were conducted by a perpetrator of abuse;

(ii)     include an acknowledgement and apology for the abuses which occurred at Holy Cross Boarding School, the Nulato Catholic Mission School (a/k/a Our Lady of the Snows), and St. Mary's High School (a/k/a St. Mary's Catholic Mission), and also for the cultural

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-
1621

disregard/disrespect resulting from the forced assimilation of Native people;

(f)     No later than sixty (60) days after allowance of any Tort Claim (as defined in the Plan), Bishop Kettler will send individual letters of apology to such Tort Claimant and, if requested by such Tort Claimant, to his or her immediate family.  The letters of apology will state that the survivor was not at fault for the abuse.  Furthermore, the letters will state that no sins were committed by those who have come forward on account of their having come forward.  The letters of apology will be personally signed by the Bishop.

(g)     CBNA will continue to comply in all respects with the following: (i) the Charter for the Protection of Children and Young People initially adopted by the United States Conference of Catholic Bishops in 2002 and revised in 2005 and as it may be amended from time to time; (ii) the Fairbanks Diocese's Faithful Healing, Preventing and Responding To Ministry-Related Child Sexual Abuse policy adopted on August 1, 2003, as revised subsequently and as it may be amended from time to time; and (iii) the Fairbanks Diocese's Policy on Abuse of Vulnerable Adults adopted November 16, 2005, as it may be amended from time to time.  Among other things the Debtor will continue to require individuals working for the Debtor or ministering within the Fairbanks Diocese to sign sworn statements attesting that they have not sexually abused any minor at any time.  Further, the Debtor and the Reorganized Debtor will continue to aggressively assert its policy requiring individuals working for the Debtor or ministering within the Fairbanks Diocese to report any information indicating the existence of sexual abuse to law enforcement.

(h)     Four times per year for five (5) years after the Effective Date and one time per year for twenty (20) years after the Effective Date, the Reorganized Debtor will publish a prominent statement in media available within the Fairbanks

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

DISCLOSURE STATEMENT SUPPORTING THIRD AMENDED JOINT PLAN OF REORGANIZATION                                    Page 22 of 120
In re *Catholic Bishop of Northern Alaska*, Case No. 08-00110-DMD
QB\9376558.4

Diocese, including, where applicable, parish bulletins, parish bulletin boards, Diocesan newsletters circulated within the Fairbanks Diocese (including but not limited to Ministering), KNOM, and on the homepage of the Reorganized Debtor's website, urging persons sexually abused by priests or religious to contact law enforcement, and the diocesan Victim's Assistance Coordinator, doctor or other health care professional or other trusted person and/or any survivor group or organization to make a report of abuse. In addition, the Debtor will provide information of health care professionals for mental health support or counseling.

(i)    The Reorganized Debtor will institute a policy requiring that its representatives (including, but not limited to, Bishop Kettler and the Debtor's spokespersons), not refer either verbally or in print to sexual abuse claimants as "alleged" claimants, "alleged" victims or "alleged" survivors, and urging its representative to refer to claimants as survivors of clergy sexual abuse.

(j)    The Reorganized Debtor will file status reports regarding its compliance with these non-monetary undertakings with the Bankruptcy Court and serve the Settlement Trustee. Reports will be filed semi-annually for the first two years after the Effective Date and annually for the next three years after the Effective Date. Nothing about this reporting requirement will prevent the issuance of a final decree or closing the Reorganization Case.

**D.    The Financial Structure and Operations of CBNA**

The financial operations of CBNA are, in many respects, unlike most other dioceses and archdioceses in the United States. Most dioceses conduct certain ministries but primarily provide oversight and assistance to parishes and deal with matters of the Roman Catholic faith within their territory. This work often includes the need to assist a few of the poorer parishes. Generally speaking, these operations are funded out of chancery taxes assessed against plate collections of the parishes within their territory, from fees for services or other support which is

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

paid to such dioceses and archdioceses by the parishes and other institutions within their respective geographic territories.

CBNA, on the other hand, must subsidize the operation of thirty-eight (38) out of the forty-six (46) Parishes within the Fairbanks Diocese's territory. Accordingly, one of CBNA's primary activities is raising money to subsidize the practice of the Roman Catholic faith in the thirty-eight (38) non-self sustaining parishes, to provide services supporting the operations of these financially non-self sustaining parishes and to provide services to all people regardless of their faith. For purposes of clarity in the discussions and exhibits that follow- CBNA operates on a fiscal year that begins July 1 and ends on June 30.

