1.    **Assets**

    a.    Real Property

Below is a summary of CBNA's real property and its disposition under the Third Amended Joint Plan:

    (1)    Chancery and Retreat Center, 1316-1318 Peger Rd., Fairbanks, AK 99709  PAN: 0573787

The Chancery Office and Retreat Center is located just off of Airport Road in Fairbanks and serves as the main offices of CBNA and the Fairbanks Diocese.  It was appraised at a value of $1.1 million in late 2007.  Under the Third Amended Joint Plan, the Chancery Office will be sold to the Endowment for $1.2 million in Cash on or before the Effective Date.  The proceeds of the sale will be paid to the Fund pursuant to the terms of the Plan.

    (2)    Kobuk Center, 2890 N. Kobuk Ave., Fairbanks AK   99709 PAN# 0573795

The Kobuk Center, which is also critical to the continued mission and ministry, is located just off of Airport Road in Fairbanks and serves as a conference center used for retreats and other CBNA and Diocesan business; it also serves as a residence for priests including the bishop of the Fairbanks Diocese and guest quarters for ministers visiting Fairbanks from the bush.  It was appraised at a value of $1.1 million in late 2007.  Under the Third Amended Joint Plan, the Kobuk Center will be sold to the Endowment for $1.12 million in Cash on or before the Effective Date.  The proceeds of the sale will be paid to the Fund pursuant to the terms of the Plan.

    (3)    Warehouses, 1316 Peger Rd., Fairbanks, AK   99709 PAN# 0126985

The Warehouses are on the same campus as the Chancery and Kobuk Center.  CBNA uses the Warehouses for staging supplies and materials for shipping to bush Parish Churches. CBNA considers the Warehouses essential to its ability to subsidize and assist the bush Parish Churches.  CBNA intends to retain the Warehouses for ministry purposes.  Under the Third Amended Joint Plan, the Warehouses will be sold to the Endowment for $225,000 in Cash on or

**Quarles & Brady LLP**
One South Church Ave.
Suite 1700
Tucson, Arizona  85701-
1621

before the Effective Date.  The proceeds of the sale will be paid to the Fund pursuant to the terms of the Plan.

> (4)    Fairbanks Counseling and Adoption Center, 912 Barnette St., Fairbanks, AK   PAN# 0040410

The Fairbanks Counseling and Adoption Center is an office building in central Fairbanks which CBNA leases to its sister charity, Fairbanks Counseling and Adoption ("FCA"), at below market rent.  FCA provides essential charitable services to all the people of Fairbanks and northern Alaska in general, including providing counseling to survivors of sexual abuse.  In addition to providing FCA discounted rent, CBNA provides FCA a small operating subsidy. Under the Third Amended Joint Plan, the FCA building will be sold to the Endowment for $600,000 in Cash on or before the Effective Date.  The proceeds of the sale will be paid to the Fund pursuant to the terms of the Plan.

> (5)    Kateri Tekakwitha Center/Convent; Galena, AK

Named after the first Blessed Native American, the Kateri Tekakwitha Center, located in Galena, Alaska on the Yukon River, serves eight (8) Athabascan Indian villages in the interior and houses three (3) religious women.  The primary work of the Center is to educate and support Catholics in the villages of Galena, Huslia, Kaltag, Koyukuk, McGrath, Nulato, Ruby and Tanana to become proficient in administering their local Parishes in the absence of priests, brothers and sisters.  The Kateri Tekakwitha Center strives to enable and empower Athabascan villagers lay ministry as Prayer Leaders, Eucharistic Ministers, Lectors, Sacristans and Parish Administrators in their home parishes.  The work of the Center is essential to the Fairbanks Diocese's ministry and CBNA's ability to support the Parish Churches in the interior region. CBNA does not believe that there is any significant market in Galena for the Kateri Tekakwitha Center.  Under the Third Amended Joint Plan, the Kateri Tekakwitha Center will be sold to the Endowment for $175,000 in Cash on or before the Effective Date.  The proceeds of the sale will be paid to the Fund pursuant to the terms of the Plan.

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

(6)    Aircraft Hangar, 3548 University Ave., Fairbanks, AK 99709

CBNA constructed an airplane hangar sufficient to hold two aircraft, on land that is the subject of a long term ground lease from the Fairbanks Airport Authority. In the past, CBNA housed aircraft used for mission travel at the Hangar. In December 2008, CBNA successfully sold the primary aircraft housed at the location. Under the Third Amended Joint Plan, the Aircraft Hangar will be sold to the Endowment for $346,000 in Cash on or before the Effective Date. The proceeds of the sale will be paid to the Fund pursuant to the terms of the Plan.

(7)    Jesuit Residence, 1318 Peger Rd., Fairbanks, AK 99709

The Jesuit Residence is a four (4) bedroom, two (2) bath residence featuring a chapel and four (4)-car garage located in central Fairbanks and has a market value of $255,000. It is part of the collateral pool securing the $1 million of debtor-in-possession financing provided by Great Falls. CBNA will retain the property under the Third Amended Joint Plan subject to the lien in favor of Great Falls.

(8)    CBNA 14.5 Acres raw land next to Chancery - House of Prayer

There is a parcel of approximately 14.5 acres of raw land near the Chancery Offices and Kobuk Center and includes the House of Prayer Chapel. This land is also part of the collateral pool securing the $1 million of debtor-in-possession financing provided by Great Falls. CBNA will retain the property under the Third Amended Joint Plan subject to the lien in favor of Great Falls.

(9)    Catholic Schools of Fairbanks, 615 Monroe Street and 709 Illinois
        Street, Fairbanks, AK 99701 PAN# 0103497, 0478377, 0478393

The campus of Monroe Jr. & Sr. High Schools and Immaculate Conception Elementary School are located in central Fairbanks. The schools operated there are the only Catholic Schools located within the four hundred ten thousand (410,000)-mile territory of the Fairbanks Diocese. Closure of the schools would impose an undue burden on the free exercise of religion on the Fairbanks families desiring a Catholic education for their children, and, therefore, its value is included in the Third Amended Joint Plan as Excluded Property pursuant to the

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-
1621

Religious Freedom Restoration Act.  Further, almost all of the improvements on the campuses are the direct result of the fundraising efforts of the Monroe Foundation.

Although these parcels were scheduled with a value of $3.5 million, CBNA does not believe that value accurately reflects the market for the property.  As a preliminary matter, as is reflected in its historical information contained in Exhibit "5", CSF is only able to operate as a result of $1,068,969 in annual contributions from the Monroe Foundation, CBNA and the Fairbanks and North Pole area Parishes.  No for-profit private school would be able to invest $3.5 million to acquire a campus to operate a school at a $1 million annual loss.  Although it is conceivable that a developer could acquire the property, raze the school buildings and attempt to develop it commercially, the nearby vacant retail and industrial properties, as well as the extraordinary costs of tearing down the school make such a scenario highly unlikely, much less at a value anywhere approaching $3.5 million.  For the foregoing reasons, the CSF campus is not included in the liquidation analysis.    CBNA has further estimated that if the Religious Freedom Restoration Act argument could be overcome,  the highest amount that a developer would pay for the property would be $1,750,000. Nevertheless, under the Third Amended Joint Plan, the CSF campus will be sold to the Endowment for $3.5 million in Cash on or before the Effective Date.  The proceeds of the sale will be paid to the Fund pursuant to the terms of the Plan.

(10)    Catholic Schools - PAN #0478377    LOT  A  MONROE CATHOLIC  SCHOOL  FIRST  ADDITION  OUT  OF  J-1 MONROE CATHOLIC SCHOOL TRACT

This is a vacant lot adjacent to the CSF campus.  It is presently subject to an eminent domain request by the City of Fairbanks.  CBNA intends to sell this lot to the City of Fairbanks, but to the extent the sale has not closed before the Effective Date, CBNA will retain the property.

(11)    CSF Convent, 615 Betty Street, Fairbanks, AK 99701    PAN# 0061778, 0061786

This is a small residential building/convent adjacent to the CSF campus which has been and can be utilized for housing teachers.  Under the Third Amended Joint Plan, the CSF Convent

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

will be sold to the Endowment for $205,000 in Cash, on or before the Effective Date. The proceeds of the sale will be paid to the Fund pursuant to the terms of the Plan.

(12)    Harding Lake Chapel and Lot, 11239 Salcha Dr., Harding Lake, AK

This is a small chapel located near some vacation cabins on Harding Lake that are used by certain families in summer. Visiting priests say Mass at this location occasionally to a handful of Catholic families who vacation at Harding Lake during the summer. CBNA intends to sell the Chapel to a group of the families who own nearby vacation cabins for $15,000.

(13)    KNOM Radio Station, 107 West Third Street, Nome, AK 99762
Lots 35A, 37A, 39A, 41A, and 43A of Block 30, according to the official plat recorded on April 2, 1992 as Plat 92-4; Records of the Cape Nome Recording District, Second Judicial District, State of Alaska.

There are five properties associated with KNOM in Nome: (1) Station, Garage, Generator, Cold Storage + Lot; (2) Volunteer house + Lot; (3) South Steadman Lot; (4) West 3rd Ave Lot; and (5) North Steadman (at 3rd Ave) Lot. CBNA scheduled the KNOM real property at a value of $780,000; however, that was based on an estimate by a banker and not a formal appraisal. CBNA believes that there is no market value to the lot with the Station, Garage, Generator and Cold Storage. This is because the building on the lot was built as a radio station studio, with significant wiring in the walls, no kitchen, and only public style restrooms. Any other user would need to either completely gut the building or raze it and construct a new building. Such a cost would make the building worth almost nothing in Nome's marketplace.