**1.      Sources of Income**

As reflected in the historical analysis attached to this Disclosure Statement as Exhibit "4", CBNA's operations have five (5) primary sources of income: (a) individual donations solicited by the Alaskan Shepherd (averaging 53.19% of annual income of CBNA since 2000); (b) Endowment Income (averaging 8.86% of annual income of CBNA since 2000); (c) Bequests (averaging 13.31% of annual income of CBNA since 2000); (d) Grants (averaging 14.31% of annual income of CBNA since 2000); and (e) fees for services and Parish Assessments[7] (averaging 6.91 % of annual income since 2000).

       a.      The Alaskan Shepherd

CBNA raises most of the funds necessary to operate the Fairbanks Diocese and fund Parish subsidies through the work of its Alaskan Shepherd office. The work of the Alaskan Shepherd office is two fold. First, it publishes the "The Alaskan Shepherd" newsletter. The newsletter, which is published ten (10) times each year, is meant to keep friends and benefactors of the Fairbanks Diocese informed about and interested in its people and its apostolic works, with articles that are historically accurate, interesting and edifying. Second, the Alaskan

**Quarles & Brady LLP**
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-
1621

---

       [7] The Fairbanks/North Pole area Parishes pay a substantial assessment to subsidize CSF's operation which is part of CBNA.

Shepherd program seeks prayer and raises financial resources which help the Fairbanks Diocese carry out its mission and ministry. The Alaskan Shepherd newsletter and solicitations go to a mailing list of more than forty-five thousand (45,000) donors around the world.

The importance of the Alaskan Shepherd operation to the Fairbanks Diocese and the other Catholic entities and agencies within its territory cannot be overemphasized. One of the most important components of the Alaskan Shepherd's operations is maintaining credibility with its donors around the world that their money goes to the missionary work and specific projects and programs designated (restricted) by the donor. It is one thing to consistently put money in a collection basket that passes through the pew at church each week and an entirely different thing to mail a $5, $10, $25 or $100 check halfway around the world on a regular basis.

Yet thousands of individuals from the lower forty-eight (48) states and around the world do. Many donors' contributions are accompanied by a prayer request. Additionally, there are many people who write-in, expressing a deep interest in the missionary nature of CBNA, but who are too poor to make a contribution. Instead of funds, they send a contribution in the form of a note containing a heartfelt prayer. Further, many individuals write in describing personal difficulties and sufferings and ask that the diocese pray for them and their loved ones. These prayer requests are all brought to the special Mass often led by Bishop Kettler each Thursday morning, specifically mentioning these requests during that portion of the liturgy that is called the "prayers of the faithful." The Alaskan Shepherd also receives hundreds, if not thousands, of Mass intentions. These requests are treated with the utmost care and reverence by the Alaskan Shepherd's staff who ensure that they are distributed to priests according to the donors' wishes.

In order to maintain credibility with its donors, and so that CBNA can manage its cash flow and operations within the law governing the use of charitable gifts, the Alaskan Shepherd office operates a sophisticated and highly accurate donor and donation tracking system. This operation allows CBNA to ensure that donation patterns are tracked and donors' intents are meticulously followed. The viability of CBNA's continued operations and its ability to make a

**Quarles & Brady LLP**
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

Disclosure Statement Supporting Third Amended Joint Plan of Reorganization        Page 25 of 120
                                        In re *Catholic Bishop of Northern Alaska*, Case No. 08-00110-DMD
QB\9376558.4

meaningful contribution (in addition to insurance proceeds) toward funding the Plan depends on its ability to maintain donor confidence throughout the reorganization process.

b.    The Endowment

The Endowment was established in approximately 1980 by Bishop Robert Louis Whelan. The Endowment was further refined and organized by Bishop Michael Joseph Kaniecki in formal documents in approximately 1996.   The Endowment is actually a "collection of endowments created by CBNA to provide for the future of the Fairbanks Diocese by ensuring the fiscal security of the Church, the parishes within the territory of the Fairbanks Diocese, schools, agencies and programs."   The Endowment documents (the "Endowment Documents") provide that:

> [T]he DONATE Fund[8] will:
>
> - Enable individuals, families, and others to support future needs of the Fairbanks Diocese, its parishes, schools, agencies and programs.
> - Provide individuals, families, and others the opportunity to establish a memorial honoring a friend or loved one.
> - Provide individuals, families, and others greater flexibility and focus in achieving their personal giving objectives.