Further, there is no market whatsoever for a radio station in Nome. Indeed, KNOM's competitor in Nome, KICY, which is a commercial radio station, has to supplement its budget by doing salmon barbecue fundraisers at Covenant Churches throughout the lower forty-eight (48) states. The reason for this is that there simply are not enough retailers in the listening area to purchase sufficient advertising. Indeed, as reflected in its historical performance as described in

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-
1621

Exhibit "6", KNOM entirely depends on donations through its "*Static*" newspaper and direct mail appeals in order to survive.

The KNOM real property could have value to a developer willing to demolish the buildings and build new buildings. Under the Third Amended Joint Plan, the KNOM Real Property Center will be sold to the Endowment for $430,000 in Cash on or before the Effective Date. The proceeds of the sale will be paid to the Fund pursuant to the terms of the Plan. In addition KNOM will contribute $150,000 of the Cash needed from CBNA to fund the Plan.

(14)    Harding Lake Second Tier Vacant Lot PAN #0160121; LOT 50
US SURVEY 3210

This is a second tier lot located at Harding Lake that is suitable for constructing a vacation cabin. CBNA has been attempting to sell this lot for a number of years, but has so far been unsuccessful. CBNA is contributing Cash to the Fund sufficient to account for whatever value is in this property.

(15)    Two Rivers Vacant Lot.

The Two Rivers Vacant Lot was donated to CBNA. Unfortunately, the donors placed significant restrictions on CBNA's ability to sell this property whereby the donors must not only approve the purchaser, but also must approve the purchaser's plans for the property. CBNA has brought what it believed to be three (3) viable offers for the property that have all been rejected by the donors. In light of the unwieldy restrictions on this gift, CBNA intends to return the property to the donors.

(16)    Oknagamut raw land remote 23.15 acres

This is a very remote parcel of raw land that has primarily been used by area Native people for subsistence since time immemorial. CBNA presently is in negotiations with a nearby Alaska Native village corporation which is interested in purchasing this parcel to ensure that subsistence uses continue into the future.

**Quarles & Brady LLP**
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

(17)    Akulurak raw land remote 66.06 acres

This is another very remote parcel of raw land that has primarily been used by area Native people for subsistence since time immemorial. CBNA obtained Court approval to sell this property to Alakanuk Native Corporation, an Alaska Native village corporation, for $25,000 and the sale closed over the summer. The proceeds of the sale will be used to pay CBNA's funding obligations on the Effective Date.

(18)    Pilgrim Springs 320 acres Historic Hot Springs 70 miles northeast
         of Nome AK.

Pilgrim Hot Springs ("Pilgrim Springs Property") is a verdant 320 acre enclave of fee land owned by CBNA located in western Alaska, about 46 miles (75 km) north of Nome. This property is surrounded by lands controlled by an ANCSA Native Village Corporation, the Mary's Igloo Native Corporation (MINC). The MINC lands, in turn, lie within a very large land swath, some of which is controlled by an ANCSA Native Regional Corporation known as Bering Straits Native Corporation (BSNC). It should be noted that the old village site of Mary's Igloo is approximately seven (7) miles northwest of the Pilgrim Springs Property. The Pilgrim Springs Property access road crosses some lands owned by the MINC, the BSNC and state-selected lands for the State of Alaska.

The Catholic Church's involvement in the region began in the early 1900's with missionary priests ministering to the native people of Old Igloo. In 1918, after a severe influenza epidemic killed more than 1,200 people, the Catholic Church was asked to take in orphans from the Nome area. They built an orphanage, a church, some greenhouses, and assorted other buildings near the original hot springs. The thermal waters were used for the greenhouse, a bath house and the natural hot spring pool. Impressive vegetable crops were also grown on the property. This mission survived until 1941, by which time all the children had grown up. A cemetery used during the orphanage days and subsequent years is located on the property.

In 1969, CBNA entered into a 99 year ground lease with a company called Pilgrim Springs Ltd. ("PS Ltd.") who, it was contemplated, would develop the property so as to generate

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

substantial royalties in addition to nominal rents.  As a result of PS Ltd.'s failure to perform, and its alleged defenses of impossibility and mutual mistake, the Court authorized CBNA to rescind the lease.  PS Ltd. and one of its former employees have filed unsecured claims as a result of this rescission.  CBNA believes that the Pilgrim Springs Property has substantial development potential as a source of geothermal power in the region, or more limited tourist or agricultural uses.  CBNA has already received one offer to purchase the Pilgrim Springs Property from the Bering Straits Native Corporation, though for a lower amount than CBNA believes may be realized under the current development plan for the property.

Geothermal Exploration – The earliest geothermal investigations at Pilgrim Springs included those of U. S. Geological Survey personnel G. Waring in 1917 and T. Miller in 1975. In 1975, R. Forbes of the University of Alaska undertook reconnaissance geological and geophysical studies.  Then, in 1979 and 1982, the Geophysical Institute, the Alaska Division of Geological and Geophysical Surveys (ADGGS), and Woodward Clyde Consultants (WCC) mapped the surface and the bedrock, conducted helium, mercury, gravity, seismic refraction, and electrical resistivity surveys, undertook geochemical sampling and analyses, and logged test wells. Their combined findings are summarized below:

- o 1979 surface thermal spring discharge was about 67 gpm of alkali-chloride water at a temperature of about 178°F (81°C).

- o Preliminary Na-K-Ca geothermometry suggests that a deep underlying geothermal reservoir may be as hot as 302°F (150°C).

- o Springs likely located near intersection of two orthogonal fault zones that form a corner of a graben.

- o Gravity studies suggest that bedrock is 1,500 feet (458 m) below property.

- o Resistivity studies suggest Pilgrim Spring reservoir is pancake shaped and about 160 ft. (50 m) thick over a ~ 0.58 sq. mi. (1.5 sq. km.) thawed area.

- o Artesian aquifers were encountered in a 66-100 ft. (20-30m.) depth interval with flow rates estimated at 200 and 300-400 gpm respectively, at a temperature of 194°F (90°C).

- o In 1982, 6 new wells produced artesian flows of 30 to 250 gpm with about 6 ft. (1.8 m.) of head. Maximum temperature was 194°F (90°C).

**Quarles & Brady LLP**
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-
1621

o The thermal gradient in the two deepest wells was ~4.0°F per 100 ft. suggesting that 302ºF (150ºC) might be reached at depth of about 4,800 feet (1,463 m.).

Studies did not determine location and nature of the upflow zone or the location, depth, and nature of possible "deep" hot reservoir. These must be determined if the property is going to have potential for development to produce electric power.

<u>Market Comments</u> – Nome currently requires 5 MW power at a cost of approximately $0.35 per kwh for residential customers. If adequate flows (~1,250 gpm per MWe) of thermal waters at 200ºF (93ºC) can be obtained from production scale wells at Pilgrim Springs Property, a modern (UTC-type) binary power cycle could be used to generate power. The efficiency of this system would be greatly enhanced by the availability of very cold river water nearby and the low (< 25ºF, -3ºC) average ambient air temperature. If a deeper, hotter resource is discovered, a more efficient industry standard "ORMAT-type" binary system might be installed. Using a modern (UTC-type) binary power cycle generation, Pilgrim Springs Property could be a viable power supplier. Power transmission to Nome must be considered in determining economic viability.

Bering Straights Regional Native Corporation filed a letter with the Court offering $900,000 for the Pilgrim Springs Property. As a result of CBNA's ongoing efforts to market and improve the Pilgrim Springs Property, CBNA believes that the value could be has high as $2.75 million. The Pilgrim Springs Property will be sold pursuant to the Plan at the Pilgrim Springs Auction which will be held on or about February 25, 2010. The opening bid at the Pilgrim Springs Auction will be by the Endowment for the sum of $1,850,000. Any bids in excess of $1,850,000 Cash will be considered and the Pilgrim Springs Property will be sold to the highest bidder. If the Pilgrim Springs Property is sold for an amount in excess of $1,850,000, in addition to $1,850,000 all excess net proceeds will be paid to the Fund.

b. Personal Property

The following are CBNA's primary items of personal property:

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona  85701-1621

    (1)    Cash

As of January 31, 2009, CBNA had approximately $760,474.64 in Cash and cash equivalents, with $283,813 associated with the administrative offices, $468,887.68 associated with KNOM and $7,773.36 associated with CSF.  These balances, especially KNOM's balance, are relatively high because December and January are peak giving seasons.

    (2)    Investments

As of January 31, 2009, CBNA had approximately $743,535.53 in investments associated with the Current Fund and the Third Amended Joint Plan Fund.  All of these investments are donated funds and grant proceeds that are subject to donor imposed use restriction and, therefore, are classified as temporarily restricted.  As CBNA incurs the expenses contemplated by the grants or the donors, the funds will be released to the general fund and the expenses paid out of the general operating account of CBNA.  CBNA has improved its management practices with respect to these restricted investment funds by more regularly reconciling the incurred expenses with restricted uses so as to free up more general unrestricted money.

    (3)    Limited Partnerships

As of January 31, 2009, CBNA had approximately $261,324.53 in investments associated with its interest in the Alaska Conference of Catholic Bishops which is a 501(c)(3) corporation that provides, among other things, insurance services to the Dioceses of Alaska.  The interest is not marketable.  CBNA is also a member of CUP II which is not marketable.

    (4)    Accounts Receivable

As of January 31, 2009, CSF had approximately $691,429 in tuition receivable.  CBNA was also owed accounts receivable of roughly $75,000.  CBNA is also the holder of several small notes secured by mortgages on real property.

    (5)    Aircraft

CBNA is the owner of a 1965 Cessna 172 prop plane which has been used in missionary work since 1980.  CBNA has been attempting to sell this aircraft for several years without success.