The Endowment Documents also describe certain established Endowment funds to which a donor can donate.  The Endowment Documents also allow for a donor to create an Endowment to "meet specific personal giving objectives" which will then be administered by CBNA.  If additional Endowment funds are established, an Endowment Operating Agreement is executed by the donor or person establishing the Endowment, as well as a Participation Agreement (collectively, "Related Documents").   The largest Endowment fund is the Mission Support Endowment (which was formerly known as the "Alaskan Shepherd Endowment").   From its inception in the early '80's until the early '90's, monies received with express restrictive intent were placed in the Mission Support Endowment.  Beginning in the early 1990's, Bishop Kaniecki

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

---

[8] The DONATE Fund is the name given to the Endowment.

announced a policy whereby, unless a bequest expressly indicated otherwise, all bequest donations would be deposited into the Mission Support Endowment, the corpus preserved and income used in connection with mission support. This policy was widely and regularly published in the Alaskan Shepherd newsletter and otherwise. This policy enabled the Mission Support Endowment to significantly accumulate in value.

Under the Endowment Documents and Related Documents, the Endowment funds are managed under the "total return" concept of Endowment management "to the extent feasible." That means that funds will be invested within specific risk levels to achieve maximum total return (earnings) without regard to the distinction between capital appreciation (realized and unrealized) and yield (interest, dividends, etc.). Further, the Endowment Documents limit earnings withdrawals to 5.5% of the principal value of the fund averaged over the preceding three (3) years. Also, "spending distributions will be limited to the accumulated net yield and capital appreciation (realized and unrealized)." This type of fund management required the fund administrator to determine earnings based on the concept of "historical dollar value." As defined in the Uniform Management of Institutional Funds Act ("UMIFA"), a charity could prudently spend amounts above historic dollar value of all contributions to the fund, valued at the time of contribution. Amounts below historic dollar value cannot be spent. As a result, if the value of Endowment investments falls below an historical dollar value due to shifts in the market, no income could be distributed until market gains increase the value of Endowment investments above the historic levels, even if it meant that the programs that the Endowment was intended to support suffered tremendously. The effect of this principle can be seen in the historical financial data for CBNA where Endowment income fell to $0.00 for the fiscal years ending on June 30, 2002, 2003, and 2004. This result was caused by the devaluation in the market value of Endowment investments after the September 11, 2001 terrorist attacks. CBNA presently is experiencing a similar problem because of the severe market downturn in the fall of 2008. If CBNA were to retain the historical dollar value based management of the Endowment, the Endowment will generate no income for many years.

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

In mid-2002, when the lower earnings from the Endowment did not continue to support the CBNA mission, Fr. Richard Case, after consultation with the Diocesan Finance Council, urged a change in the policy regarding bequests so that, absent specific donor intent to the contrary, bequests would be used to support current operations and would not be placed in the Endowment. This policy was again widely advertised in the Alaskan Shepherd newsletter and otherwise before it was implemented in order to give donors the opportunity to change their wills. Thereafter, if a bequest was received from someone who died after the policy change went into effect, the funds went to general operations unless the bequest documents specifically provided otherwise. The effect of this policy change can be seen in the historical financials where bequest income grew from $179 on June 30, 2002, to as much as $1,915,090 in the year ending June 30, 2005, averaging $981,928 per year.

CBNA has maintained comprehensive accounting records of the various Endowment funds that demonstrate how CBNA has honored donors' intent by recording all corpus funds and segregating out the earnings for the purpose of the Endowment. The Alaskan Shepherd office, with its extensive donation intake and tracking capabilities has always administered the solicitation and intake of donations to the Endowment, and CBNA has similarly managed the funds in a manner consistent with the Endowment purposes and the donors' intent. CBNA has always respected this intent by not using the corpus and by using the income for Endowment designated purposes. The Endowment funds were not reflected as "unrestricted" on financials and were segregated as a separate fund in accordance with the nature of the Endowment.

Based upon applicable Alaska and Federal Bankruptcy law, it is CBNA's position that the Endowment, the Endowment Documents and Related Documents meet the definition of a charitable trust and must be respected. See e.g., *Roberts v. State Dept. of Revenue*, 162 P.3d 1214 (Alaska 2007); *Botelho v. Griffin,* 25 P.3d 689, 693 (Alaska 2001); and *Alaska State Employees Ass'n v. Alaska Pub. Employees Ass'n,* 825 P.2d 451, 459 (Alaska 1991). Therefore, it is CBNA's position that the principal and income from the Endowment are exempt from the Claims of CBNA's Creditors, and neither the property nor the value of the Endowment corpus are

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

included in the Third Amended Joint Plan. See 11 U.S.C. § 541(d); *In re Parkview Hospital*, 211 B.R. 619 (Bankr. N.D. Ohio 1997); and *In re Roman Catholic Archbishop of Portland in Oregon*, 345 B.R. 686 (Bankr. D. Ore. 2006).