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

DISCLOSURE STATEMENT SUPPORTING THIRD AMENDED JOINT PLAN OF REORGANIZATION    Page 50 of 120
In re *Catholic Bishop of Northern Alaska,* Case No. 08-00110-DMD
QB\9376558.4

CBNA also owns a 1978 Cessna 207A prop plane, which is used to support CBNA's construction and engineering department's work which, in turn, supports the repair, upgrade and building of mission Parish Churches. CBNA intends to retain and continue to use this aircraft. On Schedule B, CBNA estimated that this plane has a value of $80,000.00.

(6)     Claims Against NorthMail, Inc.

KNOM engages in fundraising activities by: (1) appeal campaigns mailed three times each year (spring, fall, and winter) to mailing lists purchased by KNOM for that purpose; and (2) monthly newsletters mailed to current and prior donors obtained through the appeal campaigns. KNOM purchases its appeal mailing lists. Each list has a "shelf life" - a period of time in which a solicitation must be sent so as to realize a maximum return of donations from the appeal. The monthly newsletters, or "*Statics*," also have a shelf life, and must be mailed several weeks apart so as to realize maximum return. KNOM contracted with NorthMail to insert, address, and send its mass-mailed appeals and *Statics*. NorthMail did not mail KNOM's *Statics* to certain zip codes; or mailed them in so defective a manner that they failed to reach the intended recipients. Further, NorthMail did not mail all of the *Statics* prior to the expiration of their "shelf life."

Similarly, NorthMail did not mail the January 2008 appeals to all intended recipients and did not mail all of the January 2008 appeals prior to the expiration of their "shelf life." As a result, KNOM suffered significant damages due to loss of cash flow. KNOM has estimated the loss to be in excess of $250,000.

(7)     Claims for Contribution or Indemnity Against the Oregon Province of Jesuits and Other Religious Orders

Under Alaska law, when there is more than one defendant there is "several liability" only. This means that each pays damages according to his/her own share of fault. Because a defendant only pays for its share of fault, there is no need for a contribution claim on the theory that one cannot be forced to pay more than one's "fair share."

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

However there is nothing in the "several liability" that precludes an "indemnification" claim.  It is possible for a defendant to have liability to a plaintiff and still be entitled to be indemnified for that liability - i.e. CBNA may have liability to the Tort Claimants because of its status as the Fairbanks Diocese which may owe general duties to hire, install and/or supervise priests, but may claim indemnification against the Jesuits or other applicable religious orders because any liability of CBNA was due to the "active" fault of the Jesuits and CBNA did not have any "active" fault beyond the acts and omissions of the Jesuits.

CBNA has indemnification claims against the Jesuits, who provided most of its priests, including most of the perpetrators.  Each and every bishop prior to Bishop Kettler was a Jesuit priest and subject to the governance of the Jesuit provincial with respect to Jesuit matters. Moreover, the CBNA bishop did not and does not assign the priests' locations; the Jesuits did. The Jesuits filed for Chapter 11 reorganization on February 17, 2009.  CBNA timely filed a proof of claim with respect to its indemnification and other claims against the Jesuits.  Under the Third Amended Joint Plan, unless the Jesuits and other religious orders settle CBNA's indemnification claims by contributing substantial funds to the Reorganization Plan so as to become Participating Third Parties under the Third Amended Joint Plan, CBNA will assign its indemnification claims against the Jesuits and religious orders to the Settlement Trustee.

CBNA may also have claims against the Brothers of St. Francis, the Sisters of Saint Ann and certain orders of religious women as well.  Under the Third Amended Joint Plan all such Claims will be transferred to the Settlement Trustee.

The Jesuits disagree with the statements, representations, and opinions (collectively, the "Statements") in the Disclosure Statement, which are solely those of CBNA.  The Jesuits dispute the accuracy and completeness of certain of the Statements.  The Statements in the Disclosure Statement are not binding on the Jesuits and do not constitute findings by the Court.  It is the position of the Jesuits that they have reserved all their rights and objections with respect to the Plan, all rights and defenses with respect to the Jesuits' proofs of claim, and all rights, claims, and defenses with respect to any other matter in the Reorganization Case.  Similarly, CBNA

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

reserves all of its rights and objections to any position and objections which may be asserted by the Jesuits.

(8)    Claims Against Insurance Companies for Defense and Indemnity

CBNA has claims against its Insurance Companies with respect to the sexual abuse claims filed against it.  Specifically, CBNA has claims for defense and indemnity coverage against Catholic Mutual Relief Society of America ("Catholic Mutual"), which provided CBNA primary and excess/umbrella layers of insurance coverage from April 15, 1979 through April 15, 1983, and then "claims made" special excess coverage claims for the policy period of July 1, 1990 through July 1, 2009; claims against Alaska National which provided a primary layer of liability coverage from April 15, 1983 to April 15, 1988; and against Travelers Casualty and Surety Company, formerly known as Aetna Casualty and Surety Company ("Travelers"), which provided primary and excess/umbrella layers of liability coverage from April 15, 1988 through July 1, 1990.  As claims alleging tort liability for sexual abuse have been filed against CBNA it has tendered the defense and indemnity claims to its Insurance Companies.

In addition to the foregoing Insurance Companies, CBNA tendered claims alleging sexual abuse in the period between October 1973 and April 15, 1979 to Continental Insurance Company ("Continental"), under the belief that Continental had provided CBNA with liability coverage during that period.  Unfortunately, neither CBNA or Continental was able to locate a copy of the policies.  Nevertheless, Continental provided to CBNA a defense of the tendered claims but did so under a reservation of rights to deny coverage if the policies terms could not be established or if the claims of sexual abuse were not covered under the policies issued by Continental.

CBNA attempted to gather as much secondary evidence of coverage as possible in order to establish Continental's coverage of the tendered claims.  Unsatisfied, Continental filed a declaratory judgment action in the United States District Court for the District of Alaska in 2006 (the "Policies Existence Case").  CBNA and Continental conducted extensive discovery and each fully briefed cross motions for summary judgment on the Policies Existence issue.  The action was stayed by the Reorganization Case and was subsequently referred to the Bankruptcy Court.

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-
1621

The Bankruptcy Court heard oral argument on the cross motions for summary judgment on June 30, 2009.

On September 11, 2009, the Bankruptcy Court issued an interlocutory memorandum decision granting summary judgment to Continental in the Policies Existence Case, holding that although CBNA had some evidence that Continental had issued insurance policies to CBNA, there was insufficient evidence as a matter of law, to support the nature of the insurance or the scope and terms of the coverage. As a result of this decision, Continental asserts that it is entitled to extensive damages. CBNA has entered into a settlement of Continental's Claims against CBNA and CBNA's claims against Continental. CBNA is filing a motion to approve the settlement between it and Continental pursuant to 9019 Fed. R. Bankr. P. within days of the filing of this Disclosure Statement.

In addition to the Policies Existence Case, CBNA filed a separate declaratory judgment action against all the Insurance Companies to determine the scope of coverage under the relevant policies, Case No. 08-90019, entitled *Catholic Bishop of Northern Alaska, Plaintiff v. Continental Insurance Company, et al., Defendants* (the "Comprehensive Coverage Action"). As a result the settlement of Continental's claims, Continental will be dismissed from the Comprehensive Coverage Action. The parties have engaged in substantial discovery in the Comprehensive Coverage Action. CBNA's remaining Insurers have responded differently from one another with respect to the tendered claims and the Comprehensive Coverage Action. The response to the tendered claims and the treatment of the Insurance Claims under the Third Amended Joint Plan are described in detail below.

(a)    Alaska National Insurance Company

Alaska National has honored its obligations to provide defense and indemnity coverage to CBNA within the terms of its Insurance Policies. Pre-petition, Alaska National authorized CBNA to issue offers of judgment to each remaining plaintiff who had asserted claims against CBNA that Alaska National had acknowledged were covered under its Insurance Policies. Each such claimant accepted the offers of judgment. Post-petition there have been five (5) claims that

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

Alaska National has agreed implicate its liability coverage. CBNA and Alaska National are in the process of documenting a settlement whereby Alaska National has agreed to pay $1.4 million to CBNA (which CBNA will use to fund its obligations under the Plan with respect to the Fund and payment of Allowed Administrative Claims), Alaska National will obtain a release from any Claim by CBNA to insurance coverage for any present Tort Claims or Future Tort Claims and Alaska National will become a Settling Insurer under the Plan and will benefit from the proposed Channeling Injunction. The Alaska National settlement will be the subject of a motion under Bankruptcy Rule 9019. when CBNA and Alaska National complete documentation. In that motion CBNA will also sell the Alaska National policies back to Alaska National under 11 U.S.C. § 363. CBNA anticipates that the motion to approve the Alaska National settlement will be heard in conjunction with the Confirmation Hearing.

(b)    <u>The Catholic Mutual Relief Society of America</u>

The Catholic Mutual Relief Society of America ("Catholic Mutual") provided CBNA primary and excess/umbrella liability insurance coverage from April 15, 1979 through April 15, 1983 and again from July 1, 1990 through the present, including "claims made" special excess coverage for the period between July 1, 2008 to July 1, 2009. CBNA contends that Catholic Mutual has breached its obligations to CBNA under its policies, and as a result CBNA is relieved of its duty to cooperate with Catholic Mutual and, therefore, for example CBNA may waive its statute of limitations defenses as to Settling Tort Claimants, as applied to Catholic Mutual.

Catholic Mutual has outright denied CBNA any coverage of Post-Abuse Impact claims under the umbrella coverage provided during period from April 15, 1979 through April 15, 1983. Under the subject umbrella coverage certificates, Catholic Mutual agreed that it would indemnify CBNA "for all sums which [CBNA] will be legally obligated to pay as damages, all as more fully defined by the term 'ultimate net loss' on account of:

1. Personal Injuries,

2. Property Damage,

3. Advertising Offense,

**Quarles & Brady LLP**
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

to which this Certificate applies, <u>caused by an occurrence</u>."