The Committee, however, disagreed with this proposition and had filed an adversary proceeding that seeks a declaration that the Endowment corpus and income are part of the Estate and may be invaded to pay Claims pursuant to Bankruptcy Code § 541 (the "Declaratory Judgment Adversary"). However, as a result of the settlement between CBNA and the Committee, upon confirmation of the Plan, the Declaratory Judgment Adversary will be dismissed with prejudice. In addition, as discussed below, the assets of the Endowment are not included in the liquidation analysis or CBNA's analysis of the best interests of creditors test.

In order to facilitate implementation of the Third Amended Joint Plan, the Third Amended Joint Plan provides for two significant amendments to the Endowment Documents. First, the Third Amended Joint Plan provides for modifying the Endowment spending policy that has been based on the historical dollar value concept and implements the prudence standard articulated in the recently promulgated Uniform Prudent Management of Institutional Funds Act ("UPMIFA").[9] Second, and more importantly, the Third Amended Joint Plan modifies the Endowment Documents in order to permit investment in investment and mission real property, and provides for modifications to the permitted asset allocations. The Endowment Documents will be amended to add the following provision to the Investment Guidelines:

(1)    Real estate: real estate includes developed or undeveloped land and buildings that are suitable for use as investment, mission, or school property.

(2)    Investment property will have appropriate income, capital appreciation, marketability and administrative costs characteristics.

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

---

[9] UPMIFA has been enacted by 48 of the 50 states, and was introduced in the Alaska State Senate as SB 134 in 2009. It is presently pending before the Senate Education Committee.

(3)    Mission and School Property must have stable value and the property's use must be necessary for the long term mission of the Catholic Church in Northern Alaska.

The asset allocations will be amended as follows:

|  | Maximum | Minimum | Target |
|---|---|---|---|
| Total Return Based Pooled Fund: | | | |
| Real Estate | 70% | 0% | 40% |
| Equities | 70% | 25% | 45% |
| Fixed Income | 50% | 5% | 10% |
| Cash | 20% | 0% | 5% |

After approval of this amendment, the Endowment will be permitted to acquire real property.  Under the Third Amended Joint Plan, CBNA will sell the following real property to the Endowment which will then become part of the corpus of the Endowment:

| | |
|---|---|
| Catholic Schools of Fairbanks | $3,500,000.00 |
| Chancery property | $1,200,000.00 |
| Kobuk Center/ priest residence | $1,120,000.00 |
| Warehouse maintenance center | $225,000.00 |
| KNOM property, Nome , AK | $430,000.00 |
| FCA  Barnett St Building | $600,000.00 |
| Betty Street Residence | $205,000.00 |
| Hanger | $346,000.00 |
| Kateri Center, Galena | $175,000.00 |
| Cessna 207 | $75,000.00 |
| Lot next to warehouse | $31,000.00 |
| Total | $7,907,000.00 |

In addition, the Monroe Foundation will be funding its contribution to the Plan by selling a vacant lot that it owns to the Endowment for $150,000.  This investment in real estate will represent an allocation of 55% of the historic dollar value of the Endowment and approximately 57% of the value of the Endowment as of December 1, 2009.  Such an investment profile is well within the range permitted by the proposed investment policy revision.

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona  85701-1621

The UPMIFA amendment will greatly stabilize CBNA's ability to operate on a going forward basis. Instead of using historic dollar value as a limitation discussed above, UPMIFA applies a more carefully articulated prudence standard to the process of making decisions about expenditures from an endowment fund which standards are designed to encourage institutions to establish a spending policy that will be responsive to short-term fluctuations in the value of the fund, and allow an institution to maintain appropriate levels of expenditures in times of economic downturn or economic strength. In some years, accumulation rather than spending will be prudent, and in other years an institution may appropriately make expenditures even if a fund has not generated investment return that year. Although the UPMIFA does not require that a specific amount be set aside as "principal," UPMIFA assumes that the charity will act to preserve "principal" (i.e., to maintain the purchasing power of the amounts contributed to the fund) while spending "income" (i.e. making a distribution each year that represents a reasonable spending rate, given investment performance and general economic conditions). Thus, it requires the institution to monitor principal in an accounting sense, identifying the original value of the fund (the historic dollar value of the corpus) and the increases in value necessary to maintain the purchasing power of the fund.

Accordingly, the Endowment Documents will be amended to provide that at least twice annually, on or about March 31 and October 31, the Diocesan Bishop, in consultation with the Diocesan Finance Office and after consulting with the Diocesan Finance Council, may determine such spending distributions from one or more of the Endowments as is prudent for the uses, benefits, purposes and perpetual duration for which an Endowment was established. In determining the spending distributions, the Diocesan Bishop is to act in good faith, with the care that an ordinarily prudent person in a like position would exercise under similar circumstances. The relevant factors to be considered by the Diocesan Bishop in setting the spending distributions for a particular period will be determined by the Diocesan Bishop in consultation with the Diocesan Finance Office and the Diocesan Finance Council.