Section IV of the Catholic Mutual certificates states that "[t]his certificate applies to <u>personal injury</u>, property damage or advertising offense <u>which occurs anywhere during</u> the certificate period.

The Catholic Mutual Certificates define covered "Personal Injuries" as follows:

### 8.    PERSONAL INJURIES

> The term "Personal Injuries" whenever used herein means bodily injury, <u>mental injury</u>, <u>mental anguish</u>, <u>shock</u>, sickness, disability, false arrest, false imprisonment, wrongful eviction, detention, malicious prosecution, discrimination, (unless coverage thereof is prohibited by law), <u>humiliation</u>, also libel, slander or defamation of character or invasion of rights of privacy, except that which arises out of any Advertising activities.

(Parenthesis in certificates, <u>underlined</u> emphasis added)

In contrast, the Catholic Mutual primary liability coverage part covers "bodily injury" which takes place during a certificate period, and the certificates define "bodily injury" to mean

> bodily injury, sickness or disease sustained by any person which occurs during the certificate period, including death at any time resulting therefrom.

In spite of the broader definition of "Personal Injuries" in its umbrella coverage, to include potential coverage for such "Post-Abuse Impacts" as the "mental injury," "mental anguish," "shock," and/or "humiliation," Catholic Mutual has attempted to equate "Personal Injuries" with the narrower definition of covered "bodily injury" in the primary liability coverage part. CBNA submits that this coverage position, confirmed by Catholic Mutual in coverage position letters to CBNA, and also during the deposition of Ray Miller, Catholic Mutual's Vice President - Claims, reflects an improper effort by Catholic Mutual to retroactively re-write CBNA's umbrella coverage to limit coverage to "bodily injury, sickness or disease," and to delete from CBNA's umbrella coverage the clear statements of potential liability coverage to CBNA for  "mental injury," "mental anguish," "shock," and/or  "humiliation" alleged to have taken place during the Catholic Mutual

umbrella annual coverage periods of 04/15/79 - 04/15/80, 04/15/80 - 04/15/81, 04/15/81 - 04/15/82 and 04/15/82 - 04/15/83.

Having decided not to limit covered "Personal Injuries" in its standard umbrella coverage form to just "bodily injury, sickness or disease," Catholic Mutual should not be allowed to read out of its umbrella certificates coverage for "mental injury," mental anguish," "shock," and/or "humiliation." There is nothing in Catholic Mutual's definition of "Personal Injuries" in its umbrella Certificate that limits coverage to only the policy period(s) when a claimant was subjected to alleged physical sexually abusive contact with a priest, other religious or any other person. Catholic Mutual chose not to do so. CBNA submits that it is entitled to the broader coverage Catholic Mutual chose to sell to CBNA.

Various of the Tort Claimants who alleged that they suffered physical abuse prior to April 15, 1979, have asserted that they suffered post abuse impacts such as "mental injury," "mental anguish," "shock," and/or "humiliation" during the 1979-1983 coverage periods and, therefore, are covered by Catholic Mutual's umbrella coverage. CBNA further contends that Catholic Mutual is obligated to provide extensive insurance coverage of such post abuse impacts because under the Catholic Mutual Policies there is a $2 million bodily injury umbrella coverage on a "per occurrence" basis, and there is no "general bodily injury aggregate" for any of the four annual certificate coverage periods beginning on April 15, 1979 through April 15, 1983. On September 28, 2009, CBNA filed a motion for summary judgment in the Comprehensive Coverage Action seeking a declaration of its rights to coverage for Post Abuse Impacts under Catholic Mutual's umbrella policies and that there is no general bodily injury aggregate limit for such injuries. On November 2, 2009 Catholic Mutual filed its response to CBNA's motion for partial summary judgment, and at the same time Catholic Mutual filed a cross-motion for summary judgment on the Post-Abuse Impacts coverage issue. The Court in Adversary No. 09-90019 has scheduled a hearing on January 14, 2010 for CBNA's and Catholic Mutual's cross-motions.

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-
1621

DISCLOSURE STATEMENT SUPPORTING THIRD AMENDED JOINT PLAN OF REORGANIZATION    Page 57 of 120
In re *Catholic Bishop of Northern Alaska*, Case No. 08-00110-DMD

QB\9376558.4

Further, there are numerous other claims against Catholic Mutual's primary coverage, and several claims applicable to the claims made during the coverage period of July 1, 2008 to July 1, 2009. Catholic Mutual has asserted full reservation of rights with regard to indemnity coverage for these claims and has raised various coverage defenses, all of which CBNA contends are without merit.

(c)    Travelers Casualty and Surety Company, formerly known as AETNA

Travelers provided both primary and excess umbrella coverage to CBNA from April 15, 1988 through July 1, 1990. Only three claimants have asserted that they were physically abused during that coverage period. Travelers has agreed to defend CBNA with regard to the three claimants under the Travelers umbrella coverage, but under a full reservation of rights to withdraw the reference and to deny indemnity coverage to CBNA for the three claimants. Travelers has completely denied umbrella coverage to CBNA for all Post-Abuse Impacts Claimants. Like Catholic Mutual, Travelers has raised various coverage defenses, all of which CBNA contends are without merit. It is CBNA's position that the Travelers umbrella Insurance Policies include an annual $5 million aggregate coverage limit, and thus Travelers' maximum exposure under its umbrella coverage Insurance Policies is $15 million. Travelers has asserted that there are only two $5,000,000 aggregate coverage limits, so that Travelers' maximum exposure under its umbrella coverage is $10 million.

On October 9, 2009, Travelers filed a motion for summary judgment in the Comprehensive Coverage Action seeking a declaration that its umbrella policies do not cover Post Abuse Impacts and that the only claims potentially covered under Travelers' umbrella coverage are the three claims alleging that physical abuse took place during the umbrella policy period of April 15, 1988 to April 15, 1989. On November 9, 2009 CBNA filed a response to Travelers' motion and a cross-motion for summary judgment seeking a declaration that Travelers' umbrella policies cover Post Abuse Impacts. The Court in Adversary No. 08-090019 has scheduled a hearing on January 14, 2010 for Travelers' and CBNA's cross motions.

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

(d)    Assignment to Settlement Trustee

Under the Third Amended Joint Plan, CBNA will assign its claims against Catholic Mutual and Travelers to the Settlement Trustee. As described below, each Tort Claimant will be deemed to have assigned his or her Allowed Tort Claim to the Settlement Trustee so that the Claims for indemnity against Catholic Mutual and Travelers will be subject to covenant settlements, under such authority as *Great Divide Insurance Co. v. Carpenter*, 79 P.3d 599 (Alaska 2003).

Pursuant to the Third Amended Joint Plan, each Tort Claimant will be deemed to have assigned his or her Allowed Tort Claim to the Settlement Trustee (the "Assigned Allowed Tort Claim") regardless of whether such Tort Claimant votes on the Third Amended Joint Plan or votes to reject the Third Amended Joint Plan (so long as the Third Amended Joint Plan is confirmed and the Effective Date occurs). As a result of such assignment, the Settlement Trustee will succeed to all rights of the Tort Claimants against the Debtor and any Great Divide Candidate Insurer; provided, however, that any recoveries to the Settlement Trustee or any Tort Claimant with an Allowed Tort Claim against the Debtor or the Reorganized Debtor will be limited to and by the Fund, the terms of the Third Amended Joint Plan and the discharge received by the Debtor pursuant to the Third Amended Joint Plan and applicable provisions of the Bankruptcy Code. In addition, on the Effective Date, the Debtor will assign all of its rights against any Great Divide Candidate Insurer. The Settlement Trustee will also be substituted as the Plaintiff for CBNA in the Comprehensive Coverage Action and the Settlement Trustee, not CBNA, will have the right and obligation to prosecute any and all other actions against Great Divide Candidate Insurers. The proceeds of any recoveries from judgments against or settlements with any Great Divide Candidate Insurers will be paid to Settlement Trustee to be held and administered in accordance with the Third Amended Joint Plan.

(9)    Jesuit Safeco Insurance Policies Claims

CBNA is informed and believes that Safeco Insurance or one of it subsidiary or related insurance companies issues indemnity insurance to the Jesuits ("Safeco").  Because of the pervasive control of CBNA and the Fairbanks Diocese by the Jesuits and the various contractual relationships between the Jesuits, on the one hand, and the Fairbanks Diocese and/or CBNA on the other hand, CBNA believes that it may have direct claims against Safeco or any indemnity insurance policies issued by Safeco to the Jesuits.  In addition, CBNA is informed and believes that the Jesuits released all indemnity insurance coverage from Safeco when it settled with certain of the Tort Claimants in 2008.  CBNA was not a party to the settlement with the Tort Claimants nor was it a party to any agreements with Safeco.  Accordingly, CBNA is not bound by any of the agreements between CBNA and Safeco.  CBNA has informally requested copies of the Safeco indemnity or other insurance policies and the agreement between the Jesuits and Safeco; however, to date, the Jesuits have not produced those documents.