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

These factors include:

(1)     the need to preserve the Endowment into perpetuity monitoring principal in an accounting sense, identifying the original value of the fund (the historic dollar value) and the increases in value necessary to maintain the purchasing power of the fund;

(2)     the purposes of CBNA, the Fairbanks Diocese and the Endowment fund;

(3)     donor intent;

(4)     general economic conditions;

(5)     the possible effect of inflation or deflation on the fund and the beneficiaries;

(6)     the expected total return from income and the appreciation of investments;

(7)     other resources of CBNA; and

(8)     the investment policy of the Endowment.

The Bishop's authority with respect to spending distributions will be limited to no more than an amount equal to six and one quarter percent (6.25%) of the fair market value of an Endowment fund, calculated on the basis of market values determined at least quarterly and averaged over a period of the preceding three (3) years. The six and one quarter percent (6.25%) figure was chosen in order to be conservative compared to UPMIFA's presumption that a seven percent (7%) withdrawal is prudent.

The Debtor's forecast assumes that as a result of this amendment to the Endowment Documents, CBNA will receive disbursements of an amount equal to two and one-half percent (2.5%) to three percent (3%) of the historic dollar value of the Endowment on a consistent basis. This number is much lower than the six and one quarter percent (6.25%) permitted under the UPMIFA amendment, but reflects an anticipated decrease in returns due to the large investment in mission real estate contemplated under the Third Amended Joint Plan. The lower returns also permit the value of the Endowment to be replenished to historic dollar values over time, while still providing CBNA the ability to rely on the Endowment in its budgeting process.

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona  85701-1621

The Debtor believes that these amendments to the Endowment are prudent and are and will be consistent with donor intent. These amendments also enable CBNA to meet its obligations under the Plan and to finally provide for a consensual way to establish a fund from which to compensate the Tort Claimants while still maintaining the mission and ministry of the Fairbanks Diocese.

        c.       Bequests

As discussed above, beginning in 2002, bequests received from estates of men and women who died before August 1, 2002, but which did not contain an express requirement that the corpus be preserved and only the income used, or other express restriction, were treated as current unrestricted donations. Since 2002, legacies, bequests, and annuity income has averaged $841,678.00 annually. As of the Petition Date, CBNA had approximately one hundred (100) to one hundred fifty (150) pending bequests. That is to say that these donors had named CBNA in a planned giving instrument or had passed away, and CBNA was waiting for the donors' estates to be processed. In many cases, charities are entitled to a percentage of the remainder after all other aspects of the estate have been processed. As such, bequests are often pending for several years until a potential donor dies or while the decedents' estates are probated and administered. Often CBNA is unaware it is a beneficiary of a will or trust until it is contacted by a decedent's personal representative. The precise timing and amount of distributions vary widely and is very difficult to predict.

        d.       Fees for Services and Parish Assessments

The self sustaining Parishes pay a subsidy to the Fairbanks Diocese for support of the non-self sustaining Parishes and the CSF. The assessments are calculated as follows:

**Quarles & Brady LLP**
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

DISCLOSURE STATEMENT SUPPORTING THIRD AMENDED JOINT PLAN OF REORGANIZATION      Page 33 of 120
In re *Catholic Bishop of Northern Alaska*, Case No. 08-00110-DMD
QB\9376558.4

| Parish | Year Established | Years in Existence | Approx Registered Families | Prior Year Revenue | CSF Assessment | | Subsidized Parish Assessment | | Total Assessment | |
|---|---|---|---|---|---|---|---|---|---|---|
| SHC - Fbks | 1967 | 42 | 500 | 396,400 | 48,559 | 12.25% | 20,415 | 5.15% | 68,974 | 17.40% |
| ICC - Fbks | 1903 | 106 | 800 | 402,852 | 49,349 | 12.25% | 20,747 | 5.15% | 70,096 | 17.40% |
| St. Mark - Fbks | 1980 | 29 | 45 | 56,414 | 4,654 | 8.25% | 2,905 | 5.15% | 7,559 | 13.40% |
| St. Nicholas - NP | 1979 | 30 | 320 | 267,984 | 27,468 | 10.25% | 13,801 | 5.15% | 41,269 | 15.40% |
| St. Raphael - Fbks | 1989 | 20 | 260 | 194,033 | 19,888 | 10.25% | 9,993 | 5.15% | 29,881 | 15.40% |
| ICC - Bethel | --- | --- | --- | 145,478 | --- | --- | 7,492 | 5.15% | 7,492 | 5.15% |
| St. Patrick - Barrow | --- | --- | --- | 85,000 | --- | --- | 4,378 | 5.15% | 4,378 | 5.15% |
| OLS - Delta Junction | --- | --- | --- | 60,000 | --- | --- | 3,090 | 5.15% | 3,090 | 5.15% |