**2.    Liabilities**

a.    Great Falls Secured Claims

The Diocese of Great Falls-Billings, Montana loaned money to CBNA under the post-petition debtor-in-possession financing arrangement in the amount of $1,000,000 at seven percent (7%) interest payable over a twenty (20) year term and was granted a super-priority claim and a first priority lien on (1) fourteen and one-half (14.5) acres of raw land next to the Chancery in Fairbanks described in Section E.1.a(1) above; and (2) the Jesuit Residence, described in Section E.1.a(7) above.  No payments are due under the loan until the Court confirms a plan of reorganization in the Reorganization Case.

b.    Annuity Secured Claims

Certain individual persons have claims for charitable gift Annuities purchased by them from CBNA under a gift and bequest program.  Various donors made charitable gift annuities in exchange for which such donors are receiving certain fixed payments during their lives or the

**Quarles & Brady LLP**
One South Church Ave.
Suite 1700
Tucson, Arizona  85701-1621

lives of another person, the payments for which were fixed at the date of the gift based on actuarial tables of the donor's life expectancy and uniform gift annuity rates. Upon the individual's passing, the remainder of the gift becomes the property of CBNA. Because of the unknown nature of future mortality, CBNA is unable to precisely estimate the amounts it owed under the charitable gift Annuities; however, as of the Petition Date, it believed it had approximately $202,751.31 in such liability, secured by the property given to CBNA by the gifting individual.

   c.  Lease Related Claims & Pilgrim Springs Claims

   CBNA filed a motion to assume its leases with (1) the State of Alaska, Department of Transportation and Public Facilities for use of the aircraft hangar and land described in Section F.1.a(6), and (2) Ciunerkiurvik Corporation for use of a dormitory, offices and storage space in the village of St. Mary's, Alaska. The Hangar lease runs through May 31, 2040 and requires CBNA as lessee to make annual rental payments of $1,735.20 each. The St. Mary's lease runs through 2011 and requires CBNA to make semi-annual rental payments of $68,817.60 on January 1 and July 1 of each year.

   In regard to the Pilgrim Springs lease which was rescinded by CBNA, as landlord, following breach of the lease by the lessee, two Proofs of Claim were filed. The first, filed by PS Ltd. in the amount of $2,875,000.50, alleges damages related to the rescission of the lease. The second was filed by Louis and Nancy Green, employees of PS Ltd. (the "Green Claim"). The Green Claim alleges $263,143 in damages representing purported lost wages that they allege Pilgrim Springs would have paid to them had the lease not been rescinded. The Greens subsequently withdrew the Green Claim. The Greens recently filed an action in the Alaska Superior Court for quiet title alleging that they have succeeded to the property by adverse possession (the "Quiet Title Action"). The Quiet Title Action was brought in violation of the automatic stay of Bankruptcy Code §362. CBNA served written demand on the Greens to immediately dismiss the Quiet Title Action. The Greens have refused to dismiss the Quiet Title Action, and CBNA will file appropriate motions in the Bankruptcy Court and seek appropriate

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

DISCLOSURE STATEMENT SUPPORTING THIRD AMENDED JOINT PLAN OF REORGANIZATION   Page 61 of 120
In re *Catholic Bishop of Northern Alaska*, Case No. 08-00110-DMD
QB\9376558.4

sanctions for the Greens wilfull violation of the automatic stay.  In addition, the Greens' claims have no merit because they were never in adverse possession of the Pilgrim Springs Property. Furthermore, CBNA disputes the validity of each of these Pilgrim Springs Claims and will file an objection to them, in addition to exercising and asserting its Pilgrim Springs Setoff Claims.

> ### d.    Employee Benefit Claims and Tax Claims

On March 5, 2008, the Court granted CBNA's motion to honor its employee benefit plans with the caveat that CBNA could not cash out any accrued benefits save under a Plan of Reorganization.  As of the Petition Date, CBNA believes it owed employee benefits in the approximate amount of $346,006.80, of which amount $224,422.56 is entitled to priority treatment.  In addition to these Claims, certain employees of Parishes subsidized by CBNA may also assert General Unsecured Claims against CBNA based on accrued benefits owed to their employees.

The Internal Revenue Service also filed a Proof of Claim in the amount of $1,131.18. The Claim appears to be for a post-petition tax penalty for prepetition taxes that were paid after the Petition Date pursuant to order of the Bankruptcy Court.  CBNA will investigate this Claim to determine whether an objection should be filed.

> ### e.    Trade Debt

CBNA, as an operating religious non-profit, has incurred certain trade debt.  As of April 23, 2008 (the date of filing its Amended Schedule F), CBNA believes that it, along with CSF and KNOM, had approximately $94,126.26 in trade debt.  Additionally, CBNA believes that First National Bank of Alaska holds a General Unsecured Claim against CBNA in the approximate amount of $16,278.73; however, First National Bank filed a Proof of Claim in the Reorganization Case in the amount of $18,520.90.  To the extent the Claim includes debt incurred and paid post-petition, CBNA will object to this Claim.  Other trade creditors have filed Claims that were not scheduled by CBNA.  CBNA is investigating these Claims to determine whether an objection should be filed.  These include a Proof of Claim filed by Gear Athletics,

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

L.L.C. in relation to CSF in the amount of $1,317.99, and a Proof of Claim filed by Alpenglow, Inc., in the amount of $959.50, also in relation to CSF.

f.    Tort Claims and Future Tort Claims

As is discussed in detail below, CBNA is a party to a number of lawsuits or other Claims wherein the Claimants allege that they were abused by clergy or others associated with CBNA. These Claimants, whether or not they had filed a lawsuit against CBNA prior to the Petition Date are referred to in the Third Amended Joint Plan as Tort Claimants.  The Tort Claimants assert, among other things, that CBNA is liable because it failed to properly hire, install and/or supervise these individuals.  CBNA has denied these allegations and, to the extent that lawsuits were filed prepetition, has been defending those suits.  In addition to the Claims that were known on the Petition Date, one hundred sixty-five (165) individuals filed Proofs of Claim (collectively the "Present Tort Claims").  CBNA further believes that there may be other potential Tort Claimants for whom the statute of limitations applicable to Tort Claims had not occurred before November 2, 2008 ("Future Tort Claims").

The Court appointed Michael Murphy to represent the legal interests of the Future Tort Claimants (the "Future Claims Representative") at the joint request of CBNA and the Committee.  The Future Claims Representative filed a contingent, unliquidated Proof of Claim on April 2, 2009.

Pursuant to the Third Amended Joint Plan, the Committee and CBNA, with the concurrence of the attorneys who represent most of the Tort Claimants, resolved CBNA's liability and that resolution is now embodied in the Third Amended Joint Plan.

g.    Insurance Related Claims

As part of the Policies Existence Case, Continental asserted that because it had incurred costs defending CBNA under a reservation of rights, it had a substantial Claim against CBNA for reimbursement of such costs in the event that the Court determined that Continental had no duty to defend or indemnify CBNA.  Continental filed a Proof of Claim for these damages prior to the

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

hearing on the Disclosure Statement conducted on June 18, 2009. CBNA objected to the Proof of Claim.

As a result of having been granted summary judgment in the Policies Existence Case that there is not sufficient secondary evidence of the terms of the policies that CBNA purchased from Continental in order to establish coverage of the Tort Claims, the Court scheduled trial on whether Continental was entitled to reimbursement of defense costs for Friday, October 16, 2009. Continental also asserted a right to attorney's fees and costs from the Policies Existence Case and the Comprehensive Coverage action. CBNA intended to appeal the final judgment in the Policies Existence Case. However, in the days leading up to the October 16, 2009 damages trial, CBNA and Continental agreed in principal to a settlement that will result in a $1,200,000 Allowed Claim in favor of Continental, but which also provided for an agreed plan treatment allowing CBNA to pay Continental $75,000 in four (4) annual installments with no interest (the "Continental Claim Payment"). Continental is assigning its rights to the Continental Claim Payment to the Fund and Continental will thereby become a Participating Third Party under the Plan. In accordance with the agreement between the Committee and CBNA, the lump sum of $75,000 is included in the amount to be paid to the Fund on or about the Effective Date and CBNA will have no obligations to pay the four (4) annual installments discussed above. In addition, as part of the settlement, CBNA will not appeal any final verdict on CBNA's claims against Continental.

The settlement with Continental is being incorporated into a settlement agreement and a Bankruptcy Rule 9019 motion that will be heard at or prior to the Confirmation Hearing.

Additionally, CBNA's Insurance Companies have failed to pay the full amount of their portion of certain legal fees incurred in the Tort Claim litigation proceedings. Therefore, the law firm of Cook Schuhmann & Groseclose, Inc., CBNA's Special Litigation Counsel appointed under Bankruptcy Code §327(e) filed a Contingent Claim against CBNA in the amount of $389,123.19, the amount owed by CBNA's Insurance Companies for the defense of CBNA in the Tort Claim litigation proceedings. Based on information and belief, the Groseclose firm is in

**Quarles & Brady LLP**
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

DISCLOSURE STATEMENT SUPPORTING THIRD AMENDED JOINT PLAN OF REORGANIZATION                Page 64 of 120
In re *Catholic Bishop of Northern Alaska*, Case No. 08-00110-DMD

QB\9376558.4

fact owed approximately $191,000 on unpaid insurance reimbursement claims. The Groseclose firm's prepetition claim, if and when Allowed, will be treated as a general unsecured claim.

        h.      Society of Jesus, Oregon Province ("Jesuits")

CBNA also has liability under a Promissory Note given to the Jesuits in consideration for the purchase of the Bishop's residence in Fairbanks. As of the Petition Date, the amount of the claim was approximately $217,081.51.

Based on Proofs of Claim filed in the Reorganization Case, CBNA believes the Jesuits assert contingent and unliquidated Claims against CBNA for insurance coverage, allocation of fault, or other indemnification.

        i.      Parish Claims

As described above, certain of the subsidized Parish Communities may hold contingent, unliquidated Claims against CBNA for certain employee benefits. The Parish Churches may also hold contingent, unliquidated Claims against CBNA for future indemnification or contribution related to the Tort Claims; however, at this time, no Parish Church has filed a Proof of Claim. Moreover, any such Claims for indemnification, contribution or allocation of fault will be settled and released pursuant to the Parish Settlement Agreement.