Table title (above): **Assessment Calculation Fiscal Year 2009 - 2010**

Assessment rates are set by the Bishop, in conjunction with the Finance Department

{A}     Revenues are based on the prior year plate collections, donations, and fundraisers
{B}     Parish assessment is a flat rate regardless of parish statistics
{C}     CSF assessment is based on registered families
          12.25%   500+ registered families
          10.25%   100 - 499 registered families
          8.25%   1 - 99 registered families
{D}     Barrow's and Delta Junction's 2008 operating reports have not yet been provided to the Finance Department.
          As such, we have used an estimate based upon their 2007 operating reports.

The Fairbanks Diocese redistributes these monies to the CSF on a monthly basis, and to the subsidized Parishes on or about the 15th day of August, November, February, and May. It should also be noted that even the self-sustaining Parishes have very limited revenue. For example, the largest collection plate revenue for any of the Parishes is barely over $400,000 annually, and cumulatively, the eight (8) self-sustaining Parishes report just over $1.6 million annually. Thus, additional taxing of the self-sustaining Parishes was not a viable avenue for CBNA to raise funds to fund the Plan. For example, even if the Fairbanks Diocese were to impose a new three percent (3%) tax on revenue (which would represent a fifty-eight percent (58%) tax increase over what is currently charged), CBNA would raise less than $50,000 in revenue. In addition, the amount of a tax or assessment imposed by the Fairbanks Diocese on the Parishes is an ecclesiastical church governance matter and there are constraints imposed on the taxing authority of the Bishop.

CBNA also collect fees for services for portfolio management for the Endowment, accounting services provided to the Alaska Conference of Catholic Bishops and for services provided to the trustees of the Catholic Trust of Northern Alaska. Altogether, these fees and assessments average a total of approximately $600,000 per year.

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

As a result of its financial difficulties in 2009, CBNA was forced to seek additional sources of income. One place that CBNA turned was to seek one time emergency gifts and or loans from dioceses and archdiocese in the lower forty-eight (48) states. In all, CBNA contacted seventy-seven (77) dioceses and archdioceses including — Albany, NY, Allentown, PA, Amarillo, TX, Arlington, VA, Atlanta, GA, Austin, TX, Baltimore, MD, Belleville, WA, Baton Rouge, LA, Beaumont, Boise, ID, Buffalo, NY, Burlington, VT, Camden, NJ, Charleston, SC, Charlotte, NC, Cincinnati, OH, Cleveland, OH, Colorado Springs, CO, Corpus Christi, TX, Dallas, TX, Denver, CO, Detroit, MI, Dodge City, KS, Des Moines, IA, Dubuque, IA, El Paso, TX, Erie, PA, Fall River, Fargo, ND, Ft Worth, TX, Fresno, CA, Gary, IN, Great Falls-Billings, MT, Green Bay, WI, Hartford, CT, Helena, MT, Honolulu, HI, Indianapolis, IN, Joliet, IL, Kansas City-St Joseph, MO, Kansas City, KS, Laredo, TX, Lafayette, ID, Lafayette, LA, Las Cruces, NM, Lexington, KY, Louisville, KY, Marquette, Miami, FL, Michigan Catholic Conference, Nashville, TN, New York, NY, Oakland, CA, Omaha, NE, Orange, CA, Palm Beach, FL, Phoenix, AZ, Pittsburgh, PA, Philadelphia, PA, Providence, RI, Reno, NV, San Angelo, CA, San Bernardino, CA, San Francisco, CA, San Jose, CA, Seattle, WA, St Louis, MO, Sioux Falls, SD, Springfield, IL, Springfield -Cape Girardeau, MO, Tucson, AZ, Victoria, BC, Yakama, WA, and Youngstown, OH. As a result of these efforts, CBNA has received gifts from twenty-four (24) dioceses and archdiocese ranging from $200 to $50,000. The cumulative amount of all the gifts is $416,900. Unfortunately, none of the dioceses or archdioceses have been willing to lend to CBNA in large part because of CBNA's inability to demonstrate that it would be able to debt-service any such loans.