## V.
## SIGNIFICANT EVENTS PRIOR TO THE REORGANIZATION CASE

### A.    Clarification of Fiduciary Relationships

As is discussed extensively above, CBNA has always served in the capacity of a trustee holding the legal but not the beneficial interest in certain property belonging to the Parishes and others. As CBNA became aware of decisions in the Portland Archdiocese and Spokane Diocese reorganization cases, it became clear that unnecessary confusion and litigation about the CBNA-Parish Church trustee-beneficiary relationships could arise with respect to these longstanding trustee-beneficiary relationships under the corporation sole statutes. Indeed, in the Davenport Diocese's reorganization case where, like the diocese where Bishop Kettler served as a pastor, the parishes are separately incorporated and directly hold title to their land, the controversy over

**Quarles & Brady LLP**
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

DISCLOSURE STATEMENT SUPPORTING THIRD AMENDED JOINT PLAN OF REORGANIZATION      Page 65 of 120
In re *Catholic Bishop of Northern Alaska*, Case No. 08-00110-DMD
QB\9376558.4

parish property that was so time consuming and costly was completely avoided. As fiduciaries, Bishop Kettler and CBNA believed it to be important to try to avoid any confusion about property that CBNA held as a trustee for the Parishes in the geographic territory of the Fairbanks Diocese.

On April 2, 2007, Bishop Kettler executed amended and restated Articles of Incorporation for CBNA to make clear the long-standing pre-existing trust relationship between CBNA and the Parishes with respect to property ownership. Further, each Parish recorded a "notice of beneficial interest" to further give notice of the trust relationship.

## B.    Creation of the Catholic Trust of Northern Alaska

In carrying out the oversight responsibilities of the Bishop, it has long been the policy of the Fairbanks Diocese that excess deposits of Parish Churches should be pooled for investment and management purposes. This allows the Parish Churches to obtain a greater return than they would be able to get if they separately invested their funds and also allows for more professional management of the funds. Historically, the Parish Churches' funds that were sent to CBNA as custodian and manager were deposited and invested through an investment portfolio account that was segregated from other funds held and administered by CBNA. Also, the Parish Churches and other related entities, such as FCA who participated in the program, were guaranteed a certain rate of return on their investments. The excess earnings were held in reserve in order to ensure that in times when the investments did not generate the guaranteed rate of return, there would be funds to cover the return to be paid. However, any funds in excess of the guaranteed return and not needed for reserves were to be paid to CBNA. Over the years, that reserve had built up to approximately $1,294,629.55 as of June 30, 2006.

Approximately two (2) years ago, Bishop Kettler requested that CBNA, the Finance Council of the Fairbanks Diocese and Parish administration explore whether there was another mechanism for investment of their excess funds that might better serve the Parishes. As a result, the Catholic Trust of Northern Alaska ("CTNA") was formed with George R. Elliott Jr., James Haselberger, Frederick A. Villa, Fr. Ross Tozzi, Harold Esmailka, Norman E. Schmidt and

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

Bishop Kettler, as Trustees. Each Parish with deposits signed Settlor Statements, among other things, agreeing to the terms of the CTNA and instructing CBNA to transfer of the investments from the Parish deposit accounts to CTNA. This work was completed in October 2007, even though the establishment of the CTNA and discussion regarding the manner in which the CTNA would operate, were ongoing since sometime in 2005. As both Bishop Kettler and finance director Deacon Bowder have testified, the establishment of the CTNA was simply to provide a better way for the Parish Churches' funds to be invested and managed.

None of the reserves were transferred to the CTNA, but instead were paid to and used by CBNA. CBNA provides administrative assistance to the Trustees for which it will receive a fee of approximately $7,500 to $10,000 annually. As discussed above, the Committee filed the Avoidance Action Adversary Proceeding seeking to avoid the initial transfer of funds to the CTNA as a fraudulent transfer under 11 U.S.C. § 544 or 548 or as preference under 11 U.S.C. § 547; however, as a result of the agreements embodied in the Third Amended Joint Plan, the Avoidance Action Adversary Proceeding will be dismissed with prejudice on or before the Effective Date.

## C.    CBNA's and the Fairbanks Diocese's  Response to the Sexual Abuse Crisis

Immediately after the survivors of sexual abuse began to come forward in the Fall of 2002, CBNA and the Fairbanks Diocese, under Bishop Kettler's leadership, started working and have continued to work uncompromisingly to provide a safe environment in the programs, Parishes and missions throughout the geographic territory of the Fairbanks Diocese.

The United States Conference of Catholic Bishops adopted the "Charter for the Protection of Children and Young People" in June 2002 at its meeting in Dallas (the "Charter"). As part of the Charter, the Office of Child and Youth Protection ("OCYP") was established and is responsible for assisting dioceses in implementing the Charter and ensuring the consistent application of guidelines and procedures to prevent sexual abuse of minors and properly deal with allegations of misconduct.

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona  85701-1621

In accordance with the Charter, all clergy and staff, along with volunteers working with children, youth, and vulnerable adults, undergo criminal background checks. Training in the recognition and prevention of child sexual abuse is provided to children, youth, parents, volunteers, staff and clergy. In addition, clergy and staff receive additional training in ministerial misconduct and maintaining healthy boundaries. These are critical programs which must continue to be funded and must be maintained, so that what happened decades ago cannot be allowed to happen again.

CBNA maintains a Victim's Assistance Coordinator to assist anyone who has been abused. Any current reports of abuse are promptly reported to civil law enforcement agencies. Past reports along with abuse policies are reviewed by the Child Protection Team, which is comprised of community members.

In order to measure how effectively each diocese adheres to the Charter, the OCYP developed and manages an appropriate compliance audit mechanism which is conducted by the Gavin Group, Inc., (the "Gavin Group"), an independent consulting firm founded by a retired FBI official. The implementation of Diocesan abuse prevention programs has been audited annually by the Gavin Group. CBNA is in full compliance with the norms of the Charter and has received commendations for its efforts.

## D.    The Alaska Clergy Abuse Litigation

Beginning in 2003, the first in a series of cases were filed against CBNA alleging sexual abuse committed by priests and other workers in the Roman Catholic Church in Alaska (the "Alaska Clergy Abuse Cases"). These cases have resulted in claims by approximately 150 plaintiffs. The number of plaintiffs has, from time to time, fluctuated because of settlements and dismissals.

For each of the Alaska Clergy Abuse Cases containing allegations of abuse between October 1973 and April 15, 1979, CBNA tendered defense of the claims to Continental, which CBNA believed was CBNA's primary insurer during that time period. Continental provided defense in these cases under a reservation of rights. However, on January 19, 2006, Continental

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

filed a complaint in the District Court initiating the Policies Existence Case to obtain a judicial declaration that CBNA could not offer satisfactory evidence of the issuance of various liability policies by Continental to CBNA for any policy periods from October 1973 to April 15, 1979, and to be awarded a money judgment against CBNA equal to the defense costs already advanced under a reservation of rights. As of the Petition Date, there were cross motions for summary judgment by Continental and CBNA pending before the District Court with regard to the existence of the policies CBNA contends were issued to it by Continental. The outcome and resolution of the Policies Existence Case is addressed in Section IV(1)(b)(8) above.

The Alaska State Court ordered CBNA, the plaintiffs in the Alaska Clergy Abuse Cases, as well as other co-defendants, to participate in a mediation conducted by Judge Bettinelli. Unfortunately, the parties were unable to settle the Alaska Clergy Abuse Cases. However, following the mediations, CBNA made several offers of judgment on cases implicating Alaska National, which were accepted by the plaintiffs.

In November 2007, the Jesuits, a co-defendant with CBNA in the Alaska Clergy Abuse Cases and the religious order that historically supplied all of the religious workers in the Fairbanks Diocese, including every predecessor of the current Bishop, entered into a global settlement of the sexual abuse claims against the Jesuits for an aggregate amount of $50 million. CBNA was not a part of that settlement.

In view of CBNA's limited resources, the parties' failure to resolve the pending cases outside of bankruptcy, and CBNA's desire to fairly compensate the survivors of sexual abuse, CBNA filed the Reorganization Case on March 1, 2008.

## VI.
## SIGNIFICANT EVENTS IN CHAPTER 11

The significant events that have occurred since the Petition Date are summarized as follows:

### A. First Day Motions

The Court granted CBNA's "first day" motions and entered orders:

**Quarles & Brady LLP**
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

(1) Approving adequate assurance of payment to utility companies pursuant to 11 U.S.C. § 366 and prohibiting utility service providers from altering, refusing or discontinuing services;

(2) Authorizing CBNA to continue to honor certain employee benefit plans, including those for vacation and sick pay, to retain CBNA's current employees;

(3) Authorizing CBNA to file portions of Schedule F, the Master Mailing List, and other pleadings and documents under seal;

(4) Establishing an official service list and limiting notice;

(5) Authorizing CBNA to continue its current bank accounts and current cash management system in order to avoid disruption in CBNA's business and conserve estate assets; and

(6) Granting various relief pertaining to employment and compensation of professionals (described in detail *infra*, Section VI "B").

**B.** **Employment of Bankruptcy Professionals**

CBNA filed applications to employ certain professionals to assist it with the Reorganization case. The Bankruptcy Court has entered orders approving the employment of the following professionals by CBNA:

o   The law firm of Quarles & Brady, LLP;

o   The law firm of Dorsey & Whitney, LLP;

o   The law firm of Cook, Schuhmann & Groseclose, Inc.;

o   The accounting and financial consulting firm of Keegan, Linscott & Kenon, P.C.;

o   The aircraft brokerage Northern Aircraft, Inc.;

o   The real estate firm of Robert Fox Realty, L.L.C.; and

o   The geothermal consultant Gerald W. Huttrer of the firm of Geothermal Management Company, Inc.