## 2.    Uses of Income

CBNA's operation is lean. Excluding KNOM and CSF, CBNA directs the majority of its resources towards ministry and mission programs. In 2008, $2,103,663 of revenue resources were channeled back out to the bush Parishes in the form of direct subsidies, wage and benefit subsidies for religious and lay Parish workers and program directors, as well as for the building, remodeling, and restoration of the Parish facilities. Additionally, CBNA directed another

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-
1621

$749,175 of revenue resources towards other chancery based ministry programs such as Religious Education, Children and Family Life, and Adult Formation. Combined, CBNA was able to focus more than fifty-six percent (56%) of its resources towards ministry and mission. The Alaskan Shepherd Fundraising operations further comprise another approximately eleven percent (11%) of the expenditures.

Significantly, since 2000, professional fees have grown from one and .41 percent (1.41%) of expenses, to over seventeen percent (17%) of expenses while the Reorganization Case was pending in the fiscal year ended June 30, 2008. Since the fiscal year ending June 30, 2001 (no sexual abuse Claims were filed before that date), professional fees have grown by an average of fifty-eight and .47 percent (58.47%) per year. Continuing to devote so many resources to professional fees is not sustainable and is also one of the reasons CBNA filed the Reorganization Case.

As a result of significant cash shortfalls, in May 2009, the Fairbanks Diocese took certain emergency steps to drastically reduce its staffing levels. Among other things, the Bishop announced the elimination of five (5) full-time positions and one (1) part-time position for fiscal year beginning July 1, 2009. Further in addition to continuing to furlough employees one (1) day per week throughout the summer, CBNA instituted permanent reductions for certain staff including:

- o   twenty percent (20%) hours and pay reduction for the Bishop's secretary;
- o   fifty percent (50%) hours and pay reduction for the Librarian/Archive Clerk (going from full time to half time);
- o   twenty percent (20%) hours and pay reduction for the office manager for the Alaskan Shepherd;
- o   twenty percent (20%) hours and pay reduction for three clerks in the Alaskan Shepherd's office; and
- o   sixteen percent (16%) salary reduction for the Chancery Office Campus Maintenance Director.

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

In addition to the foregoing, the Bishop announced that top management was also taking voluntary permanent salary reductions including:

- o  twenty percent (20%) salary reduction for the Bishop;

- o  twenty-five percent (25%) salary reduction for the Director of Finance; and

- o  twenty percent (20%) salary reduction for the Chancellor.

All told these efforts will reduce CBNA's payroll expense by more than $400,000 per year.

### 3.    Catholic Schools of Fairbanks Sources and Uses of Cash

As reflected in the historical analysis of CSF attached to this Disclosure Statement as Exhibit "5", on average, CSF's operations generate seventy-three and .4 percent (73.4%) of its income from tuition and fees, five and .45 percent (5.45%) of its income from after school program charges, and sixteen and .87 percent (16.87%) of its income from direct donations consisting primarily of a direct subsidy from CBNA's chancery office and an assessment charged to the Fairbanks and North Pole metropolitan area Parishes.  However CSF's operations, including direct donations, only account for eighty-two percent (82%) of the funds needed to operate CSF.  On average, CSF's operations run at an annual deficit of $589,179.  CSF, therefore, depends on the generosity and hard work of the Monroe Foundation, which net of fundraising expenses, raises $610,433 on average each year or eighteen and .46 percent (18.46%) of the funds necessary to operate CSF.  On average, direct contributions and Monroe Foundation contributions together account for thirty-two and .33 percent (32.33%) of CSF's annual operating budget.

### 4.    KNOM's Sources and Uses of Cash

As reflected in the historical analysis of KNOM attached to this Disclosure Statement as Exhibit "6", on average, KNOM receives eighty-four percent (84%) of its income from its "*Static*" newspaper fundraising and eleven and .6 percent (11.6%) from bequests specific to KNOM.  On average, fundraising expenses account for approximately twenty-seven and .93

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona  85701-1621

percent (27.93%) of KNOM's expenses; programming accounts for seven and .97 percent (7.97%) of expenses; expenses associated with volunteers and staffing account for roughly forty-five and .26 percent (45.26%) of expenses; technical expenses account for approximately six and .34 percent (6.34%) of expenses; and general operating overhead accounts for twelve and one-half percent (12.50%) of expenses. Since 2000, on average, KNOM's operations have lost $16,491.18 per year.

**E.** **Disputes Over Property Ownership and Associated Risks**

Similar to other diocesan bankruptcy cases, CBNA scheduled property that it holds in trust for the benefit of Parishes and property that it holds in trust for charitable purposes (the Endowment) as property held for the benefit of others, under line 14 of the Statement of Financial Affairs. This was not out of the ordinary. Indeed, every debtor in every bankruptcy case in the United States answers line 14 of the Statement of Financial affairs. Pursuant to Bankruptcy Code § 541(d), property that a debtor holds in trust (a trustee holds bare legal title) for the benefit of another (who holds the equitable interest in the property) does not constitute property of the debtor's bankruptcy estate and cannot be used to pay the debtor's creditors. Specifically, Bankruptcy Code § 541 provides in pertinent part:

> (a)    The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:
>
> (1)    Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.
>
> . . .
>
> (d)    Property in which the debtor holds, as of the commencement of the case, **only legal title and not an equitable interest,** . . . becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, **but not to the extent of any equitable interest in such property that the debtor does not hold**.