The United States Trustee appointed the Committee which has also filed applications to

Disclosure Statement Supporting Third Amended Joint Plan of Reorganization                    Page 70 of 120
                                                      In re *Catholic Bishop of Northern Alaska,* Case No. 08-00110-DMD
QB\9376558.4

employ professionals. The Bankruptcy Court has entered orders approving the employment of the following professionals by the Committee:

- o The financial consulting firm of J.H. Cohn;

- o The law firm of Manly & Stewart, LLP;

- o The firm of Morrow & Hensel Consulting;

- o The law firm of David H. Bundy, P.C.; and

- o The law firm of Pachulski Stang Ziehl & Jones, LLP.

CBNA and the Committee jointly moved to employ the individual Future Claims Representative, Michael Murphy, and his firm, Alix Partners, L.L.C., which employment was approved by the Court.

On CBNA's application, the Court also entered an order establishing a procedure for allowance and payment of professionals on a monthly basis during the course of the Reorganization Case. However, because of the financial circumstances of CBNA, professionals have not been receiving payment on a monthly basis.

## C.    **Establishment of Bar Date and Procedures Related to Filing Claims Under Seal**

Because of the sensitive nature of the Tort Claims, CBNA filed a motion on the Petition Date, which the Court granted, to allow filing of certain portions of Schedule F and the Master Mailing List under seal. All Proofs of Claim forms of Tort Claimants have similarly been filed under seal. CBNA has worked closely with the United States Trustee and the Committee to establish practices that ensure the confidentiality of the Tort Claimants' personal identifying information, while at the same time preserving the Claimants' right to appear and be heard.

The Court set December 2, 2008, as the date by which all claims against CBNA were to be filed. This date was extended to April 2, 2009 as to the Future Claims Representative. The Court also approved the form of notice, the Claim form to be used by Tort Claimants, and the manner in which CBNA proposed to publish, and did publish, notice and advertise in various state and national printed publications and other media.

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

**D.    Construction Motion**

On March 28, 2008, CBNA filed an "Emergency Motion to Use Restricted and Unrestricted Funds for Certain Construction Projects," which the Court granted over the Committee's objection following an evidentiary hearing.  Through the motion, CBNA sought permission to complete various projects that had begun pre-petition.  These included: (1) repairing fire damage to St. Michael Parish church in McGrath; (2) installing a water treatment system in Kalskag; (3) constructing a new church to replace an old, unsafe structure in Scammon Bay; and (4) adding an emergency exit and small private room to the church in Kotlik.  The Committee stipulated to allow the fire repairs in McGrath, and the Court granted the remainder of the disputed relief over the Committee's objection.  Recognizing the importance that donated funds be used by CBNA in accordance with the donors' intent, and the important role that CBNA plays in rural Alaskan villages through projects such as these, the Court held that the construction projects were within the ordinary course of CBNA's charitable religious operations.

**E.    Insurance and Tort Litigation**

The Court granted a motion for limited stay relief on June 27, 2008 to allow the District Court to hear oral argument on pending cross-motions for summary judgment in the Policies Existence Case.  That case was referred to the Bankruptcy Court approximately two weeks later and was currently pending as Adversary No. 08-90033.  Oral argument on the cross motions for summary judgment was heard on June 30, 2009.  The Court issued its summary judgment decision in favor of Continental on September 11, 2009.  Pursuant to the settlement discussed in Section IV(1)(b)(8) above, CBNA will not appeal the ruling of the Bankruptcy Court in the Policies Existence Case.

On April 24, 2008, CBNA filed the Comprehensive Coverage Action, seeking, among other things, a determination as to the existence and extent of its insurance coverage.  A motion to withdraw the reference was filed, but the case will remain in the Bankruptcy Court through the completion of pre-trial proceedings, which will last at least through the first half of 2010.  On March 25, 2009, the Court denied the Committee permission to intervene as a plaintiff in the

Comprehensive Coverage Action. There has been extensive discovery conducted in the Comprehensive Coverage Action, and on October 2, 2009 CBNA filed a Motion for Summary Judgment contending that: Catholic Mutual Insurance Company has breached its policy with CBNA, and that under the terms of Catholic Mutual's umbrella second level coverage during the period between April 15, 1979 and April 15, 1983, mental anguish, shock and humiliation experienced by Tort Claimants during the policy period is covered, even if the physical abuse occurred before the policy period. On October 9, 2009, Travelers filed a motion for summary judgment seeking a finding that its coverage only extends to potentially three (3) claimants that allege that they were abused during their coverage period. On November 9, 2009, CBNA filed in response in opposition to Travelers' motion and CBNA also filed a cross-motion for summary judgment against Travelers on the "Post-Abuse Impact" coverage issue.

With respect to the Comprehensive Coverage Action, the Bankruptcy Court issued a "Report and Recommendation Regarding the Defendant's Motion to Withdraw the Reference" on September 16, 2008 (the "Report"). A copy of this Report is attached hereto as Exhibit "8."

The Committee, certain Tort Claimants, and CBNA twice stipulated to extend the deadline for CBNA to remove certain actions filed by Tort Claimants in state court to the Bankruptcy Court, which relief the Court granted although, pursuant to Bankruptcy Rule 9027(a)(2)(B), the time for CBNA to remove has not yet begun.[11] Therefore, CBNA still has the option of removing the Alaska Clergy Abuse Cases to the Bankruptcy Court although in light of the resolution with the Committee and fact that the Third Amended Joint Plan is being proposed jointly by the Committee and the Debtor, CBNA does not believe that any such removal will occur.

**F.**    **Post-Petition Financing**

CBNA negotiated an agreement with Great Falls, to provide interim debtor-in-possession financing in the amount of $1,000,000, which was approved by the Court by final order entered

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

---

[11] The Stipulation specifically acknowledged that this time period had not yet begun.

December 12, 2008.  Great Falls was granted a super-priority administrative claim in exchange for such financing, as described in Section F.2.a.  The loan was used to pay certain administrative costs associated with the Reorganization Case, among other things.

### G.    The Standing Motion and Related Proceedings

On January 23, 2009, the Committee filed a motion for the Court to grant it standing to prosecute various Claims on behalf of CBNA, which, if such Claims existed, would be property of the estate (the "Standing Motion").  CBNA believed these claims were unsustainable and that the resources of the Estate were better used to compensate the Tort Claimants rather than to incur the administrative expenses necessary to pursue Claims that will ultimately be unsuccessful.  The Committee disagreed.  CBNA and the Committee attempted to mediate these issues in October, 2008, but were unsuccessful.

In the course of reviewing the Standing Motion, CBNA discovered that state court litigation counsel had violated the automatic stay.  On February 11, 2009, at CBNA's request, the Court issued an Order to Show Cause why state court litigation counsel should not be sanctioned for the stay violation.  Counsel responded in opposition to the Order to Show Cause and the matter was taken under advisement following an evidentiary hearing.  The Court issued its Memorandum Decision and Order on the matter on April 16, 2009.  The Court held that the stay had been violated and, in addition to imposing monetary sanctions, among other things, ordered the Committee to file an amended Standing Motion.  Ultimately the Committee filed an amended Standing Motion and, on September 11, 2009, the Court denied the amended Standing Motion as to all of the claims except for the avoidance action against CTNA.  As previously stated, all Claims with respect to the avoidance and other actions are being settled pursuant to the Third Amended Joint Plan and the Parish Settlement (which includes CTNA) and the Monroe Foundation Settlement.

### H.    Other Property of the Estate

The Court granted CBNA's motion to sell an aircraft and certain remote real property in western Alaska, under which CBNA was able to realize significant value for the Estate.  The

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

Court also granted CBNA's application to employ Robert Fox Realty, L.L.C. to market certain of CBNA's real property that has not yet been sold.

The Court also granted CBNA's stipulated application to extend time for it to assume or reject executory contracts and unexpired leases.

In December, 2008, the Court approved CBNA's rescission of a lease of its property known as Kruzgamepa Hot Springs Ranch or Pilgrim Hot Springs. CBNA had entered into the Lease in 1969, under which the tenant agreed to develop a resort or other business enterprise at the hot springs, to develop the geothermal potential of the property, to develop the oil and gas potential of the property, and to remit a percentage of the proceeds of these operations to CBNA. The tenant defaulted under the lease by failing to develop the property and even to maintain the structures already existing on the property. The tenant asserted, among other things, impossibility of performance which resulted in recession of the lease. CBNA intends to sell the property, for which purpose it has retained a geothermal consultant. Additionally, the Alaska Center for Energy and Power, based at the University of Alaska at Fairbanks, is currently conducting research regarding the property's potential at no expense to CBNA. CBNA also brought a motion for turnover after the former tenant refused to vacate the property and the motion was granted.

Upon learning of CBNA's plans to sell Pilgrim Hot Springs, three parties filed objections to CBNA's Disclosure Statement: (1) Louis and Nancy Green; (2) Nancy McGuire, President of Friends of Pilgrim Springs, and (3) GNL Exploration. The parties objected to sale of Pilgrim Hot Springs because, among other things, of the alleged presence of a cemetery on the property. The objecting parties also asserted various other theories regarding the salability of the Pilgrim Spring Property not supported by evidence, such as difficulties with ingress and egress and concerns about the chain of title to the property. These objections were, in substance, objections to the sale of Pilgrim Hot Springs itself, and not proper objections to the Disclosure Statement; therefore, they were overruled by the Court at a hearing on December 4, 2009.