(emphasis added).

**Quarles & Brady LLP**
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

By the provisions of the Bankruptcy Code quoted above, the Bankruptcy Code recognizes long standing black letter law that it is a breach of fiduciary duty, a breach of the duty of loyalty, and self dealing for a trustee to divert funds that he or she holds for the benefit of another for personal benefit (i.e. paying the trustee's personal debts). See e.g., 38 Am. Jur. 2d Trusts § 381 (1992) ("A trustee is under a duty to refrain from personal traffic in, or private use, or appropriation of trust property or funds, at least without the express consent of the beneficiary. The trustee must not apply trust property or funds to his or her personal debts, or suffer them to be so applied."); *Restatement (Third) of Trusts* § 42 cmt. c (2003) ("Although a beneficial interest in a trust may generally be reached by creditors of the beneficiary . . . , the trustee's personal creditors or trustee in bankruptcy may not reach either the trust property or the trustee's nonbeneficial interest therein."). In other words, just because a debtor files for bankruptcy protection or reorganization does not compel the debtor to breach his or her fiduciary duties with respect to property that is held in trust.

A true and correct copy of line 14 of the Statement of Financial Affairs that was filed with CBNA's amended schedules is attached to this Disclosure Statement as Exhibit "7". The property identified on line 14 includes: (1) Parish Church real property which is held by CBNA as a trustee for the benefit of the Parish Churches; (2) Endowment funds which are held by CBNA as a trustee for the benefit of certain charitable purposes; (3) custodial funds held by CBNA primarily resulting from consolidating "second collections" at church services for payment of a single check to the national charity; and (4) I.R.C. § 457 retirement accounts of certain employees.

The Committee and certain individual tort creditors had asserted that the Parish Church real property and the Endowment funds (collectively the Parish Church real property and the Endowment funds are referred to in this Disclosure Statement as the "Contested Trust Property") should be taken and used to pay CBNA's Creditors and, as a result of that dispute, the Committee initiated the Declaratory Judgment Adversary Proceeding in order to require the use of this trust property to pay Creditors. substantively consolidated with CBNA's estate. CBNA disputes the

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

Committee's position; however, as a result of the settlement between CBNA and the Committee and pursuant to the Third Amended Joint Plan, the Declaratory Judgment Adversary Proceeding will be dismissed with prejudice upon the Effective Date of the Third Amended Joint Plan.

In addition to the foregoing, the Court granted the Committee the right to file avoidance actions in order to try to recover the transfer of funds to the CTNA as a fraudulent transfer, or as an improper preference, in October 2007. Immediately after the Court entered its order permitting the Committee to pursue avoidance actions against the CTNA, the Committee filed the complaint captioned *Official Committee of Unsecured Creditors v. Catholic Trust of Northern Alaska, et. al.*,[10] Adversary no. 09-90025-DMD (the "Avoidance Action Adversary"). CTNA and CBNA believe that there were numerous defenses to the Avoidance Action Adversary; however, as a result of the settlement between CBNA and CTNA which has been approved by the Committee, upon the Effective Date of the Third Amended Joint Plan, the Avoidance Action Adversary will be dismissed with prejudice.

The Third Amended Joint Plan incorporates settlements between CBNA and the Estate on the one hand and the Parish Churches, Monroe Foundation and the CTNA on the other hand. Under that settlement, the Parish Churches agree to pay $650,000 from their unrestricted deposits with the CTNA to the Fund on the Effective Date, and the Monroe Foundation agrees to pay $150,000 to the Fund on the Effective Date, in exchange for a release from claims against their property including a dismissal of the Declaratory Judgment Adversary Proceeding and the Avoidance Action Adversary Proceeding, with prejudice. The $650,000 represents more than two-thirds of the unrestricted funds still on deposit with the CTNA (the weak economy has forced Parish Churches to look to their savings to help sustain themselves).

**Quarles & Brady LLP**
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

---

[10] The Committee also named every trustee and every parish as defendants.

Disclosure Statement Supporting Third Amended Joint Plan of Reorganization                Page 40 of 120
In re *Catholic Bishop of Northern Alaska,* Case No. 08-00110-DMD
QB\9376558.4