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

## I.    **Recession Affects CBNA Income and Budgets**

CBNA has been affected by the global economic downturn the same as so many others. Specifically, as a result of the unprecedented fall in the equities markets (for example, the S&P 500 fifty-seven percent (57%) drop from its October 2007 peak), the market value of the Endowment investments had fallen thirty-two percent (32%) from their Petition Date values. Accordingly, a source of funds on which CBNA would have ordinarily relied became unavailable. CBNA's other investments have similarly suffered, and it has not realized donations at the rate it ordinarily would, as many of its donors have suffered similar economic distress. Moreover, other capital reserves had been depleted prior to the Petition Date and after, primarily to pay professional fees for defense of the State Court Actions and with respect to the Reorganization Case.  As a result, CBNA has been forced to rely more heavily on bequest income for basic operations.  Unfortunately, bequest income is less predictable than standard Alaskan Shepherd donations.  These unforeseeable decreases in income have adversely affected CBNA's ordinary operating budgets.

While CBNA's operations have always been lean, CBNA took unprecedented measures to slash its budgets to respond to these challenges as described in detail in Section IV(D) above. In addition to the steps taken by CBNA to deal with operational issues in light of its decreasing cash flow that is described in Section IV(D) above, CBNA eliminated the matched retirement contribution benefit previously offered to its employees.  As previously stated, these steps will result in approximately $400,000 per year of savings on payroll expenses.  Even with these drastic stop-loss measures, the very existence of CBNA was in danger.

Fortunately, the Endowment has regained much of the value that it lost over the winter and spring.  No one can foresee how long the current national economic crisis will persist, or whether it will worsen before it improves.  These severe economic problems caused CBNA to reconsider a plan based on major debt service obligations.

**Quarles & Brady LLP**
One South Church Ave.
Suite 1700
Tucson, Arizona  85701-
1621

**J.**     **Mediations and Settlement Negotiations**

As part of its ongoing efforts to present a consensual resolution of the Reorganization Case and facilitate confirmation of a plan of reorganization that could be supported by all significant creditor constituencies, CBNA engaged in ongoing mediations with parties essential to its Third Amended Joint Plan.   CBNA, the Committee and counsel for certain Tort Claimants engaged in several days of mediation in October 2008 ("October Mediations") regarding the extent of Estate property.   The October Mediations were conducted by Judge Bettinelli.   Unfortunately those negotiations proved unsuccessful.   The parties concluded that until the Claims Bar Date passed on December 2, 2008 and the Insurance Companies could be brought to the table, no productive mediations could take place.

Accordingly, the parties and the Court scheduled mediation secessions to be conducted by the Hon. Frank L. Kurtz, United States Bankruptcy Judge for the Eastern District of Washington, and Judge Bettinelli beginning in Seattle, Washington on April 20-23, 2009 ("April Comprehensive Mediations").   CBNA filed its initial Plan of Reorganization and Disclosure Statement in order to set forth a starting place proposal for these comprehensive negotiations.   Regrettably the parties were unable to resolve the issues.   The results of the latest mediation which resulted in the Third Amended Joint Plan are discussed in Section M below.

**K.**     **Stay Relief Proceedings.**

On September 14, 2009, eight (8) Tort Claimants filed a limited motion for relief from the automatic stay in order to release their eight claims for trial solely for purposes of conducting a jury trial in order to determine the value of their Tort Claims.   The Debtor objected.   The moving Tort Claimants responded as did Travelers.   The Committee joined in the moving Tort Claimants' response.   The Court heard argument on the motion on October 28, 2009, and took the matter under advisement.   It is expected that if the Third Amended Joint Plan is approved, there will not be a need for the Court to rule on the lift stay motion.

**L.**     **Plan & Disclosure Statement**

The Court granted CBNA's two stipulated motions to extend its exclusive period in which

**Quarles & Brady LLP**
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

to file its plan of reorganization, to allow CBNA further time to try to come to an agreement with the Committee as to a plan of reorganization. CBNA had presented a detailed term sheet to the Committee in the early stages of the Reorganization Case in the hope that the parties could agree to a plan. CBNA timely filed the First Amended Plan prior to expiration of the exclusivity deadline of March 31, 2009. CBNA's exclusivity, therefore, was automatically extended through June 15, 2009 during which period CBNA may exclusively solicit acceptance of a plan. The Debtor sought a further extension of the exclusive period in connection with its pending plan and disclosure statement. The Court further extended exclusivity through oral argument on the Disclosure Statement on June 18, 2009.

The Disclosure Statement supporting the First Amended Plan was argued on June 18, 2009. The Court extended exclusivity while it considered certain under advisement matters. The Court ruled on the objections to the First Amended Disclosure Statement requiring that the Debtor include information about its rulings on the Policy Existence Case and the Avoidance Actions Motion, and further requiring certain technical amendments. In addition, the Court extended exclusivity through November 2, 2009. No further exclusivity extensions are permitted under the statute.

On October 26, 2009 CBNA filed its Second Amended Plan of Reorganization and on October 30, 2009 filed a Disclosure Statement supporting that Plan. Finally, as a result of agreement with the Committee for plan treatment of the Tort Claimants, the Debtor and the Committee are filing the Third Amended Joint Plan and the Debtor is filing the Third Amended and Restated Disclosure Statement with respect to the Third Amended Joint Plan.

**M.** **Events Following the Filing of the Second Amended Plan.**

Following the filing of the Second Amended Plan:

- Certain Tort Claimants and the Debtor argued a motion for relief from the Automatic Stay.

- The Defendants in the Committee's Declaratory Judgment and Avoidance Action adversary proceedings filed motions to dismiss under Rule 12.

- The Committee intensified its discovery, including a review of accounting

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-
1621

DISCLOSURE STATEMENT SUPPORTING THIRD AMENDED JOINT PLAN OF REORGANIZATION          Page 78 of 120
In re *Catholic Bishop of Northern Alaska,* Case No. 08-00110-DMD
QB\9376558.4

documents in Fairbanks.

- The Debtor, the Parish Churches, the Monroe Foundation and the CTNA engaged in extensive negotiation with the Committee, including a face to face mediation conducted by Judge Bettinelli on November 13, 2009 which ultimately resulted in the settlement represented in the Third Amended Joint Plan.

## VII.
## DESCRIPTION OF THE THIRD AMENDED JOINT PLAN

Among other things, treatment of Claims is described below. However, whether or not any payment is made under the Third Amended Joint Plan on account of a Claim depends on whether it is "Allowed" by the Bankruptcy Court. A Claim may be Allowed in one of three ways- (1) it was listed in CBNA's schedules as undisputed and in a liquidated amount even if no Proof of Claim was filed by the holder of the Claim; (2) a timely Proof of Claim was filed by the holder of the Claim and no objection to the Proof of Claim was timely filed in accordance with the treatment the applicable Class of Claims; or (3) if an objection was filed to a Proof of Claim then when an order has been entered by allowing the Claim that has not been appealed, or if appealed, the appeal has been finally determined or dismissed.

The Third Amended Joint Plan proposes that it will become effective (the "Effective Date") the first Business Day which is twenty (20) days after the Bankruptcy Court enters an Order confirming the Third Amended Joint Plan, in a form and substance acceptable to the Debtor and the Committee, unless the Confirmation Order is stayed by an order of the Bankruptcy Court, the District Court or another appellate court. Nothing in the Plan precludes the date by which the Effective Date has to occur from being extended by agreement between the Committee and CBNA although there is no requirement that either the Committee or CBNA agree to any such extension. The Effective Date triggers many of the obligations of the parties under the Third Amended Joint Plan, including funding the Third Amended Joint Plan and payment of certain Claims. However, the Effective Date may occur before all Claims have been Allowed by the Bankruptcy Court and will occur before all Tort Claims have been liquidated and Allowed. Accordingly, in the description of the treatment of Claims below and in the Third

**Quarles & Brady LLP**
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621

Amended Joint Plan, the payment of Claims is, in some cases, triggered by the "Claim Payment Date" which is defined as the later of the Effective Date or the first Business Day ten (10) days after a Claim becomes an Allowed Claim by a Final Order.

## A.    Unclassified and Unimpaired Claims

The Third Amended Joint Plan identifies three types of Claims as unclassified and treats those Claims in accordance with the Bankruptcy Code and applicable law: Administrative Claims, Priority Unsecured Claims and Priority Tax Claims.  The Third Amended Joint Plan defines Administrative Claims to include any actual and necessary costs or expenses of administration under Bankruptcy Code § 503, post-petition operating expenses, professional fees and expenses approved by the Bankruptcy Court under Bankruptcy Code §§ 330 or 331, certain post-petition property tax claims and charges assessed under Chapter 123 of Title 28, United States Code.  The Third Amended Joint Plan defines Priority Unsecured Claims to include any Claim entitled to priority under Bankruptcy Code § 507 that is not an Administrative Claim, a Priority Tax Claim or a Priority Employee Unsecured Claim.  The Third Amended Joint Plan provides that Administrative and Priority Unsecured Claims will be paid in Cash in full on the Claim Payment Date, or by any alternative arrangement agreed to by the Claim holder.  The Third Amended Joint Plan defines Priority Tax Claims to include all unsecured Claims entitled to priority pursuant to Bankruptcy Code § 507(a)(8) and provides for the treatment authorized by Bankruptcy Code § 1129(a)(9)(C).

The following Classes of Claims are unimpaired by the Third Amended Joint Plan - that is to say that the Claims will be paid in full in accordance with the Claim holder's existing contractual rights:

Class 1- Priority Employee Unsecured Claims.  This Class is defined to include the Claims of CBNA employees for vacation or sick leave pay which are entitled to priority under Bankruptcy Code § 507(a)(4)(A).  These Claims will be honored in the ordinary course in accordance with CBNA's policies at the time the Claims mature.  However, the Third Amended Joint Plan does not alter CBNA's ability to review the policies and procedures regarding vacation

Quarles & Brady LLP
One South Church Ave.
Suite 1700
Tucson, Arizona 85701-1621